DISTRICT OF COLUMBIA, ss:

## DECLARATION OF STACY HAUF

I, Stacy Hauf, declare and say as follows:

1. I am an Attorney Adviser in the Office of the Legal Adviser for the Department of State, Washington, DC. This office has responsibility for extradition requests, and I am charged with the extradition case of Freddie Lee Stapleton. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States of America and the Federal Republic of Germany are found in the Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition, signed on June 20, 1978 (the "1978 Treaty"), the Supplementary Treaty to the 1978 Treaty, signed on October 21, 1986 (the "1986 Supplementary Treaty"), and the Second Supplementary Treaty to the 1978 Treaty, signed on April 18, 2006 (the "2006 Second Supplementary Treaty") (collectively, the "Treaty"). A copy of the Treaty is attached to this declaration.

3. In accordance with the provisions of the Treaty, the German Foreign Office has submitted Diplomatic Note number 506-531.00/64508, dated February 25, 2021, requesting the extradition of Freddie Lee Stapleton. A copy of the diplomatic note is attached to this declaration.

4. In accordance with Article 30 of the 1978 Treaty, the Government of the United States represents the interests of Germany in proceedings in U.S. courts arising out of extradition requests made by Germany, and Germany provides similar representation in its courts for extradition requests made by the United States.

5. The offense for which extradition is sought is covered by Article 2 of the 1978 Treaty, as amended by Article 1 of the 1986 Supplementary Treaty.

6. Under Article 29 of the 1986 Treaty, as amended by Article 6 of the 2006 Second Supplementary Treaty, documents that bear the certificate or seal of the Ministry of Justice, or

-2-

Ministry or Department responsible for foreign affairs, of the Requesting State are admissible in extradition proceedings without further certification, authentication or other legalization. Therefore, such documents satisfy the authentication requirements for extradition without the need for certification by the U.S. Embassy in Berlin. Germany, in submitting documents in the instant case that bear the certificate or seal of the Ministry of Justice, has complied with the Treaty's provision on authentication.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on July ⁶, 2021.

STACY HAUF

Attachments:

1. Copy of Note

2. Copy of the Treaty



## *Note Verbale*

The German Foreign Office presents its compliments to the Embassy of the United States of America regarding the extradition of U.S. Citizen Freddie Lee Stapleton from the United States to Germany stating the following information:

The Government of the United States is requested:

a) to extradite U.S. Citizen Freddie Lee Stapelton, born on September 15, 1957, in Brandon/United States of America, assumed to currently reside at:

> 310 Barrow Street
> Apt. - D - 1
> Pearl, Mississippi 39208

for the prosecution of the offenses stated in the arrest warrant of the Local Court of Ulm (7 Gs 984/20), dated May 19, 2020,

b) to surrender items found in the fugitive's possession if these have been obtained in connection with the offense stated in the arrest warrant or could be used as evidence,

c) to arrest and keep the fugitive detained until he is ready to be extradited,

d) to advise of the duration of the fugitive's detention as a result of the extradition request.

In addition, we would like to inform you that it is the intention to have the fugitive picked-up from the United States of America by German officials and transfer him by air to the Federal Republic of Germany at the expense of German law enforcement authorities, whereby the U.S. Government will be requested to suggest an airport which offers non-stop flights to Germany as point of transfer.

The evidence and information provided by Germany may be used for all investigative and procedural purposes, also in view of third parties, except:

a)    for the purpose of causing the conviction of a person for an offense for which the death penalty could be imposed, and

b)    for proceedings in special courts,

unless, the Federal Republic of Germany, has given their consent in advance.

The German Foreign Office takes this opportunity to renew to the Embassy of the United States of America the assurance of its highest consideration.

Berlin, February 25, 2021

(Seal)

Embassy of
the United States of America
B E R L I N



Geschäftszeichen (bitte bei Antwort angeben): 506-531.00/64508 USA

<u>DOPPEL</u>

## Verbalnote

Das Auswärtige Amt beehrt sich, der Botschaft der Vereinigten Staaten von Amerika betreffend die Auslieferung des US-amerikanischen Staatsangehörigen Freddie Lee Stapelton aus den Vereinigten Staaten von Amerika nach Deutschland Folgendes mitzuteilen:

Die Regierung der Vereinigten Staaten wird ersucht:

a) den US-amerikanischen Staatsangehörigen Freddie Lee Stapelton, geb. am 15.09.1957 in Brandon/Vereinigte Staaten von Amerika, derzeitiger Aufenthaltsort vermutlich:

> 310 Barrow Street
> Apt. - D - 1
> 39208 Pearl Mississippi,

zur Verfolgung der im Haftbefehl des Amtsgerichts Ulm (7 Gs 984/20) vom 19.05.2020 genannten Straftaten auszuliefern,

b) die im Besitz des Verfolgten vorgefundenen Gegenstände herauszugeben, soweit diese durch die im Haftbefehl genannte Tat erlangt worden sind oder als Beweismittel dienen können,

c) den Verfolgten bis zum Vollzug der Auslieferung in Auslieferungshaft zu nehmen und zu halten,

d) beim Vollzug der Auslieferung mitzuteilen, während welcher Zeit der Verfolgte infolge des Auslieferungsersuchens in Haft gehalten worden ist.

Botschaft der

Vereinigten Staaten von Amerika

B E R L I N

Ferner wird mitgeteilt, dass beabsichtigt ist, den Verfolgten von deutschen Beamten in den Vereinigten Staaten von Amerika abholen zu lassen und ihn auf Kosten der deutschen Strafverfolgungsbehörden auf dem Luftweg in die Bundesrepublik Deutschland zu überstellen, wobei die US-amerikanische Regierung gebeten wird, als Übergabeort einen Flughafen vorzuschlagen, von dem eine Non-Stop-Luftüberstellung nach Deutschland möglich ist.

Die aus Deutschland übermittelten Beweismittel und Informationen dürfen für alle Ermittlungs- und Verfahrenszwecke, auch im Hinblick auf Dritte, verwendet werden, außer

a)      für den Zweck, die Verurteilung einer Person wegen einer Straftat herbeizuführen, für welche die Todesstrafe verhängt werden könnte, und

b)      für Verfahren vor Sondergerichten,

es sei denn, die Bundesrepublik Deutschland hat vorab ihr Einverständnis erklärt.

Das Auswärtige Amt benutzt diesen Anlass, die Botschaft der Vereinigten Staaten von Amerika erneut seiner ausgezeichneten Hochachtung zu versichern.

Berlin, den 25. Februar 2021
L.S.

Botschaft der

Vereinigten Staaten von Amerika

B E R L I N

TREATY

between

The United States of America

and

the Federal Republic of Germany

Concerning Extradition

TIAS 9785

EXT-STAPLETON-00007

The United States of America

and

the Federal Republic of Germany –

desiring to provide for more effective cooperation between
the two States in the repression of crime and, specifically,
newly to regulate and thereby to facilitate the relations
between the two States in the area of extradition –

have agreed as follows:

### Article 1

Obligation to Extradite

(1) The Contracting Parties agree to extradite to each
other subject to the provisions described in this
Treaty persons found in the territory of one of
the Contracting Parties who have been charged with
an offense or are wanted by the other Contracting
Party for the enforcement of a judicially pronounced
penalty or detention order for an offense committed
within the territory of the Requesting State.

(2) When the offense has been committed outside the
territory of the Requesting State, the Requested
State shall grant extradition subject to the pro-
visions described in this Treaty if either

　　a) its laws would provide for the punishment of
　　　such an offense committed in similar circum-
　　　stances, or

EXT-STAPLETON-00008

b) the person whose extradition is requested is
a national of the Requesting State.

## Article 2

### Extraditable Offenses

(1) Extraditable offenses under this Treaty are:

a) Offenses described in the Appendix to this
Treaty which are punishable under the laws
of both Contracting Parties;

b) Offenses, whether listed in the Appendix to
this Treaty or not, provided they are punish-
able under the Federal laws of the United
States and the laws of the Federal Republic
of Germany.

In this connection it shall not matter whether or
not the laws of the Contracting Parties place the
offense within the same category of offenses or
denominate an offense by the same terminology.

(2) Extradition shall be granted in respect of an ex-
traditable offense:

a) For prosecution, if the offense is punishable
under the laws of both Contracting Parties by

TIAS 9785

EXT-STAPLETON-00009

deprivation of liberty for a maximum period
exceeding one year, or

b) For the enforcement of a penalty or a deten-
tion order, if the duration of the penalty
or detention order still to be served, or
when, in the aggregate, several such penalties
or detention orders still to be served, amount
to at least six months.

(3) Subject to the conditions set out in paragraphs
(1) and (2), extradition shall also be granted:

a) For attempts to commit, conspiracy to commit,
or participation in, an extraditable offense;

b) For any extraditable offense when, only for
the purpose of granting jurisdiction to the
United States Government, transportation,
transmission of persons or property, the
use of the mails or other means of communi-
cation or use of other means of carrying out
interstate or foreign commerce is also an
element of the specific offense.

(4) When extradition has been granted in respect of
an extraditable offense, it shall also be granted
in respect of any other extraditable offense which
would otherwise not be extraditable only by reason
of the operation of paragraph (2).

EXT-STAPLETON-00010

### Article 3

Territorial Application

(1) A reference in this Treaty to the territory of a
Contracting Party is a reference to all territory
under its jurisdiction.

(2) A reference in this Treaty to the territory of a
Contracting Party shall furthermore include its
territorial waters and airspace and vessels and
aircraft registered with the competent authority
of this Contracting Party if any such vessel is
on the high seas or if any such aircraft is in
flight when the offense is committed. For the
purpose of this Treaty an aircraft shall be con-
sidered to be in flight at any time from the moment
when all its external doors are closed following
embarkation until the moment when any such door is
opened for disembarkation.

### Article 4

Political Offenses

(1) Extradition shall not be granted if the offense in
respect of which it is requested is regarded by the
Requested State as a political offense, an offense
of a political character or as an offense connected
with such an offense.

EXT-STAPLETON-00011

(2) Extradition also shall not be granted if the Requested State has substantial grounds for believing that the request for extradition has, in fact, been made with a view to try or punish the person sought for an offense mentioned in paragraph (1).

(3) For the purpose of this Treaty the following offenses shall not be deemed to be offenses within the meaning of paragraph (1):

a) A murder or other willful crime, punishable under the laws of both Contracting Parties by a penalty of at least one year, against the life or physical integrity of a Head of State or Head of Government of one of the Contracting Parties or of a member of his family, including attempts to commit such an offense, except in open combat;

b) An offense which the Contracting Parties or the Requesting State have the obligation to prosecute by reason of a multi-lateral international agreement.

## Article 5

### Military Offenses

Extradition shall not be granted if the offense in respect of which it is requested is purely a military offense.

EXT-STAPLETON-00012

## Article 6

### Fiscal Offenses

If the competent executive authority of the Requested
State determines that an offense for which extradition
has been requested represents an offense as described
in Item No. 27 of the Appendix to this Treaty and that
extradition for such an offense would be contrary to
the public policy or other essential interests of that
State, extradition may be refused even though the offense
also falls into one of the other categories of extradi-
table offenses under this Treaty.

## Article 7

### Extradition of Nationals

(1) Neither of the Contracting Parties shall be bound
    to extradite its own nationals.  The competent ex-
    ecutive authority of the Requested State, however,
    shall have the power to grant the extradition of
    its own nationals if, in its discretion, this is
    deemed proper to do and provided the law of the
    Requested State does not so preclude.

(2) The Requested State shall undertake all available
    legal measures to suspend naturalization proceedings
    in respect of the person sought until a decision
    on the request for his extradition and, if that re-
    quest is granted, until his surrender.

TIAS 9785

EXT-STAPLETON-00013

(3) If the Requested State does not extradite its own
    national, it shall, at the request of the Requesting
    State, submit the case to its competent authorities
    in order that proceedings may be taken if they are
    considered appropriate.  If the Requested State re-
    quires additional documents or evidence, such docu-
    ments or evidence shall be submitted without charge
    to that State.  The Requesting State shall be informed
    of the result of its request.

## Article 8

### Prior Jeopardy for Same Offense

Extradition shall not be granted when the person whose
extradition is requested has been tried and discharged
or punished with final and binding effect by the com-
petent authorities of the Requested State for the
offense for which his extradition is requested.

## Article 9

### Lapse of Time

Extradition shall not be granted if at the time the Re-
quested State receives the request for extradition the
prosecution, or the enforcement of the penalty or of
the detention order, has become barred by lapse of time
under the law of the Requesting State.

EXT-STAPLETON-00014

## Article 10

Jurisdiction of the Requested State

(1) Extradition may be refused if the person sought
is proceeded against in the Requested State for
the offense for which extradition is requested.

(2) The fact that the competent authorities of the
Requested State have decided not to prosecute
the person sought for the offense for which ex-
tradition is requested or decided to discontinue
any criminal proceedings which have been initiated
shall not preclude extradition.

## Article 11

Complaint and Authorization

The obligation to extradite shall not be affected by the
absence of any complaint or any authorization as a result
of an offense if such complaint or such authorization is
required under the law of the Requested State.

## Article 12

Capital Punishment

When the offense for which extradition is requested is
punishable by death under the laws of the Requesting State

EXT-STAPLETON-00015

and the laws of the Requested State do not permit such
punishment for that offense, extradition may be refused
unless the Requesting State furnishes such assurances as
the Requested State considers sufficient that the death
penalty shall not be imposed, or, if imposed, shall not
be executed.

### Article 13

#### Extraordinary Courts

(1) An extradited person shall not be tried by an
extraordinary court in the territory of the Re-
questing State.

(2) Extradition shall not be granted for the enforce-
ment of a penalty imposed, or detention ordered,
by an extraordinary court.

### Article 14

#### Channel of Communication; Extradition Documents

(1) The request for extradition, any subsequent docu-
ments and all other communications shall be trans-
mitted through the diplomatic channel unless otherwise
provided by this Treaty.

(2) The request shall be accompanied by:

EXT-STAPLETON-00016

a) All available information concerning the
   identity and nationality of the person sought;

b) The text of all applicable provisions of law
   of the Requesting State concerning the definition
   of the offense, its punishment and the limitation
   of legal proceedings or the enforcement of penal-
   ties; and

c) A statement by a competent authority describing
   the measures taken, if any, that have interrupted
   the period of limitation under the law of the
   Requesting State.

(3) A request for the extradition of a person sought for
the purpose of prosecution shall be accompanied, in
addition to the documents provided for in paragraph
(2), by:

a) A warrant of arrest issued by a judge of the
   Requesting State and such evidence as, according
   to the law of the Requested State, would justify
   his arrest and committal for trial if the offense
   had been committed there, including evidence
   proving that the person requested is the person
   to whom the warrant of arrest refers; and

b) A summary statement of the facts of the case
   unless they appear from the warrant of arrest.

EXT-STAPLETON-00017

(4) A request for the extradition of a person sought by reason of a judgment of guilt for the imposition or enforcement of a penalty or detention order shall be accompanied, in addition to the documents provided for in paragraph (2), by:

    a) If the judgment handed down in the territory of the Requesting State contains only a determination of guilt, this judgment, confirmation that the judgment has final and binding effect and a warrant of arrest issued by a competent authority of the Requesting State;

    b) If the judgment handed down in the territory of the Requesting State contains the determination of guilt and the sentence imposed, a copy of this judgment of conviction as well as the confirmation that this judgment has final and binding effect and is enforceable and a statement of the portion of the sentence that has not been served.

(5) A witness' statement taken down in writing or other evidence, not under oath, shall be admitted in evidence as a statement made or evidence given under oath if it is certified that the person making the statement or giving the evidence was warned by a competent authority that any false, misleading or incomplete declaration would render him liable to punishment.

EXT-STAPLETON-00018

### Article 15

#### Additional Evidence

(1) If the Requested State considers that the evidence furnished in support of the request for the extradition of a person sought is not sufficient to fulfill the requirements of this Treaty, that State shall request the submission of necessary additional evidence; it may fix a time limit for the submission of such evidence and, upon the Requesting State's application, for which reasons shall be given, may grant a reasonable extension of the time limit.

(2) If the person sought is under arrest and the additional evidence or information submitted as aforesaid is not sufficient, or if such evidence or information is not received within the period specified by the Requested State, he shall be discharged from custody. However, such discharge shall not bar a subsequent request in respect of the same offense. In this connection it shall be sufficient if reference is made in the subsequent request to the supporting documents already submitted provided these documents will be available at the extradition proceedings on this subsequent request.

EXT-STAPLETON-00019

## Article 16

### Provisional Arrest

(1) In case of urgency either Contracting Party may
apply for the provisional arrest of the person sought
before the request for extradition has been submitted
to the Requested State through the diplomatic channel.
The request for provisional arrest may be made either
through the diplomatic channel or directly between
the United States Department of Justice and the Minister
of Justice of the Federal Republic of Germany.

(2) The application for provisional arrest shall state
that a warrant of arrest as mentioned in paragraph
(3) a) of Article 14, or a judgment as mentioned in
paragraph (4) a) or b) of Article 14, exists and that
it is intended to make a request for extradition. It
shall also state the offense for which extradition will
be requested and when and where such offense was com-
mitted and shall give all available information con-
cerning the description of the person sought and his
nationality.  The application shall also contain such
further information, if any, as would be necessary to
justify the issuance of a warrant of arrest in the
Requested State had the offense been committed, or
the person sought been convicted, in that State.

EXT-STAPLETON-00020

(3) On receipt of an application for provisional arrest
the Requested State shall take the necessary steps
to secure the arrest of the person sought.

(4) Provisional arrest shall be terminated if, within
a period of 40 days after the apprehension of the
person sought, the Requested State has not received
the request for extradition and the documents men-
tioned in Article 14.  This period may be extended,
upon the Requesting State's application, for up to
an additional 20 days after the apprehension of the
person sought.

(5) The termination of provisional arrest pursuant to
paragraph (4) shall not prejudice the extradition of
the person sought if the extradition request and the
supporting documents mentioned in Article 14, insofar
as they were not submitted in a timely manner, are
later delivered.  In this connection, reference may
be made to the extradition request and the supporting
documents which have already been transmitted to the
Requested State.

### Article 17

Requests for Extradition Made by Several States

(1) A Contracting Party which has received concurrently
requests for the extradition of the same person either
for the same offense, or for different offenses, from

EXT-STAPLETON-00021

the other Contracting Party and from a third State
shall make its decision having regard to all the cir-
cumstances and especially the possibility of a sub-
sequent re-extradition to another Requesting State,
the relative seriousness and place of commission of
the offenses, the nationality of the person sought
and the provisions of any extradition agreements
between the Requested State and the Requesting States.

(2) If the Requested State reaches a decision at the
same time upon extradition to one of the Requesting
States and on re-extradition to another Requesting
State, it shall communicate that decision on
re-extradition to each of the Requesting States.

## Article 18

### Simplified Extradition

If the extradition of a person sought to the Requesting
State is not obviously precluded by the laws of the Re-
quested State and provided the person sought irrevocably
agrees in writing to his extradition after personally
being advised by a judge or competent magistrate of his
rights to formal extradition proceedings and the protection
afforded by them that he would lose, the Requested State
may grant his extradition without a formal extradition
proceeding having taken place. In this case Article 22(1)
shall not be applicable.

EXT-STAPLETON-00022

## Article 19

### Decision

(1) The Requested State shall promptly communicate
to the Requesting State the decision on the request
for extradition.

(2) The Requested State shall give the reasons for any
complete or partial rejection of the request for
extradition.

## Article 20

### Delayed Decision and Surrender

The Requested State may, after a decision on the request
has been rendered by a competent court, defer the surrender
of the person whose extradition is requested, when that
person is being proceeded against or is serving a sentence
in the territory of the Requested State for a different
offense, until the conclusion of the proceedings and the
full execution of any punishment he may be or may have
been awarded.  In this case the Requested State shall
advise the Requesting State.

EXT-STAPLETON-00023

### Article 21

Surrender of the Person Sought

(1) If the extradition has been granted, surrender
of the person sought shall take place within such
time as may be prescribed by the laws of the Re-
quested State. If no time period for surrender is
prescribed by the laws of the Requested State,
surrender shall take place within 30 days from
the date on which the Requesting State has been
notified that the extradition has been granted.
The competent authorities of the Contracting
Parties shall agree on the time and place of the
surrender of the person sought.

(2) If the person sought is not removed from the terri-
tory of the Requested State within the time required
under paragraph (1), he may be set at liberty. The
Requested State may subsequently refuse to extradite
the person sought for the same offense.

(3) If circumstances beyond its control prevent a Con-
tracting Party from timely surrendering or taking
delivery of the person to be extradited, it shall
notify the other Contracting Party before the ex-
piration of the time limit. In such a case the
competent authorities of the Contracting Parties
may agree upon a new date for the surrender.

EXT-STAPLETON-00024

## Article 22

### Rule of Speciality

(1) A person who has been extradited under this Treaty
shall not be proceeded against, sentenced or de-
tained with a view to carrying out a sentence or
detention order for any offense committed prior to
his surrender other than that for which he was
extradited, nor shall he be for any other reason
restricted in his personal freedom, except in
the following cases:

a) When the State which extradited him consents
thereto.  A request for consent shall be sub-
mitted, accompanied by the documents mentioned
in Article 14 and a record established by a
judge or competent officer of the statement
made by the extradited person in respect of
the request for consent.  If under the law
of the Requesting State the issuance of a
warrant of arrest for the offense for which
extradition is sought is not possible, the
request may instead be accompanied by a
statement issued by a judge or competent
officer establishing that the person sought
is strongly suspected of having committed
the offense.

EXT-STAPLETON-00025

b) When such person, having had the opportunity to leave the territory of the State to which he has been surrendered, has not done so within 45 days of his final discharge or has returned to that territory after leaving it. A discharge under parole or probation without an order restricting the freedom of movement of the extradited person shall be deemed equivalent to a final discharge.

(2) The State to which the person has been extradited may, however, take any legal measures necessary under its law, in order to proceed in absentia, to interrupt any lapse of time or to record a statement under paragraph (1) a).

(3) If the offense for which the person sought was extradited is legally altered in the course of proceedings, he shall be prosecuted or sentenced provided the offense under its new legal description is:

a) Based on the same set of facts contained in the extradition request and its supporting documents; and

b) Punishable by the same maximum penalty as, or a lesser maximum penalty than, the offense for which he was extradited.

EXT-STAPLETON-00026

## Article 23

Re-extradition to a Third State

(1) Except as provided for in Article 22 (1) b), the
Requesting State shall not, without the consent of
the Requested State, re-extradite to a third State
a person extradited to the Requesting State and
sought by the said third State in respect of an
offense committed prior to his surrender.

(2) A request for consent to re-extradition to a third
State shall be accompanied by the documents sup-
porting the request for extradition made by the
third State, if the Requested State needs these
documents for its decision. These documents shall
conform to the documents mentioned in Article 14
of this Treaty.

## Article 24

Information on the Result of the Criminal Proceedings

The Requesting State shall upon demand inform the Re-
quested State of the result of the criminal proceedings
against the extradited person and send a copy of the
final and binding decision to that State.

EXT-STAPLETON-00027

### Article 25

Surrender of Property

(1) To the extent permitted under the laws of the
Requested State and subject to the rights of that
State or of third parties, which shall be duly re-
spected, all articles which may serve as evidence,
or which have been acquired as a result of an
offense, or have been obtained as consideration
for such articles, and which at the time of the
arrest are found in the possession of the person
sought or are discovered subsequently, shall be
surrendered if extradition of the person sought
is granted.  Surrender of such articles shall be
possible even without any special request and,
if possible, at the same time that the person
sought is surrendered.

(2) Subject to the conditions provided in paragraph
(1), the articles mentioned therein shall be
surrendered even if the person sought cannot be
surrendered owing to his death or escape.

(3) The Requested State may condition the surrender
of articles upon a satisfactory assurance from
the Requesting State that the articles will be
returned to the Requested State as soon as possible.

EXT-STAPLETON-00028

### Article 26

Transit

(1) Transit of a person who is the subject of extra-
dition from a third State through the territory
of a Contracting Party to the territory of the
other Contracting Party shall be granted on sub-
mission of a request, provided that the offense
concerned is an extraditable offense under Article
2 and that the Contracting Party requested to
grant transit does not consider the offense to be
one covered by Articles 4 or 5.

(2) Transit of a national of the Requested State
may be refused if, in the opinion of that State,
it is inadmissible under its law.

(3) Subject to the provisions of paragraph (4), the
request for transit must be accompanied by a
warrant of arrest issued by a judge or competent
officer of the Requesting State and by a statement
as mentioned in Article 14 (3) b).

(4) If air transport is used, the following provisions
shall apply:

EXT-STAPLETON-00029

a) When no intermediate stop is foreseen, the
Contracting Party requesting transit shall
notify the other Contracting Party, certify
that one of the documents mentioned in
Article 14, paragraph (3) a) or paragraph
(4) a) or b) exists, and state whether
the person whose transit is being notified
is a national of the Contracting Party over
the territory of which the flight is to be
made. In the case of an unscheduled landing
such notification shall have the effect of
a request for provisional arrest as provided
for in Article 16; thereafter a formal re-
quest for transit shall be made.

b) When an intermediate stop is planned, the
Contracting Party requesting transit shall
submit a formal request for transit.

### Article 27

#### Applicable Law

Except where this Treaty otherwise provides, the law
of the Requested State shall be applicable with respect
to provisional arrest, extradition and transit.

EXT-STAPLETON-00030

## Article 28

### Language to be Used

The documents transmitted in the application of this Treaty shall be in the language of the Requesting State accompanied by a certified translation into the language of the Requested State.  The expense of translation shall be borne by the Requesting State.

## Article 29

### Certification

A warrant of arrest and depositions or other evidence, given on oath or in a manner described in Article 14 (5), and the judgment of conviction and of the sentence, if it has been passed, or certified copies of these documents, shall be admitted in evidence in the examination of the request for extradition when:

a) In the case of a request emanating from the Federal Republic of Germany, they are signed by a judge or competent officer, are authenticated by the official seal of the Federal Minister of Justice and are certified by the competent diplomatic or consular officer of the United States in the Federal Republic of Germany, or

EXT-STAPLETON-00031

b) In the case of a request emanating from the
United States, they are signed by a judge
or competent officer, are authenticated by
the official seal of the Department of State
and are certified by the competent diplomatic
or consular officer of the Federal Republic
of Germany in the United States.

## Article 30

### Expenses

Expenses arising from the transportation of a person
sought to the Requesting State shall be borne by that
State.  No other pecuniary claim arising from an extra-
dition or a transit request shall be made by the Re-
quested State against the Requesting State.  The
appropriate legal officers of the State in which the
extradition proceedings take place shall, by all legal
means within their power, assist the Requesting State
before the competent judges and officers.

## Article 31

### Scope of Application

This Treaty shall apply to offenses encompassed by
Article 2 committed before as well as after the date
this Treaty enters into force.  Extradition shall not
be granted, however, for an offense committed before
this Treaty enters into force which was not an offense
under the laws of both Contracting Parties at the time
of its commission.

EXT-STAPLETON-00032

### Article 32

Definitions

For the purpose of this Treaty, the term

a) "Penalty" means deprivation of liberty as a
result of a sentence upon conviction for an
offense;

b) "Detention order" means any order involving
deprivation of liberty which has been made by
a criminal court in addition to or instead of
a penalty.

### Article 33

Berlin Clause

(1) This Treaty shall also apply to Land Berlin pro-
vided that the Government of the Federal Republic
of Germany does not make a contrary declaration to
the Government of the United States of America
within three months of the date of entry into force
of this Treaty.

(2) Upon the application of this Treaty to Land Berlin,
references in the Treaty to the Federal Republic of
Germany or to the territory thereof shall be deemed
also to be references to Land Berlin.

EXT-STAPLETON-00033

### Article 34

Ratification; Coming Into Force; Denunciation

(1) This Treaty shall be subject to ratification; the instruments of ratification shall be exchanged in Washington, D.C., as soon as possible.

(2) This Treaty shall enter into force 30 days after the exchange of the instruments of ratification.[1]

(3) Between the Contracting Parties this Treaty shall terminate and replace the Extradition Treaty between the United States of America and Germany signed at Berlin July 12, 1930.[2]

(4) This Treaty shall continue in force until the expiration of one year from the date on which written notice of termination is given by one Contracting Party to the other.

Done at Bonn this 20th day of June, 1978, in duplicate in the English and German languages, both texts being equally authentic.

For the                          For the
United States of America         Federal Republic of Germany

*[signature]* [3]    *[signature]* [4]

*[signature]* [5]

---

[1] Aug. 29, 1980.
[2] TS 836; 47 Stat. 1862.
[3] Walter J. Stoessel, Jr.
[4] Guenther Van Well.
[5] Guenther Erkel.

TIAS 9785

## APPENDIX

1. Murder.

2. Manslaughter.

3. Aggravated wounding, injury, or assault, even when loss of life results; wounding or injuring with intent to cause grievous bodily harm.

4. Illegal abortion.

5. Kidnapping; abduction; false imprisonment; child-stealing.

6. Rape, indecent assault; incest; bigamy.

7. Unlawful sexual acts with or upon children under the age specified by the laws both of the Requesting and Requested States.

8. Procuration.

9. Libel.

10. Willful non-support or willful abandonment of a minor or other dependent person when by reason of such non-support or abandonment the life of that minor or other dependent person is or is likely to be endangered.

11. Robbery; larceny; burglary; embezzlement; extortion.

12. Malicious damage to property.

13. Fraud, including offenses against the laws relating to the unlawful obtaining of money, property or securities, to fiduciary relationships or to exploitation of minors.

EXT-STAPLETON-00035

14. Offenses against the laws relating to forgery, including the making of forged documents or records, whether official or private, or the uttering or fraudulent use of such documents or records.

15. Receiving, possessing, or transporting for personal benefit any money, valuable securities, or other property, knowing the same to have been unlawfully obtained.

16. Offenses relating to counterfeiting.

17. Perjury, including subornation of perjury; false statements, either written or oral, whether or not under oath, made to a judicial authority or to a government agency or office.

18. Arson.

19. Unlawful obstruction of juridical proceedings or proceedings before governmental bodies or interference with an investigation of a violation of a criminal statute, by influencing, bribing, impeding, threatening, or injuring by any means any officer of the court, juror, witness, or duly authorized criminal investigator.

20. a) Unlawful abuse of official authority which results in bodily injury or deprivation of life, liberty or property of any person.

    b) Unlawful injury or intimidation in connection with, or interference with, voting or candidacy for public office, jury service, government employment, or the receipt or enjoyment of benefits provided by government agencies.

EXT-STAPLETON-00036

21. Facilitating or permitting the escape of a person from custody; prison mutiny.

22. Offenses against the laws relating to bribery.

23. Offenses against the laws relating to civil disorders.

24. Offenses against the laws relating to illegal gambling enterprises.

25. Any act willfully jeopardizing the safety of any person traveling upon a railway or in any aircraft or vessel or other means of transportation.

26. Piracy, by statute or by the law of nations; mutiny or revolt aboard an aircraft or vessel against the authority of the captain or commander of such aircraft or vessel; any seizure or exercise of control, by force or violence or threat of force or violence, of an aircraft or vessel.

27. a) Offenses against the laws relating to importation, exportation or transit of goods, articles, or merchandise.

    b) Offenses relating to willful evasion of taxes and duties.

    c) Offenses against the laws relating to international transfers of funds.

28. Offenses against the bankruptcy laws.

29. Offenses against the laws relating to narcotic drugs, Cannabis sativa L., Hallucinogenic drugs, cocaine and its derivatives, and other dangerous drugs and chemicals.

30. Offenses against the laws relating to the illicit manufacture of or traffic in poisonous chemicals or substances injurious to health.

EXT-STAPLETON-00037

31. Offenses against the laws relating to firearms, ammunition, explosives, incendiary devices or nuclear materials.

32. Offenses against the laws relating to the sale or transportation or purchase of securities or commodities.

33. Any other act for which extradition may be granted in accordance with the laws of both Contracting Parties.

EXT-STAPLETON-00038

PROTOCOL

At the time of signing this day of the Extradition
Treaty between the United States of America and the
Federal Republic of Germany the undersigned plenipoten-
tiaries have agreed that Article 4(3)(b) of the Treaty
and Item No. 20(b) of the Appendix thereto are to be
interpreted as follows:

(1) With respect to the interpretation of Article
4(3)(b) the Contracting Parties mutually agree that
at the time of the conclusion of the Treaty, this
provision has reference, for example, to the Conven-
tion for the Suppression of Unlawful Seizure of
Aircraft of December 16, 1970,[1] the Convention for
the Suppression of Unlawful Acts Against the Safety
of Civil Aviation of September 23, 1971,[2] and the
Convention on the Prevention and Punishment of
Crimes Against Internationally Protected Persons
including Diplomatic Agents of December 14, 1973.[3]

(2) The Contracting Parties mutually agree to interpret
Item No. 20(b) of the Appendix to the Treaty as
meaning that the terms "jury service" and "ehren-
amtlicher Richter" apply to persons who in the
legal practice of both Contracting Parties have
corresponding functions (in the United States of
America: members of a jury; in the Federal Republic
of Germany: members of a court who are not judges by
profession).

---

[1] TIAS 7192; 22 UST 1641.
[2] TIAS 7570; 24 UST 564.
[3] TIAS 8532; 28 UST 1975.

Done at Bonn this 20th day of June, 1978, in duplicate in the English and German languages, both texts being equally authentic.

For the
United States of America

For the
Federal Republic of Germany

EXT-STAPLETON-00040

SUPPLEMENTARY TREATY TO THE TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE FEDERAL REPUBLIC OF GERMANY CONCERNING EXTRADITION

*The United States of America and the Federal Republic of Germany,*

*Desiring* to make more effective the Treaty of June 20, 1978 between the United States of America and the Federal Republic of Germany concerning Extradition (hereinafter referred to as "the Extradition Treaty"),

*Have agreed as follows:*

### ARTICLE 1

(a) Article 2, paragraph (1) of the Extradition Treaty is amended to read as follows:

"(1) Extraditable offenses under the Treaty are offenses which are punishable under the laws of both Contracting Parties. In determining what is an extraditable offense it shall not matter whether or not the laws of the Contracting Parties place the offense within the same category of offense or denominate an offense by the same terminology, or whether dual criminality follows from Federal, State or Laender laws. In particular, dual criminality may include offenses based upon participation in an association whose aims and activities include the commission of extraditable offenses, such as a criminal society under the laws of the Federal Republic of Germany or an association involved in racketeering or criminal enterprise under the laws of the United States."

(b) Article 6 of the Extradition Treaty is amended to read as follows:

"Extradition may be refused for offenses in connection with taxes, duties, customs and exchange if the competent executive authority of the Requested State determines that extradition for any such offense would be contrary to the public policy or other essential interests of the Requested State."

(c) The Appendix to the Extradition Treaty is hereby deleted.

### ARTICLE 2

Article 4, paragraph (3) of the Extradition Treaty is amended to read as follows:

"For the purpose of this Treaty the following offenses shall not be deemed to be offenses within the meaning of paragraph (1):

(a) an offense for which both Contracting Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit his case to their competent authorities for decision as to prosecution;

(b) murder, manslaughter, maliciously wounding, or inflicting grievous bodily harm;

(1)

(c) kidnapping, abduction, or any form of unlawful detention, including taking a hostage;

(d) placing or using an explosive, incendiary or destructive device capable of endangering life, or of causing grievous bodily harm, or of causing substantial property damage;

(e) an attempt or conspiracy to commit, or participation in, any of the foregoing offenses."

### ARTICLE 3

The title of Article 20 of the Extradition Treaty is amended to read as follows: "Temporary or Deferred Surrender." The text of Article 20 is renumbered to become Article 20, paragraph (1), and the following text is inserted as Article 20, paragraph (2):

"(2) Alternatively, the Requested State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution. The person so surrendered shall be kept in custody in the Requesting State and shall be returned to the Requested State after conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the Contracting Parties."

### ARTICLE 4

This Supplementary Treaty shall apply to any offense committed, and to any request made, or to any person found extraditable, before or after this Supplementary Treaty enters into force, provided that this Supplementary Treaty shall not apply to an offense committed before this Supplementary Treaty enters into force which was not an offense under the laws of both Contracting Parties at the time of its commission.

### ARTICLE 5

(1) This Supplementary Treaty shall also apply to Land Berlin provided that the Government of the Federal Republic of Germany does not make a contrary declaration to the Government of the United States of America within three months of the date of entry into force of this Supplementary Treaty.

(2) Upon the application of this Supplementary Treaty to Land Berlin, references in the Supplementary Treaty to the Federal Republic of Germany or to the territory thereof shall be deemed also to be references to Land Berlin.

### ARTICLE 6

(1) This Supplementary Treaty shall form an integral part of the Extradition Treaty.

(2) This Supplementary Treaty shall be subject to ratification and the instruments of ratification shall be exchanged at Bonn as soon as possible. It shall enter into force upon the exchange of instruments of ratification. It shall be subject to termination in the same manner as the Extradition Treaty.

In witness whereof, the undersigned, being duly authorized thereto by their respective Governments, have signed this Supplementary Treaty.

Done at Washington this twenty-first day of October 1986, in duplicate, in the English and German languages, both texts being equally authentic.

FOR THE UNITED STATES
OF AMERICA:

*George P. Shultz*

FOR THE FEDERAL REPUBLIC
OF GERMANY:

*[signature]*

Second Supplementary Treaty

to

the Treaty between the United States of America

and

the Federal Republic of Germany

Concerning Extradition

EXT-STAPLETON-00044

The Government of the United States of America

and

the Government of the Federal Republic of Germany,

As contemplated by Article 3, paragraph (2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003 (hereafter "the U.S.-EU Extradition Agreement"),

Acknowledging that in accordance with the provisions of this Second Supplementary Treaty, the bilateral Treaty between the United States of America and the Federal Republic of Germany Concerning Extradition signed 20 June 1978 as amended by the Supplementary Treaty to the Treaty between the United States of America and the Federal Republic of Germany Concerning Extradition signed 21 October 1986 (hereafter referred to as "the bilateral extradition treaty") is applied in the manner set forth in Article 3 of the U.S.-EU Extradition Agreement,

Have agreed as follows:

## Article 1

Pursuant to Article 13 of the U.S.- EU Extradition Agreement, Article 12 of the bilateral extradition treaty is amended to read as follows:

"Article 12

Capital Punishment

Where the offense for which extradition is sought is punishable by death under the laws in the Requesting State and not punishable by death under the laws in the Requested State, the Requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or if for procedural reasons such condition cannot be complied with by the Requesting State, on condition that the death penalty if imposed shall not be carried out. If the Requesting State accepts extradition subject to conditions pursuant to this Article, it shall comply with the conditions. If the Requesting State does not accept the conditions, the request for extradition may be denied."

Article 2

Pursuant to Article 14 of the U.S.- EU Extradition Agreement, the following text is inserted into the bilateral extradition treaty as Article 15 bis:

"Article 15 bis

Sensitive information in a request

Where the Requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the Requested State to determine the extent to which the information can be protected by the Requested State. If the Requested State cannot protect the information in the manner sought by the Requesting State, the Requesting State shall determine whether the information shall nonetheless be submitted."

Article 3

Pursuant to Article 6 of the U.S.-EU Extradition Agreement, the following text is added to the bilateral extradition treaty as the final sentence of Article 16, paragraph (1):

EXT-STAPLETON-00046

"The facilities of the International Criminal Police Organization (Interpol) may be used to transmit such a request."

## Article 4

Pursuant to Article 7 of the U.S.- EU Extradition Agreement, the following text is inserted into the bilateral extradition treaty as Article 16, paragraph (5):

"(5) The Requesting State may satisfy its obligation to transmit its request for extradition and supporting documents through the diplomatic channel pursuant to Article 14, paragraph (1), by submitting the request and documents to the Embassy of the Requested State located in the Requesting State. In that case, the date of receipt of such request by the Embassy shall be considered to be the date of receipt by the Requested State for purposes of applying the time limit that must be met under paragraph (4) of the present Article to enable the person's continued detention. "

The current paragraph (5) is renumbered to become paragraph (6).

## Article 5

Pursuant to Article 10 of the U.S.- EU Extradition Agreement, Article 17 of the bilateral extradition treaty is amended to read as follows:

## "Article 17
### Requests for Extradition or Surrender Made by Several States

(1) If the Requested State receives requests from the Requesting State and from any other State or States for the extradition of the same person either for the same offense or for different offenses, or if the Federal Republic of Germany receives an extradition

request from the United States of America and a request for surrender pursuant to the European arrest warrant for the same person, either for the same offense or for different offenses, the competent authority of the executive branch of the Requested State shall determine to which State, if any, it will surrender the person.

(2) In making its decision under paragraph (1) of this Article, the Requested State shall consider all of the relevant factors, including, but not limited to, the following:

    a)  whether the requests were made pursuant to a treaty;

    b)  the places where each of the offenses was committed;

    c)  the respective interests of the Requesting States;

    d)  the seriousness of the offenses;

    e)  the nationality of the victim;

    f)  the nationality of the person sought;

    g)  the possibility of any subsequent re-extradition between the Requesting States; and

    h)  the chronological order in which the requests were received from the requesting States.

(3) If the Requested State reaches a decision at the same time upon extradition to one of the Requesting States and on re-extradition to another Requesting State, it shall communicate that decision on re-extradition to each of the Requesting States."

Article 6

Pursuant to Article 5, paragraph (2) of the U.S.- EU Extradition Agreement, Article 29 of the bilateral extradition treaty is amended to read as follows:

"Article 29
Certification

Documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization. "Ministry of Justice" shall, for the United States of America, mean the United States Department of Justice; and, for the Federal Republic of Germany, the Federal Ministry of Justice."

Article 7

(1) In accordance with Article 16 of the U.S.-EU Extradition Agreement, this Supplementary Treaty shall apply to offenses committed before as well as after it enters into force.

(2) This Supplementary Treaty shall not apply to requests for extradition made prior to its entry into force.

Article 8

(1) This Supplementary Treaty shall form an integral part of the bilateral extradition treaty.

(2) This Supplementary Treaty shall be subject to the completion by the United States of America and the Federal Republic of Germany of their respective applicable internal procedures for entry into force. The Contracting Parties shall thereupon notify each other that such internal procedures have been completed.

(3) This Supplementary Treaty shall enter into force on the date of entry into force of the U.S.-EU Extradition Agreement.

(4) In the event of termination of the U.S.-EU Extradition Agreement, this Supplementary Treaty shall be terminated.

DONE at Washington, this 16 day of April 2006, in duplicate, in the English and German languages, both texts being equally authentic.

For the Government of the
United States of America:

For the Government of the
Federal Republic of Germany:



# Baden-Württemberg

STAATSANWALTSCHAFT ULM

DER LEITENDE OBERSTAATSANWALT

Staatsanwaltschaft Ulm · Postfach 38 63 · D-89028 Ulm

| | |
|---|---|
| Datum | 28. August.2020 |
| Name | Christof Lehr |
| Durchwahl | ++49 731 189 1000 |
| Aktenzeichen | 11 Js 19684/13 |
| | (Bitte bei Antwort angeben) |

An die
zuständige Justizbehörde der
Vereinigten Staaten von Amerika

**Internationale Rechtshilfe in Strafsachen**

**hier: Auslieferungsersuchen an die Vereinigten Staaten von Amerika
des Freddie Lee Stapelton, geboren am 15. September 1957 in Brandon,
Vereinigte Staaten von Amerika**

**Anlagen**
1 CD der aufgearbeiteten Fallakte
1 beglaubigte Übersetzung der aufgearbeiteten Fallakte
1 beglaubigter Abdruck des Haftbefehls des Amtsgerichts Ulm, Deutschland, vom
19. Mai 2020 (nebst beglaubigter Übersetzung)

**Fallübersicht**

in dem Ermittlungsverfahren gegen Freddie Lee Stapelton wegen versuchten Mordes
Staatsanwaltschaft Ulm – Aktenzeichen 11 Js 19684/13

Mein Name ist Christof Lehr, ich bin 60 Jahre alt und lebe in Ulm, Deutschland. Ich bin
Leitender Oberstaatsanwalt der Staatsanwaltschaft in Ulm, Deutschland. Seit 01. September
1994 habe ich bei der Staatsanwaltschaft Ulm das Amt des Staatsanwalts des
Landes Baden-Württemberg inne. Am 31. Mai 2010 hat mich das Bundesland Baden-
Württemberg zum Leitenden Oberstaatsanwalt befördert. Ich arbeite in dieser Funktion
seit dem 01. Februar 2013 für die Staatsanwaltschaft Ulm.

EXT-STAPLETON-00051

In dieser Eigenschaft führe ich ein Ermittlungsverfahren gegen den amerikanischen Staatsangehörigen Freddie Lee Stapelton. Nach unseren Ermittlungen ist Freddie Lee Stapelton dringend tatverdächtig, am späten Abend des 23. Oktober 1985 gegen 22.20 Uhr im Bereich der Nördlichen Ringstraße in der Innenstadt von Göppingen, Baden-Württemberg, Deutschland, eine damals 29 Jahre deutsche Staatsangehörige mit einem Messer überfallen und sodann vergewaltigt zu haben. Im Anschluss soll er seinem Opfer mit einem Holzknüppel drei kräftige Schläge gegen den Kopf versetzt haben, um diese zu töten und so zu verhindern, dass die Frau ihn als Täter der zuvor begangenen Vergewaltigung identifizieren kann. Sodann soll Freddie Lee Stapelton, der davon ausging, dass sein Opfer tot ist, dieses in den Kofferraum seines Fahrzeugs geladen und an einer Landstraße in Göppingen-Hohrein in einen Straßengraben geworfen und mit Ästen und Laub bedeckt haben. Das Tatopfer überlebte schwer verletzt.

**1. Zu dem Tatvorwurf im Einzelnen:**

Am späten Abend des 23. Oktober 1985 wurde die damals 29 Jahre deutsche Staatsangehörige S      A      -G      gegen 22.20 Uhr auf dem Heimweg von einem Nähkurs im Bereich der Nördlichen Ringstraße in Göppingen, Baden-Württemberg, Deutschland, auf Höhe einer Parkanlage im Bereich des dortigen Stadtbades von einem Farbigen überfallen, der sich ihr von hinten genähert hatte und sie mit einem ungefähr 25 Zentimeter langen Messer bedrohte. Der Täter zerrte sie in die Parkanlage und begann sie unter Gewaltanwendung auszuziehen. Die Geschädigte schrie um Hilfe und versuchte sich zunächst gegen den Angriff zu wehren, wobei sie den Täter in die Hand biss. Hierdurch fügte sie dem Täter eine blutende Wunde an der Hand zu. Nachdem der Täter - auch mit seiner blutenden Hand - die Geschädigte bis auf Bluse und Unterhemd entkleidet, sie dabei am Hals gewürgt und ihr wiederholt mit den Fäusten ins Gesicht geschlagen hatte, vergewaltigte er sie mehrfach vaginal und anal.

Sodann entfernte sich der Täter kurzzeitig und kehrte mit einem Holzknüppel zurück. Er schlug mit diesem mindestens dreimal heftig und gezielt in der Absicht, die Frau zu töten, um sie als Zeugin auszuschalten und so seine Identifizierung als Täter der Vergewaltigung zu verhindern, auf den Kopf der Geschädigten, die am Boden liegen geblieben und sich aus Angst vor weiteren Übergriffen durch den Täter totgestellt hatte. Als sich der Täter wieder entfernte blieb die Geschädigte erneut regungslos liegen, da sie nunmehr aufgrund ihres körperlichen Zustands nahezu bewusstlos war und zudem annahm, der Täter halte sich noch in der Nähe auf. Dieser kehrte kurze Zeit später mit einem Personenkraftwagen zurück, schleppte die Geschädigte, die er für tot hielt, in das Fahrzeug und fuhr mit ihr in die Gegend von Göppingen-Hohrein (Entfernung vom

Tatort je nach Fahrtstrecke zwischen 6,4 und 6,8 Kilometer), wo er sie in einen Straßengraben warf und ihren Körper mit Ästen und Laub zudeckte. Nachdem sich der Täter entfernt hatte, erwachte die jungen Frau und schleppte sich schwer verletzt zu einem nahegelegenen Anwesen des Zeugen Hägenläuer, von wo aus die Polizei verständigt wurde.

Aufgrund der Verletzungen der Geschädigten und er von ihr geschilderten Umstände - insbesondere der Heftigkeit und Zielrichtung der Schläge mit einem festen Gegenstand auf den Kopf des Opfers, welches der Täter sodann ganz offensichtlich für tot hielt und in einem Versteck ablegte - muss davon ausgegangen werden, dass der Täter die Geschädigte töten wollte, damit diese bei der Polizei keine Angaben machen kann, die zur Aufklärung der Tat und der Feststellung seiner Täterschaft führen.

Die Geschädigte erlitt einen Bruch der 6. und 7. Rippe, einen Riss des linken Trommelfells, eine Platzwunde an der linken Stirn und Schläfenseite, 2 Würgemale linksseitig am Kehlkopf und einen Bluterguss rechtsseitig am Kehlkopf sowie Schwellungen und Schürfwunden am Körper.

Nach den Angaben der Geschädigten handelte es sich bei dem Täter um einen nicht ganz schwarzen Farbigen, etwa 175 Zentimeter groß, 28 bis 32 Jahre alt, schlank mit schmalem Gesicht, kurze krause Haare und leicht wulstige Lippen. Der Täter habe deutsch mit amerikanischem Akzent gesprochen. Überdies gab die Geschädigte an, dass der Täter stark nach Alkohol gerochen habe.

## 2. Dringender Tatverdacht

a)
Der oben beschriebene Tatablauf ergibt sich zunächst aus den Vernehmungen der Geschädigten, welche unmittelbar nach der Tat durchgeführt wurden. Die Geschädigte beschrieb in ihrer Vernehmung den Täter und dessen Bekleidung wie folgt:

- nicht ganz schwarzer Farbiger,
- etwa 175 Zentimeter groß,
- etwa 28 bis 32 Jahre alt,
- schlank mit schlankem Gesicht, der Kopf wirkte im Verhältnis zum Körper eher kleiner,
- kurze, krause Haare mit leichtem Kotelettenansatz,
- Lippen leicht wulstig,
- kleine Ohren,
- feingliederige Finger,

- er habe eine rote blousonartige Jacke getragen,
- der Täter habe deutsch mit amerikanischem Akzent gesprochen und stark nach Alkohol gerochen.

b)

Im Rahmen einer ärztlichen Untersuchung konnten bei der Geschädigten die oben näher bezeichneten Verletzungen festgestellt werden. Des Weiteren konnten bei einer gynäkologischen Untersuchung der Geschädigten Spermien in deren Vagina festgestellt werden, nicht dagegen in deren Anus.

c)

Am Tatort konnte ein zerbrochender Holzknüppel mit einem Durchmesser von 3 cm aufgefunden werden. An diesem befanden sich Blutantragungen, welche von der Geschädigten stammten. Die Geschädigte hatte in ihrer Vernehmung von einem mutmaßlich metallenen Gegenstand in Rohrform gesprochen, mit welchem auf sie eingeschlagen worden sei.

Ferner konnten am Tatort folgende Gegenstände festgestellt werden:

- Brille der Geschädigten
- Tasche der Geschädigten
- Mantelknöpfe vom Mantel der Geschädigten.

An der Kreisstraße 1407 bei Göppingen-Hohrein - wenige hundert Meter vom Anwesen des Zeugen Hägenläuer entfernt - konnten Kleidungsstücke der Geschädigten aufgefunden werden. Im linken Graben, unmittelbar neben einem Straßenleitpfosten und den dortigen Baumstämmen wurden folgende Gegenstände der Geschädigten aufgefunden:

- Mantel
- Mohairpulli
- Hosenrock
- Halbschuhe.

Etwas oberhalb der Kleidungsstücke wurde die abgerissene Uhr der Geschädigten aufgefunden. Im Geäst der dortigen Bäume hing die Strumpfhose der Geschädigten. Auf der gegenüberliegenden Wiese wurde überdies die blutverschmierte Unterhose der Geschädigten aufgefunden. Ferner wurden auf der Straße auf Höhe der Kleidungsstücke mehrere Bluttropfen festgestellt.

Die Zeugin Rosemarie Kübler, welche nach eigenen Angaben am Tatabend die Geschädigte auf dem Weg zum Nähkurs begleitet hatte, gab an, dass die Geschädigte am Tatabend u.a. einen Hosenrock, eine weiße Bluse, eine Mohairstrickweste sowie einen dunkelblauen Gabardinemantel und Halbschuhe getragen habe.

d)

Der Zeuge Eugen Hägenläuer berichtete, wie die Geschädigte am 24. Oktober 1985 gegen 0.45 Uhr blutüberströmt bei ihm geklingelt und um Hilfe gebeten habe. Die Geschädigte sei zu diesem Zeitpunkt nur mit einer zerrissenen Bluse und einem Schal bekleidet gewesen. Am Hinterkopf der Geschädigte konnte ein Laubblatt festgestellt werden.

Der Zeuge Thomas Mayer, welcher sich zur Tatzeit im Bereich des Tatorts aufhielt, hörte Hilferufe, konnte jedoch von seinem Standpunkt aus keine weiteren Beobachtungen machen.

Der Ehemann der Geschädigten schilderte in Übereinstimmung mit den Angaben der Geschädigten, dass der letzte gemeinsame Geschlechtsverkehr mehr als zwei Wochen vor der Tat stattgefunden habe.

e)

Die Hautfarbe des Täters in Verbindung mit dessen von dem Tatopfer beschriebenem amerikanischen Akzent legte die Möglichkeit nahe, dass es sich bei dem Täter um einen amerikanischen Staatsangehörigen handeln könnte. Hinzu kommt, dass seinerzeit vergleichsweise viele amerikanische Soldaten in Deutschland - nicht nur in Göppingen, sondern auch an anderen Standorten in Baden-Württemberg und den umliegenden Bundesländern - stationiert waren. Vor diesem Hintergrund konzentrierten sich die Ermittlungen zunächst auf farbige US-Soldaten, ohne dass jedoch Farbige anderer Staatszugehörigkeit aus dem Blick verloren wurden.

Da nach den Aussagen der Geschädigten und den am Tatort gesicherten Blutspuren davon auszugehen war, dass der Täter eine Bissverletzung an einer Hand erlitten hatte, wurden zunächst in den US-Kasernen in Göppingen und dem nahegelegenen Schwäbisch Gmünd sämtliche erreichbare Farbige auf Handverletzungen überprüft. Diese Ermittlungen blieben ohne Erfolg.

Wie aus einer Personalliste hervorgeht, war der hier verdächtige Freddie Lee Stapelton als SGT in der Zeit vom 03. Dezember 1982 bis zum 15. November 1985 in der Einheit HHC, 4 BN, 16 INF in Göppingen (Cooke Barracks) stationiert, weshalb auch dieser in eine durch die hiesige Kriminalpolizei in der Zeit vom 25. Oktober 1985 bis

zum 07. November 1985 durchgeführten Abklärung einbezogen worden war. Bei dieser Überprüfung wurden folgende Kriterien herangezogen:

- Alter
- Rasse
- Tönung der Hauptfarbe bei Negroiden
- Deutschkenntnisse
- Größe
- Statur
- Handverletzung (Vernarbung bzw. Verkrustung)
- Familienstatus
- Alibi (soweit verlässlich nachprüfbar).

Ein Tatverdacht ergab sich damals nicht.

f)

Da ein Großteil der Angehörigen der US-Streitkräfte im Standort Göppingen in den Jahren 1982 und 1984 von einem Fotostudio fotografiert worden waren, wurden diese ausgewertet und der Geschädigten am 22. November 1985 vorgelegt. Von den etwa 100 vorgelegten Lichtbildern war die Geschädigte bei 2 Personen (K    W    und K    P    ) der Meinung, dass sie dem Tätertypus sehr nahekommen würden, ohne diese jedoch als Täter zu identifizieren. Bei einer dieser Personen stellte sich im Weiteren heraus, dass er nicht die Blutgruppe 0 aufweist. Damit schied er als Täter aus, da die am Tatort aufgefundenen Blutspuren des mutmaßlichen Täters der Blutgruppe 0 zugewiesen werden konnte. Bei der anderen Person wurde eine Blutprobe erhoben, deren Auswertung jedoch ergab, dass er als Spurenverursacher nicht in Betracht kommt. Die übrigen abgebildeten Personen, darunter auch der hier tatverdächtige Stapelton, schloss die Geschädigte als Täter aus.

g)

Im Zuge von Fahndungs- und Überwachungsmaßnahmen, in die auch die Registrierung von Fahrzeugen mit amerikanischem Kennzeichen einbezogen waren, die sich unter anderem im Stadtgebiet von Göppingen befanden, wurde am 06. November 1985 und in der Nacht vom 08. auf den 09. November 1985 in Göppingen in der Freihofstraße beziehungsweise gegenüber der Freihofstraße der dort geparkte gelbe Personenkraftwagen Pontiac/Plymouth mit dem amtlichen Kennzeichen EC-7830 festgestellt werden. Dieses Fahrzeug war damals auf Stapelton zugelassen. Die in der Göppinger Innenstadt gelegene Freihofstraße ist etwa 800 Meter vom Tatort der Vergewaltigung in der Nördlichen Ringstraße entfernt.

h)

Auch die Überprüfung von Wohnbereichen im Landkreis Göppingen, die von US-amerikanischen Staatsbürgern bevorzugt bewohnt wurden, sowie Fahndungs- und Überwachungsstreifen im Nordstadtbereich von Göppingen erbrachten keine weiteren Täterhinweise. Ein Hinweis aus der Bevölkerung auf den US-amerikanischen Zivilisten C     L   S      blieb ebenfalls ohne Erfolg. Dieser wurde zunächst am 26. Oktober 1985 vorläufig festgenommen. Seine Überprüfung ergab jedoch in der Folgezeit, dass er als Täter ausscheidet.

i)

Von zwei weiteren amerikanischen Staatsangehörigen (M     G    und R    F     ) wurden Blutproben entnommen, deren Auswertung jedoch ebenfalls ergab, dass diese Personen als Täter ausscheiden.

j)

Auch eine Auslobung von insgesamt 10.000 Deutsche Mark führte zu keinen weiterführenden Ermittlungsansätzen.

Da zum damaligen Zeitpunkt keine weiteren Ermittlungsansätze vorhanden waren, wurde das Ermittlungsverfahren mit staatsanwaltschaftlicher Verfügung vom 07. November 1986 eingestellt.

k)

Die Geschädigte hatte - wie bereits oben erwähnt - den Täter in die Hand gebissen, so dass dieser blutete. Darüber hinaus hatte der Täter einen Teil der Kleidung der Geschädigten selbst gewaltsam ausgezogen, nämlich Mantel, Pulli, Hosenrock, Unterhose und Strumpfhose. Diese Teile blieben am Ablageort zurück. Der Täter hat die Strumpfhose in einen Baum und die Unterhose auf eine Wiese geworfen.

Bereits 1985 konnten am Tatort (insbesondere auf zwei Pflastersteinen), am Ablageort sowie an den Kleidungsstücken Blutspuren gesichert werden. Diese Blutspuren, welche der Blutgruppe 0 zuzuordnen waren, stammten nicht von der Geschädigten, die die Blutgruppe A1 hat.

Im Zuge der wissenschaftlich fortschreitenden Möglichkeiten im Bereich der DNA-Spurenauswertung erfolgte im Jahr 2001 mit Beschluss des Amtsgerichts Göppingen, Deutschland, vom 05. Oktober 2001 nochmals die gezielte Untersuchung und Auswertung von damals gesicherten DNA-Spurenträgern (Blutspuren an Bekleidungsstücken des Tatopfers S      A     -G        sowie an zwei gesicherten Pflastersteinen vom Tatort) durch das Landeskriminalamt Baden-Württemberg. Hierdurch konnte zu-

nächst an zwei Pflastersteinen jeweils ein gleichartiges zu Identifizierungszwecken ge-
eignetes DNA-Identifizierungsmuster erstellt werden. Im Rahmen einer weiteren Un-
tersuchung konnten sodann auch an der Unterhose und der Strumpfhose des Tatop-
fers mehrere Blutspuren ein- und derselben männlichen Person gesichert und ein
DNA-Profil erstellt werden. Dieses DNA-Profil entsprach zweifelsfrei dem bereits gesi-
cherten DNA-Identifizierungsmuster des am Pflasterstein gesicherten Bluts.

Aufgrund des begründeten Verdachts, dass es sich bei dem unbekannten Täter um
einen amerikanischen Soldaten gehandelt hat, wurden mit Schreiben vom 04. Mai
2012 die zuständigen Justizbehörden der Vereinigten Staaten von Amerika im Rah-
men eines Rechtshilfeersuchens um einen Abgleich des molekulargenetischen Mus-
ters der Tatortspuren mit der DNA-Analysedatei der Vereinigten Staaten von Amerika
gebeten. Am 01. Juli 2013 teilte das FBI durch Mr. Richard Tamplin, Stv. FBI Legal
Attache, USGK Frankfurt (dortige Aktenzeichen BN-13650 Ser 82 / HQ-29905008)
hierher mit, dass das DNA-Profil über acht Loci (D16S539, D18S51, D21S11,
D3S1358, D8S1179, FGA, VWA, TH01) mit dem Profil des Freddie L. Stapelton, ge-
boren am 15. September 1957 übereinstimme. Stapelton sei 1988 wegen Entführung,
Vergewaltigung und Angriff auf Polizeibeamte festgenommen und zu 30 Jahren Ge-
fängnis verurteilt worden. Nach 10 Jahren sei die Restfreiheitsstrafe zur Bewährung
ausgesetzt worden. Am 21. Juli 2006 sei er dann wegen Besitzes einer Feuerwaffe
festgenommen und am 01. Dezember 2006 zu drei Jahren Gefängnis verurteilt wor-
den. Danach sei er unter Bewährung stehend der Aufsicht des US Probation Office,
Jackson, Mississippi, 501 E Court St, Suite 1, Jackson, MS, 39201, unterstanden. Am
02. März 2013 sei die Akte geschlossen worden. Dieser sei folgende Wohnanschrift
des Freddie L. Stapelton zu entnehmen: 310 Barrow St, Apt D-1, Pearl Mississippi
(Telefon 601-932-0229, 601-566-3402). Als Arbeitsplatz sei das Wasserwerk von
Pearl Mississippi vermerkt. Überdies hätten zwei weitere mögliche Adressen recher-
chiert werden können:

Rt 10 Bx 348, Jackson, Mississippi, 39208
245 McKenzie Lane, Pearl, Mississippi 39208

Grundlage dieser Mitteilung war ein Schreiben des U.S. Department of Justice vom
27. Juni 2013, welchem darüber hinaus zu entnehmen war, dass das mitgeteilte DNA-
Muster Übereinstimmung aufweise mit den DNA-Proben Sentinel Case 80-BN-13650
(Serial 82) und FBI FDDU Sample ID 2009-078723.

Am 04. August 2014 erging durch das Amtsgericht Ulm, Deutschland, ein Beschluss
zur zwangsweisen Erhebung einer Blut- oder Speichelprobe des Tatverdächtigen Fre-
ddie Lee Stapelton zum Zwecke einer molekulargenetischen Untersuchung und einem
Abgleich des DNA-Musters mit den gesicherten DNA-Merkmalen der am Tatort und

der Bekleidung des Opfers gesicherten Spuren. Eine entsprechende Speichelprobe wurde sodann im Wege der justiziellen Rechtshilfe von den zuständigen Justizbehörden der Vereinigten Staaten übersandt. Ein daraufhin durch das Landeskriminalamt Baden-Württemberg erfolgter Abgleich führte zu dem Ergebnis, dass Freddie Lee Stapelton mit einer Wahrscheinlichkeit von 1 zu 536 Quadrillionen der Verursacher der Blutspuren an den aufgefundenen Pflastersteinen sowie von einer Blutspur an der Unterhose des Tatopfers ist.

Nach der Identifizierung des Freddie Lee Stapelton wurde das Ermittlungsverfahren bei der Staatsanwaltschaft Ulm unter dem Aktenzeichen 11 Js 19684/13 wieder aufgenommen und fortgeführt. Am 19. Mai 2020 erließ das Amtsgericht Ulm, Deutschland, gegen Freddie Lee Stapelton einen nationalen Haftbefehl unter dem Aktenzeichen 7 Gs 984/20.

## 3. Rechtliche Würdigung

Der Täter steht bei dem gegebenen Sachverhalt im dringenden Verdacht, sich wegen Vergewaltigung sowie wegen versuchten Mordes - zum Zwecke der Verdeckung einer anderen Straftat - strafbar gemacht zu haben.

Der Tatbestand der Vergewaltigung unterliegt im deutschen Strafrecht allerdings einer Verjährungsfrist von 20 Jahren. Dies hat zur Folge, dass die Tat in Deutschland nicht mehr unter dem Gesichtspunkt der Vergewaltigung, sondern nur noch als versuchter Mord verfolgt werden kann.

Die einschlägigen Strafnormen, welche versuchten Mord unter Strafe stellen, lauten wie folgt:

§ 211 Strafgesetzbuch [Mord]

(1) Der Mörder wird mit lebenslanger Freiheitsstrafe bestraft.

(2) Mörder ist, wer
aus Mordlust, zur Befriedigung des Geschlechtstriebs, aus Habgier oder sonst aus niedrigen Beweggründen,
heimtückisch oder grausam oder mit gemeingefährlichen Mitteln oder
um eine andere Straftat zu ermöglichen oder zu verdecken,
einen Menschen tötet.

§ 22 Strafgesetzbuch [Begriffsbestimmung des Versuchs]

Eine Straftat versucht, wer nach seiner Vorstellung von der Tat zur Verwirklichung des Tatbestandes unmittelbar ansetzt

§ 23 Strafgesetzbuch [Strafbarkeit des Versuchs]

(1) Der Versuch eines Verbrechens ist stets strafbar, der Versuch eines Vergehens nur dann, wenn das Gesetz es ausdrücklich bestimmt.

(2) Der Versuch kann milder bestraft werden als die vollendete Tat (§ 49 Abs. 1).

(3) [ ... ]

§ 12 Strafgesetzbuch [Verbrechen und Vergehen]

(1) Verbrechen sind rechtswidrige Taten, die im Mindestmaß mit Freiheitsstrafe von einem Jahr oder darüber bedroht sind.

(2) Vergehen sind rechtswidrige Taten, die im Mindestmaß mit einer geringeren Freiheitsstrafe oder die mit Geldstrafe bedroht sind.

(3) [ ... ]

Nach deutschem Recht verjährt versuchter Mord nicht. Dies folgt aus § 78 Absatz 2 Strafgesetzbuch, dessen Wortlaut ich wie folgt wiedergebe:

§ 78 Strafgesetzbuch [Verjährungsfrist]

(1) [ ... ]

(2) Verbrechen nach § 211 (Mord) verjähren nicht.

(3) [ ... ]

Dies gilt nach der einschlägigen Rechtsprechung nicht nur für Fälle des vollendeten Mords, sondern auch für Fälle, in denen es - wie hier - beim Versuch eines Mords geblieben ist.

Der Beschuldigte steht bei dem geschilderten Sachverhalt somit im dringenden Verdacht, sich wegen versuchten Mordes gemäß § 211, 22, 23 Strafgesetzbuch strafbar gemacht.

## IV. Ersuchte Maßnahme

Es wird darum ersucht, den amerikanischen Staatsangehörigen Freddie Lee Stapelton, geboren am 15. September 1957 in Brandon, Vereinigte Staaten von Amerika, nach Deutschland zum Zwecke der Strafverfolgung wegen des vorstehend beschriebenen versuchten Mordes zum Nachteil der S        A        G        nach Deutschland auszuliefern.

Lehr
Leitender Oberstaatsanwalt



EXT-STAPLETON-00062

[Coat of arms of the German federal state of Baden-Württemberg]
# Baden-Württemberg

ULM PUBLIC PROSECUTOR'S OFFICE (Staatsanwaltschaft Ulm)
CHIEF SENIOR PUBLIC PROSECUTOR (Der Leitende Oberstaatsanwalt)

Staatsanwaltschaft Ulm, Postfach 38 63, 89028 Ulm, Germany

To the
Competent legal authority in the
United States of America

| | |
|---|---|
| Date | August 28, 2020 |
| Name | Christof Lehr |
| Extension | +49 731 189-1000 |
| File reference | 11 Js 19684/13 |
| | (Please state in response) |

## International mutual judicial assistance in criminal matters

## Here: request to the United States of America for extradition of Mr Freddie Lee Stapleton, born on September 15, 1957 in Brandon, United States of America

### Enclosure
1 CD of the re-organized case file
1 certified translation of the re-organized case file
1 certified copy of the arrest warrant issued on May 19, 2020 by the Ulm Local Court, Germany (including a certified translation)

### Case summary
in the criminal investigation proceedings against Freddie Lee Stapleton for attempted murder, Ulm Public Prosecutor's Office, file number 11 Js 19684/13

My name is Christof Lehr, I am 60 years of age and live in Ulm, Germany. I am the Chief Senior Public Prosecutor of the Ulm Public Prosecutor's Office (Staatsanwaltschaft Ulm), Germany. Since September 1, 1994, I have held the office of Public Prosecutor of the German federal state of Baden-Württemberg. On May 31, 2010, the Land of Baden-Württemberg promoted me to Chief Senior Public Prosecutor. I have been working in this position since February 1, 2013 for the Ulm Public Prosecutor's Office.

In this capacity I am conduction investigation proceedings against the U.S. citizen Freddie Lee Stapleton. According to our investigations, Freddie Lee Stapleton is strongly suspected of having attacked a German national, who was 29 years old at the time, at knifepoint and then raping her at around 10:20 p.m. in the area of the road Nördliche Ringstrasse (Northern Loop) in the city center of Göppingen, Baden-Württemberg, Germany, late on October 23, 1985. He was then said to have dealt three powerful blows to his victim's head with a wooden club in order to kill her and thereby prevent the woman from identifying him as the perpetrator of the rape committed previously. Thereafter, Freddie Lee Stapleton, who assumed that his victim was dead, was said to have loaded her into the trunk of his vehicle and thrown her into a ditch on a country road in Göppingen-Hohrein and covered her with branches and leaves. The victim of the crime survived but was seriously injured.

## 1. Detailed information concerning the charge:

On the late evening of October 23, 1985, at about 22:20, on her way home from a sewing course in the area of the road Nördliche Ringstrasse (Northern Loop) in Göppingen, federal state of Baden-Württemberg, Germany, at the level of the park in the area of the municipal baths, Mrs S        A        Gε        , a then 29 year old German female citizen, was attacked by a man (a person οι συιοι) who had approached her from behind and had threatened her with an approximately 25 centimeter long knife. The perpetrator dragged her into the park and started to strip her by force. The injured party cried out for help and initially tried to defend herself against the attack biting the perpetrator's hand and, by doing so, inflicting a bleeding wound to his hand. After having stripped the injured party to her blouse and undershirt, strangling her and hitting her repeatedly in her face with his fists, also using his bleeding hand, the perpetrator raped her several times vaginally and anally.

After this, the perpetrator moved away for a short time and returned with a wooden club. In the intention of killing the woman to eliminate her as a witness so as to avoid being identified as the perpetrator of the rape, with this club, he hit at least three times, hard and deliberately, at the head of the injured party who had remained lying on the ground while feigning death for fear of further acts of violence by the perpetrator. When the perpetrator moved away again, the injured party continued to lie motionlessly on the ground as she now was almost unconscious due to her physical condition and also as she thought that the perpetrator was still around. A short time later, the latter returned with a car, dragged the injured party, who he thought was dead, into the vehicle and drove with her to the area of Göppingen-Hohrein (at a distance of 6.4 to 6.8 kilometers from the crime scene, depending on the route travelled) where he threw her into the roadside ditch and covered her body with twigs and leaves. After the perpetrator had gone, the victim woke up and, seriously injured, dragged herself to the property nearby belonging to the witness Mr Hägenläuer from which the police was called.

Based on the injured party's injuries and the circumstances described by her – in particular the hardness and deliberateness of the blows with a solid object to the head of the victim who was then obviously believed dead and laid in a hiding place by the perpetrator – it must be assumed that the perpetrator intended to kill the injured party to prevent the latter from giving details to the police which would lead to the crime being solved and his guilt being determined.

The injured party suffered a fracture of the 6th and 7th rib, a tear in the left ear drum, a laceration on the left front and side temple, 2 strangulation marks on the left side and a bruise on the right side of the larynx as well as swellings and abrasions on her body.

According to information provided by the injured person, the perpetrator was a colored man, not fully black, about 175 centimeters tall, 28 to 32 years old, slim with a narrow face, short curly hair and slightly protruding lips. According to the information provided, the perpetrator spoke German with an American accent. Moreover, the injured party stated that the perpetrator had a strong smell of alcohol.

## 2. Strong suspicion that an offence has been committed

a)

The facts described above follow, in the first instance, from the police interviews conducted with the injured party immediately after the crime. In her police interview the injured party described the perpetrator and his clothing as follows:

- a colored man, not fully black,
- about 175 centimeters tall,
- about 28 to 32 years old,

- slender with a slender face, the head seemed rather small in relation to the body,
- short, frizzy hair with slight sideburns,
- slightly protruding lips,
- small ears,
- delicate fingers,
- he was wearing a red blouson-style jacket,
- according to the information provided, the perpetrator spoke German with an American accent and had a strong smell of alcohol.

b)
In the course of a medical examination, the injured party was found to have suffered the injuries described in more detail above. In addition, during the gynecological examination of the injured party, sperm was discovered in her vagina, but not in her anus.

c)
At the scene of the crime, a broken wooden club with a 3-centimeter diameter was found. This contained traces of the injured party's blood. In her police interview, the injured party said that she thought she had been hit with a tube-shaped metal item.

Moreover, the following items were found at the scene of the crime:
- the injured party's glasses
- the injured party's bag
- buttons from the injured party's coat

On the side of district road 1407 near Göppingen-Hohrein – a few hundred meters from the house of the witness Mr Hägenläuer – clothes belonging to the injured party were found. In the ditch on the left-hand side of the road, directly adjacent to a road delineator and some tree trunks, the following items belonging to the injured party were found:
- coat
- mohair jumper
- culottes
- low shoes

Slightly above the place of discovery of the items of clothing, the torn-off watch of the injured party was found. The injured party's tights were found hanging in the branches of trees at that locations. The blood-stained underpants belonging to the injured party were found in the meadow opposite. Moreover, several drops of blood were discovered on the road near the items of clothing.

The witness Ms Rosemarie Kübler, who says that she had accompanied the injured party to the sewing class on the evening of the crime, stated that among other items the injured party had worn culottes, a white blouse and a knitted mohair waistcoat as well as a dark blue gabardine coat and low shoes on the evening of the crime.

d)
The witness Eugen Hägenläuer stated that on October 24, 1985, at around 00:45, the injured party, who was covered in blood, had rung his doorbell and asked him for help. At this point, the injured party was only dressed in a torn blouse and a scarf. There was a leaf stuck to the back of the injured party's head.

The witness Thomas Mayer, who was in the vicinity of the crime scene at the time of the crime, heard cries for help but did not notice anything else from where he was located.

The injured party's husband stated, in accordance with the injured party's statement, that the last sexual intercourse between the spouses had occurred more than two weeks prior to the crime.

e)
The perpetrator's skin color in combination with his American accent described by the victim of the offence suggested the possibility that the perpetrator could be an American citizen. A further point is that, at that time, a relatively large number of American soldiers were stationed in Germany – not only in Göppingen, but also at other locations in Baden-Württemberg and the surrounding federal states. Against this background, the investigations initially focused on black US soldiers although investigators did not lose sight of black men of other nationalities.

Given that, according to the injured party's statement and the blood traces collected at the scene of the crime, it was to be assumed that the perpetrator had suffered a bite to one hand, all black men in US barracks in Göppingen and in nearby Schwäbisch Gmünd were checked for injuries to their hands. These investigations were inconclusive.

As is evidenced by a staff list, Freddie Lee Stapleton who is under investigation here, was stationed as a SGT from December 3, 1982, until November 15, 1985, in the HHC, 4 BN, 16 INF unit in Göppingen (Cooke Barracks); he was therefore included in the investigations carried out by the local criminal investigation department in the time between October 25, 1985, until November 7, 1985. The following criteria were taken into account as part of this investigation:
- age
- race
- skin tone (in the case of black people)
- command of German
- height
- build
- hand injury (scar / crusts)
- marital status
- alibi (insofar as this is reliably verifiable)

At that time, no grounds were found to suspect that he had committed the crime.

f)
Given that a large proportion of US forces stationed in Göppingen had been photographed in a photo studio in 1982 and 1984, these photographs were analyzed and presented to the injured party on November 22, 1985. From among the roughly 100 photographs presented to her, the injured party believed in relation to 2 individuals (K    W    and K    F    ) that they resembled the type of perpetrator; she did not, however, identify them as the perpetrator. In relation to one of these individuals it transpired subsequently that he did not have blood type 0. This means that he had to be ruled out as the perpetrator as the traces of blood of the suspected perpetrator, which had been found at the crime scene, were of the blood type 0. With regard to the other individual, the blood type was determined, but a further analysis showed that the evidence could not have originated from him. The injured party ruled out the other persons depicted as possible perpetrators, including the suspect in this case, Mr Stapleton.

g)
In the course of investigatory and surveillance measures, which also covered vehicles registered under US number plates located inter alia in the urban area of Göppingen, a yellow

Pontiac/Plymouth car with registration plate EC-7830 was seen on November 6, 1985 and in the night of November 8/9, 1985, respectively, parked in Freihofstrasse in Göppingen or rather opposite Freihofstrasse. At the time in question this car was registered in the name of Mr Stapleton. The street Freihofstrasse in Göppingen's city center is about 800 meters from the scene of the rape in the road Nördliche Ringstrasse (Northern Loop).

h)
Moreover, the examination of residential areas in the district of Göppingen favored by US citizens, as well investigatory and surveillance patrols in the Nordstadt area of Göppingen did not result in any further leads as to the identity of the perpetrator. Information provided by a member of the public regarding the US civilian Mr C          L    S     was also unsuccessful. He was first provisionally arrested on October 26, 1985. Subsequent checks revealed, however, that he was not the perpetrator.

i)
Blood samples were taken from two further US nationals (M     G      and R     F      ), but their analyses also concluded that these people were not the perpetrator.

j)
The offer of a reward totaling 10,000 German Marks did not, at first, result in any further information.

Given that, at the time, there were no further investigative approaches, the investigations were discontinued by order of the public prosecutor's office of November 7, 1986.

k)
As stated above, the injured party had bitten the perpetrator's hand, making it bleed. Moreover, the perpetrator himself had taken off by force some of the injured party's clothes, namely her coat, pullover, culottes, underpants and tights. These clothes remained at the place where he deposited the victim. The perpetrator threw the tights onto a tree and the underpants onto a meadow.

Back in 1985, forensics managed to secure traces of blood at the crime scene (in particular on two paving stones), at the place where the victim was left and on the items of clothing. These traces of blood, which were of the blood type 0, were not those of the injured party who has the blood type A1.

In the course of scientific advances in the field of DNA trace analysis, on October 5, 2001 the Local Court of Göppingen (Amtsgericht Göppingen), Germany, ordered another targeted examination and analysis of DNA trace materials recovered at that time (traces of blood on the clothing of the victim of the crime, Mrs S          A          -G       , as well as on two paving stones recovered at the scene of the crime) by the State Office of Criminal Investigation of Baden-Württemberg (Landeskriminalamt Baden-Württemberg) in 2001. This procedure initially resulted in the creation of a similar DNA identification pattern from each of the two paving stones, which was suitable for identification purposes. In the course of a further examination it was then possible to also secure several traces of blood belonging to the same male person on the underpants and tights of the victim and to create a DNA profile. This DNA profile was undoubtedly the same as the DNA identification patterns of the blood already secured on the paving stone.

Based on the well-founded suspicion that the unknown perpetrator was an American soldier, by letter of May 4, 2012, in the context of a request for mutual assistance, the competent

judicial authorities in the United States of America were asked to compare the molecular-genetic sample of the trace evidence found at the crime scene with the US DNA database. On July 1, 2013, Mr Richard Tamplin, Deputy FBI Legal Attaché, US Consulate in Frankfurt (their file references BN-13650 Ser 82 / HQ-29905008) provided a statement on behalf of the FBI, that the DNA profile was equivalent to that of Freddie L. Stapleton, born on September 15, 1957, in terms of eight loci (D16S539, D18S51, D21S11, D3S1358, D8S1179, FGA, VWA, TH01). The statement went on to say that in 1988, Stapleton was arrested and sentenced to 30 years in jail for abduction, rape and attacking police officers. After 10 years the remaining custodial sentence was suspended. On July 21, 2006, he was then arrested for possession of a firearm and on December 1, 2006, he was sentenced to three years in jail. Following this custodial sentence, as part of his suspended sentence, he was subject to the supervision of the US Probation Office, Jackson, Mississippi, 501 E Court St, Suite 1, Jackson, MS, 39201. According to the FBI statement, the file was closed on March 2, 2013. The file lists the following residential address for Mr Freddie L. Stapleton: 310 Barrow St, Apt D-1, Pearl Mississippi (Telephone 601-932-0229, 601-566-3402). His place of work is listed as the waterworks in Pearl, Mississippi. According to the FBI statement, research had revealed two further possible addresses:

Rt 10 Bx 348, Jackson, Mississippi, 39208
245 McKenzie Lane, Pearl, Mississippi 39208

The basis for this statement was a letter from the US Department of Justice of June 27, 2013, which also showed that the DNA sample in question shows matches with the following DNA samples: Sentinel Case 80-BN-13650 (Serial 82) and FBI FDDU Sample ID 2009-078723.

On August 4, 2014, the Local Court of Ulm (Amtsgericht Ulm), Germany, issued an order to compulsorily collect a blood or saliva sample of the suspect Freddie Lee Stapleton for the purpose of molecular-genetic examination and comparison of the DNA pattern with the secured DNA characteristics of the evidence recovered at the scene of the crime and on the victim's clothing. A corresponding saliva sample was then supplied by the competent judicial authorities in the U.S. by way of judicial legal assistance. A subsequent comparison carried out by the State Office of Criminal Investigation of Baden-Württemberg showed that the traces of blood on the discovered paving stones and a trace of blood on the victim's underpants stems from Freddie Lee Stapleton with a probability of 1 in 536 quadrillion.

After Freddie Lee Stapleton was identified, the Ulm Public Prosecutor's Office resumed and continued the criminal investigation proceedings under file no. 11 Js 19684/13. On May 19, 2020, the Local Court of Ulm, Germany, issued a national arrest warrant against Freddie Lee Stapleton under file no. 7 Gs 984/20.

## 3. Legal classification

Based on the circumstances given, the perpetrator is strongly suspected of having committed rape and attempted murder under specific aggravating circumstances – in order to cover up another offence.

However, according to German criminal law, the offence of rape is subject to a limitation period of 20 years. As a result, the crime in Germany may no longer be prosecuted under the aspect of rape, but only under the aspect of attempted murder under specific aggravating circumstances.

The relevant provisions under criminal law, based on which the offence of attempted murder under specific aggravating circumstances is punishable, are as follows:

Section 211 of the German Penal Code (StGB): murder under specific aggravating circumstances

(1) Whosoever commits murder under the conditions of this provision shall be liable to imprisonment for life.
(2) A murderer is any person who kills a person
for pleasure, for sexual gratification, out of greed or otherwise base motives,
by stealth or cruelly or by means that pose a danger to the public or
in order to facilitate or to cover up another offence.


Section 22 of the German Penal Code: definition of the attempt

A person attempts to commit an offence if he takes steps which will immediately lead to the completion of the offence as envisaged by him.


Section 23 of the German Penal Code: liability for attempt

(1) Any attempt to commit a felony entails criminal liability; this applies to attempted misdemeanors only if expressly so provided by law.
(2) An attempt may be punished more leniently than the completed offence (section 49 (1)).
(3) [...]


Section 12 of the German Penal Code: felonies and misdemeanors

(1) Felonies are unlawful acts punishable by a minimum sentence of one year's imprisonment.
(2) Misdemeanors are unlawful acts punishable by a lesser minimum term of imprisonment or by fine.

(3) [...]


Attempted murder is not subject to the statute of limitations under German law. This results from section 78 (2) of the German Penal Code which reads as follows:

Section 78 of the German Penal Code: limitation period
(1) [...]
(2) Felonies under section 211 (murder under specific aggravating circumstances) are not subject to the statute of limitations.
(3) [...]


In accordance with the relevant case law, this not only applies to cases of completed murder, but also to cases – such as here – in which the offence remained an attempt.

Given the facts described, the perpetrator is therefore strongly suspected of attempted under specific aggravating circumstances pursuant to sections 211, 22, 23 of the German Criminal Code (StGB).

## IV. Requested measure

It is therefore politely requested that the U.S. citizen Freddie Lee Stapleton, born on September 15, 1957 in Brandon/U.S., be extradited to Germany in order to be prosecuted for the aforementioned attempted murder to the detriment of Mrs S        A        -G        .

[Signature]
Lehr
Chief Senior Public Prosecutor

[Round stamp bearing the inscription: Ulm Public Prosecutor's Office]



END OF TRANSLATION

Translator's notes:

The information given in square brackets referring to signatures, stamps, etc. that appear in the original document, was inserted by the translator.

In my capacity as a certified translator for the German, English, French and Russian languages, duly sworn by the President of Ulm Regional Court (Landgericht Ulm, Germany), I hereby certify that the above is a true and complete translation of the German document presented to me for translation.



Ulm, December 31, 2020



Rainer Lutz
Rathausstr. 10
89081 Ulm, Germany



# Amtsgericht Ulm
- Ermittlungsrichter -

**Geschäftszeichen:** 7 Gs 984/00
(Bitte stets angeben)

Telefon-Nr.: 0731/189-0
Telefax-Nr.: 0731/189-2200

Staatsanwaltschaft Ulm

11 Js 19684/13

Ulm, 18.05.20

Staatsanwaltschaft
Ulm

2 0. MAI 2020

............... Js ...............

# Haftbefehl

gegen den Beschuldigten **Freddie Stapleton,**
geboren am 15. September 1957 in Brandon,
Vereinigte Staaten von Amerika,
wohnhaft: 310 Barrow Street Apt D-1, 39208 Pearl
Mississippi, Vereinigte Staaten
Staatsangehörigkeit: amerikanisch,
Familienstand: unbekannt,
Beruf: Specialist 4

wird die Untersuchungshaft angeordnet.

Der Beschuldigte ist folgenden Sachverhalts dringend verdächtig:

Am späten Abend des 23. Oktober 1985 wurde die damals 29 Jahre deutsche Staatsange-
hörige S A G gegen 22.20 Uhr auf dem Heimweg von einem Nähkurs
im Bereich der Nördlichen Ringstraße in Göppingen, Baden-Württemberg, Deutschland, auf
Höhe einer Parkanlage im Bereich des dortigen Stadtbades von dem Beschuldigten über-
fallen, der sich ihr von hinten genähert hatte und sie mit einem ungefähr 25 Zentimeter lan-
gen Messer bedrohte. Der Beschuldigte zerrte sie in die Parkanlage und begann sie unter
Gewaltanwendung auszuziehen. Die Geschädigte schrie um Hilfe und versuchte sich zu-
nächst gegen den Angriff zu wehren, wobei sie den Beschuldigten in die Hand biss. Hier-
durch fügte sie diesem eine blutende Wunde an der Hand zu. Nachdem der Beschuldigte -
auch mit seiner blutenden Hand - die Geschädigte bis auf Bluse und Unterhemd entkleidet,

11 Js 19684/13

Seite 1

sie dabei am Hals gewürgt und ihr wiederholt mit den Fäusten ins Gesicht geschlagen hatte, vergewaltigte er sie mehrfach vaginal und anal.

Sodann entfernte sich der Beschuldigte kurzzeitig und kehrte mit einem Holzknüppel zurück. Er schlug mit diesem mindestens dreimal heftig und gezielt auf den Kopf der Geschädigten, um diese zu töten. Er wollte so verhindern, dass die Geschädigte bei der Polizei Angaben machen kann, die zur Aufklärung der Tat und zur Feststellung seiner Täterschaft führen. Die Geschädigte blieb am Boden liegen und stellte sich aus Angst vor weiteren Übergriffen durch den Beschuldigten tot. Als sich der Beschuldigte wieder entfernte, blieb die Geschädigte weiter regungslos liegen, da sie nunmehr aufgrund ihres körperlichen Zustands nahezu bewusstlos war und zudem annahm, der Beschuldigte halte sich noch in der Nähe auf. Dieser kehrte kurze Zeit später mit einem Pkw zurück, schleppte die Geschädigte in das Fahrzeug und fuhr mit ihr in die Gegend von Göppingen-Hohrein (Entfernung vom Tatort je nach Fahrtstrecke zwischen 6,4 und 6,8 Kilometer), wo er sie - in der Annahme die Geschädigte sei bereits tot - in einen Straßengraben warf und ihren Körper mit Ästen und Laub zudeckte. Nachdem sich der Beschuldigte entfernt hatte, begab sich die Geschädigte zu einem nahegelegenen Anwesen des Zeugen Hägenläuer, von wo aus die Polizei verständigt wurde.

Die Geschädigte erlitt durch die Schläge des Beschuldigten mit den Fäusten und dem Holzknüppel einen Bruch der 6. und 7. Rippe, einen Riss des linken Trommelfells, eine Platzwunde an der linken Stirn und Schläfenseite, zwei Würgemale linksseitig am Kehlkopf und einen Bluterguss rechtsseitig am Kehlkopf sowie Schwellungen und Schürfwunden am Körper.

Freddie Stapleton wird beschuldigt, versucht zu haben, einen Menschen zu töten, um eine andere Straftat zu verdecken,

dies ist strafbar als versuchter Mord gemäß §§ 211 Absatz 2 Gruppe 3 Alternative 2, 22, 23 Strafgesetzbuch.

Der dringende Tatverdacht ergibt sich aus dem Ergebnis der bisherigen Ermittlungen, insbesondere aus der Untersuchung der am Tatort und an der Geschädigten aufgefundenen

EXT-STAPLETON-00072

DNA-Spuren des Täters, die dem Beschuldigten mit einer Wahrscheinlichkeit von 1 : 536 Quadrillionen zugeordnet werden können.

Der Beschuldigte ist einer der in § 112 Absatz 3 Strafprozessordnung genannten Straftaten dringend verdächtig, nämlich eines Verbrechens des versuchten Mordes gemäß § 211 Absatz 2 Gruppe 3 Alternative 2 in Verbindung mit §§ 22, 23 Strafgesetzbuch. Der Beschuldigte flüchtete nach der Tat. Es steht nicht zu erwarten, dass er sich einem Strafverfahren in Deutschland freiwillig stellen würde, weswegen seine Auslieferung nach Deutschland erforderlich werden wird.

Auch bei Berücksichtigung des Grundsatzes der Verhältnismäßigkeit (§ 112 Absatz 1 Satz 2 Strafprozessordnung) ist die Anordnung der Untersuchungshaft geboten. Eine andere, weniger einschneidende Maßnahme verspricht keinen Erfolg (§ 116 Strafprozessordnung).

--------------------------------------
Richter(in)
am Amtsgericht

Hörsch

**Richterin am Amtsgericht**

[Coat of arms of the German federal state of Baden-Württemberg]

# Ulm Local Court
# (Amtsgericht Ulm)

- Investigating Judge -

**File reference:** 7 Gs 984/20
(Please always quote)

Tel.: +49 731 189-0
Fax: +49 731 189-2200

Ulm Public Prosecutor's Office:
11 Js 19684/13

Ulm, May 19, 2020

## Arrest warrant

Against the accused

**Freddie Stapleton**,
born on September 15, 1957 in Brandon, United States of America,
resident at: 310 Barrow Street Apt D-1, 39208 Pearl Mississippi, United States
of American nationality,
marital status: unknown,
profession: Specialist 4

pre-trial detention is ordered.

The accused is strongly suspected of having committed the following offence:

On the late evening of October 23, 1985, at about 22:20, on her way home from a sewing course in the area of the road Nördliche Ringstrasse (Northern Loop) in Göppingen, federal state of Baden-Württemberg, Germany, at the level of the park in the area of the municipal baths, Mrs S    A    -G    , a then 29 year old German female citizen, was attacked by the accused who had approached her from behind and had threatened her with an approximately 25 centimeter long knife. The accused dragged her into the park and started to strip her by force. The injured party cried out for help and initially tried to defend herself against the attack biting the accused's hand and, by doing so, inflicting a bleeding wound to his hand. After having stripped the injured party to her blouse and undershirt, strangling her and hitting her repeatedly in her face with his fists, also using his bleeding hand, the accused raped her several times vaginally and anally.

After this, the accused moved away for a short time and returned with a wooden club. With this club, he hit at least three times, hard and deliberately, at the head of the injured party in the intention of killing her. By doing so, he wanted to prevent the injured party from giving details to the police which would lead to the crime being solved and his guilt being determined. The remained lying on the ground while feigning death, for fear of further acts of violence by the

accused. When the accused moved away again, the injured party continued to lie motionlessly on the ground as she now was almost unconscious due to her physical condition and also as she thought that the accused was still around. A short time later, the latter returned with a car, dragged the injured party into the vehicle and drove with her to the area of Göppingen-Hohrein (at a distance of 6.4 to 6.8 kilometers from the crime scene, depending on the route travelled) where, assuming that the injured party was already dead, he threw her into the roadside ditch and covered her body with twigs and leaves. After the accused had gone, the injured party went to a property nearby belonging to the witness Mr Hägenläuer from which the police was called.

During this attack, due to the accused's blows with his fists and the wooden club, the injured party suffered a fracture of the 6th and 7th rib, a tear in the left ear drum, a laceration on the left front and side temple, two strangulation marks on the left side and a bruise on the right side of the larynx as well as swellings and abrasions on her body.

Freddie Stapleton is charged with attempting to kill a person in order to cover up another offence.

This is punishable as attempted murder under specific aggravating circumstances pursuant to sections §§ 211 subs. 2 group 3 alternative 2, 22, 23 of the German Criminal Code (StGB).

The urgent suspicion that a criminal offense has been committed follows from the outcome of the previous investigations, in particular from the examination of the perpetrator's DNA evidence found at the crime scene and on the injured party and which can be attributed to the suspect with a probability of 1:536 quadrillion.

The suspect is urgently suspected to have committed one of the criminal offenses listed in section 112(3) of the German Code of Criminal Procedure (StPO), namely the offense of attempted murder pursuant to section 211(2), group 3, alternative 2 in conjunction with sections 22, 23 of the German Criminal Code (StGB). The suspect fled after the crime. It is not expected that he would voluntarily face criminal proceedings in Germany, which is why his extradition to Germany will become necessary.

Even if the principle of proportionality is taken into account (section 112 subs. 1 sentence 2 of the German Code of Criminal Procedure (StPO)), it is necessary to order pre-trial detention. Another, less restrictive measure has no prospect of success (section 116 StPO).


[Signature]
Hörsch
Local Court Judge


[Receipt stamp of the Ulm Public Prosecutor's Office dated May 20, 2020]

END OF TRANSLATION

Translator's notes:

The information given in square brackets referring to signatures, stamps, etc. that appear in the original document, was inserted by the translator.

In my capacity as a certified translator for the German, English, French and Russian languages, duly sworn by the President of Ulm Regional Court (Landgericht Ulm, Germany), I hereby certify that the above is a true and complete translation of the German document presented to me for translation.

Ulm, December 31, 2020





Rainer Lutz
Rathausstr. 10
89081 Ulm, Germany



EXT-STAPLETON-00077

# Staatsanwaltschaft Ulm

Aktenz.: _____ 11 Jp 19684 _____ / 13 _____

Dateiname: _____ 11 Jp 19684-13 StO01 _____
(z.B. „28 Js 2893-12 StO01 bis StO07")

gescannt am: _____ 21.01.2021 _____

von: _____ Harder, Marianne _____ Just. Ang _____
Name, Vorname, Dienstbezeichnung

_____ li Harder _____
(Unterschrift)

Polizeipräsidium Ulm
Kriminalinspektion 1 - Deliktspezifische Ermittlungen
Lindenstraße 1
89077 Ulm

00001
Ulm, 27.03.2020
Telefon: 0731 188 0
Durchwahl: 0731 188 4101
Sachbearbeiter: Bartosch
Az.: ST/1851087/2019

# Inhaltsverzeichnis

Vorgangsdeckblatt  – Euthoummen –
Mitteilung Ausgang des Verfahrens  – Euthoummen –
Schreiben Anwaltskanzlei Schätz, Härle, Halt + Prozessvollmacht  – unter 4. –
Beweismittelverzeichnis  – Euthoummen –
Annahmeverfügung für Beweismittel  – unter 13. –

1. **Strafanzeige**

2. **Ermittlungsbericht** vom 27.03.2020

   Ermittlungsauftrag der StA Ulm 22.08.2019

   Aktenzeichenmitteilung

   Sachstandsanfrage/-mitteilung 04.03.2020

   Abschlussbericht vom 24.10.1986

   Einstellungsverfügung der StA Ulm 07.11.1986

3. Anzeigen Vergewaltigung / vers. Sexualmord

   **Anzeigenaufnahme** des Polizeirevier Göppingen vom 24.10.1985

4. **Geschädigtenkomplex**

   Vernehmung der Geschädigten Albrecht-Ganthaler vom 24.10.1985

   Vernehmung am 25.10.1985

   Vernehmung am 26.10.1985

   Vernehmung am 07.11.1985

   Erklärung – Entbindung ärztlicher Schweigepflicht vom 25.10.1985

   Schriftsätze der RA-Kanzlei Schätz, Härle, Halt mit Prozessvollmacht

5. **Zeugenkomplex**

   Zeugenvernehmung Anzeigenerstatter Eugen Hägenläuer 24.10.1985

   ZV Thomas Mayer 24.10.1985

   ZV Michael Ganthaler 24.10.1985

   ZV Rosemarie Kübler 24.10.1985

6. **Ärztlicher Befundbericht** der Klinik am Eichert GP vom 30.10.1985

   **Gynäkologischer Befundsbericht** der KaE GP vom 25.10.1985

7. **Tatortbefunds-/Spurensicherungsbericht** der KT Göppingen vom 16.10.1986

   Spuren-/Asservatenliste

   Auffindebericht von Bekleidung der Geschädigten

   Skizzen der Wegstrecken der Geschädigten zum/Tatort zum Ablegeort

   Lichtbildmappen (Tatort, Opfer mit Verletzungen, Bekleidung mit Spuren, Tatortspuren)

   1 CD (digitale Befunde – Lichtbildmappen)

   Schreiben – Aufbewahrung verderblicher Spuren an LKA BW 24./25.10.1985

   Beweismittelverzeichnisse / Nachweis der Beweismittelketten

   KT-Untersuchungsantrag an das LKA BW vom 29.10.1985

   Untersuchungsbericht des LKA BW vom 06.05.1986

8. **Identifizierung des Tatverdächtigen STAPLETON**

KT-Untersuchungsauftrag an das LKA BW 07.11.2001

Beschluss des Amtsgerichts Ulm 9 Gs 780/01 (§ 81e/f StPO)

Kurzbericht des LKA BW – KTI – vom 29.01.2002 (DNA-Identifizierungsmuster ID172001)

Erfassung der DNA in der DNA-Analyse-Datei vom 12.03.2002

Auftrag Abgleich des DNA-ID-Profils in den DNA-Datenbanken der USA

Antrag an StA Ulm – Justizielles Rechtshilfeersuchen in USA vom 01.09.2008/12.01.2009

Schreiben der KT GP an StA Ulm 11.02.2009

KT-Untersuchungsantrag an LKA BW – KTI / StA Ulm vom 10./20.03.2009 mit Ass.-Liste

Schreiben an StA Ulm / Untersuchungsbericht des LKA BW vom 22.10.2009

9. **RH-Ersuchen DNA-Abgleich in DAD der Vereinigten Staaten** vom 04./15.05.2012

Beschluss des AG Ulm 9 Gs 780/01

Rückantwort U.S.-amerikanisches Justizministerium mit Memorandum vom 01.07.2013

Schreiben der StA Ulm an GenStA und JuMi BW Stuttgart 02.07.2013

Schriftsätze des U.S.- amerikanischen JuMi vom 18.07.2013 zur Identifizierung
  des Beschuldigten STAPLETON Freddie Lee

10. **Ermittlungsauftrag der StA Ulm** vom 09.09.2013

**Beweisrelevante Ermittlungsvermerke der KASt. Geislingen** v. 10./11.09./14.10.2013

Anfrage an IP Washington – Erkenntnismitteilung zum Beschuldigten

Rückantwort des Department of Justice (DoJ) vom 27.12.2013

Ermittlungsbericht zur Überprüfung US-Angehöriger in Cooke Barracks vom 12.11.1985
  mit Personalliste

Erhebung und Durchführung Lichtbildvorlage bei Geschädigten am 22.11.1985

Bericht über Feststellung des Pkw des Beschuldigten mit amerikanischem Kz. EC-7830

Auskünfte aus Melderegister der Stadt Göppingen / Standesamt der Stadt Karlsruhe

Beglaubigte Kopie des Familienbuchs des STAPLETON Freddie / Rexer

Fahndungsunterlagen (Phantombild / BKA-Blattveröffentlichung /Handzettel /Ö-Fahndung)

11. **RH-Verkehr / Ersuchen an Justizbehörden der Vereinigte Staaten von Amerika**

Beschluss des AG Ulm 3 Gs 1210/14 – Erhebung/DNA-Untersuchung Blut-/Speichelprobe
  beim Beschuldigten STAPLETON Freddie Lee

RH-Ersuchen um DNA-Abgleich in der DNA-Datenbank (CODIS) vom 10.05.2017

Handlungsanleitung zur DNA-Entnahme mit Entnahmesets + Einwilligungserklärung

RH-Ersuchen um Entnahme einer Blut-/Speichelprobe des Beschuldigten vom 16.01.2018

Rückantwort / Übersendung der DNA-Probe des STAPLETON Freddie Lee durch das
  U.S.-Justizministerium vom 16.04.2019 mit Beweismittelverzeichnis/-kette

12. Antrag der StA Ulm an LKA BW – KTI – auf DNA-Untersuchung und Abgleich des DNA-
  ID-Profils des Beschuldigten mit den gesicherten DNA-Spuren des Täters

**Molekulargenetischer Untersuchungsbericht des LKA BW – KTI – vom 31.07.2019**

000003

**13.** Beweismittelverzeichnis

**14.** Polizeikostennachweisungen — *Entnommen* —

Bartosch, EKHK

# 1
**Strafanzeige**

Polizeipräsidium Ulm
Kriminalinspektion 1 - Deliktspezifische Ermittlungen
Lindenstraße 1
89077 Ulm

Ulm, 25.03.2020
Telefon: **0731 188 0**
Durchwahl: **0731 188 4101**
Sachbearbeiter: **Bartosch**
Az.: **ST/1851087/2019**



# STRAFANZEIGE

Staatsanwaltschaft Ulm
Olgastraße 109
89073 Ulm

Aktenz. Staatsanwaltschaft
11 Js 19684/13

## STRAFTAT
Delikt Mord gemäß § 211 StGB, Versuch gem. § 22, 23 StGB ; Vergewaltigung

## TATORT
Gemarkung
    73033 Göppingen
Orts-/Stadtteil Stadtgebiet
    Nördliche Ringstraße

    Höhe Parkanlage

## TATZEIT
Tatzeit/-zeitraum Mittwoch, 23.10.1985, 22:20 Uhr bis Donnerstag, 24.10.1985, 00:43 Uhr

Schadenshöhe in €

Einl. Erm.-Verfahren 24.10.1985 ☐ Antrag Vermögensabschöpfung

Zust. Datenstation Polizeipräsidium Ulm Datenstation

## BESCHULDIGTE PERSON
Mündigkeit **Erwachsener**
Name **Stapleton**
Geburtsname Stapleton
Vorname **Freddie Lee**
Geburtsdatum 15.09.1957
Geburtsort/-land Brandon, Vereinigte Staaten (USA)
Sterbedatum
Geschlecht männlich     Familienstand unbekannt
Staatsangehörigkeit ungeklärt
2. Staatsangehörigk.

STANZ_017

EXT-STAPLETON-00083

03 / 2019

Anschrift 39208 Pearl Mississippi, Vereinigte Staaten (USA)
310 Barrow Street 310
Apt. D-1
Erlernter Beruf Specialist 4                    Tätigkeit US-Armeeangehöriger (SGT SP 5)
Telefon

Sprache Englisch
Vernehmung Person nicht vernommen

Persönl. Verhältnisse Angaben verweigert
Eink. Beschuldigter €                            Eink. Ehegatte €
Sonst. Einkünfte €                               mtl. Belastungen €
Vermögen €
Kinder                                           Alter

Eltern (siehe Beiblatt)
Schadensregulierung

Täter-Opfer-Ausgleich

Mitteilung an die Ausländerbehörde
erfolgte am

Sonstige Namen

DNA bereits erfasst ☐ ja  ☒ nein
Falls nein: DNA-Probenentnahme veranlasst ☒ ja  ☐ nein

Ausweisart
ausgestellt am                                   Behörde
Nummer

Bemerkungen

**Betäubungsmittel**

## ANZEIGENDE PERSON
Name **Hägenläuer**
Geburtsname Hägenläuer
Vorname **Eugen**
Geburtsdatum 19.08.1938
Geburtsort/-land
Geschlecht männlich                              Familienstand verheiratet
Anschrift 73037 Göppingen
Unterer Weiler 15

Telefon privat 07165 8017

Sprache
Vernehmung Person vernommen

Tätigkeit Landwirt

## GESCHÄDIGTE PERSON

Name **A** **-G**
Geburtsname A
Vorname **S**
Geburtsdatum ‾ 1956
Geburtsort/-land Göppingen
Geschlecht weiblich
Staatsangehörigkeit deutsch
Anschrift 73033 Göppingen

Familienstand verheiratet

Telefon privat

Sprache
Vernehmung Person vernommen

Tätigkeit beurlaubte Beamtin/ Hausfrau

Nachfolgendes wurde ausgehändigt:

☐ die Broschüre „Opferschutz" des Innenministeriums Baden-Württemberg

☒ das Merkblatt: Rechte von Verletzten und Geschädigten im Strafverfahren

☒ das Merkblatt der Versorgungsämter von Baden-Württemberg zur Entschädigung von
Opfern von Gewalttaten

Strafantrag **Ja**
Einstellungsnachrich **wird erwünscht.**

Täter-Opfer-Ausgleich

## SACHVERHALT

Die Geschädigte A -G wurde zur Tatzeit auf ihrem Heimweg von zunächst
unbekanntem Täter in der Nähe des Stadtbades in Göppingen überfallen, mit einem Messer bedroht,
am Hals gewürgt, mit den Fäusten wiederholt ins Gesicht geschlagen, gewaltsam entkleidet und
mehrfach gegen ihren Willen vaginal und anal vergewaltigt. Nach Tatausführung schlug der
Beschuldigte der Geschädigten in Tötungsabsicht mit einem Holzknüppel mehrfach auf den Kopf und
verbrachte sie, die sich nun totstellte, sodann mit einem Pkw im Kofferraum an den Ortsrand nach
Göppingen-Hohrein, wo er sie nahe des Waldrands in einen Straßengraben warf, sie verscharrte,
indem er sie mit Ästen und Laub abdeckte und flüchtig ging.

Die Geschädigte erlitt durch die Tat Rippenbrüche, einen Riss des Trommelfells, eine Platzwunde an
der linken Stirn-/Schläfe, Kehlkopfdruckstellen und Blutergüsse sowie Schwellungen und
Schürfwunden am ganzen Körper.

Der Beschuldigte wurde durch einen Biss der Geschädigten in dessen Hand verletzt; er blutete.

Im Rahmen der kriminaltechnischen Tatbefundsaufnahme, insbesondere Spurensicherung und molekulargenetischen Untersuchung an der gesicherten Opferbekleidung und Tatortspuren (Blutspuren) sowie des im Rahmen eines justiziellen Rechtshilfeverkehrs zwischenzeitlich vorliegenden DNA-Musterabgleichs bzw. -suchlaufs in den USA, konnte letztendlich der Beschuldigte, der amerikanische Sta. Freddie Lee Stapleton zweifelsfrei identifiziert werden.

Bartosch, EKHK

000009

## Person

|  |  |
|---|---|
| Name | **Stapleton** |
| Vorname | **Freddie Lee** |
| Geburtsdatum | 1957 |

## Vater

|  |  |  |
|---|---|---|
| Name | **Stapleton** | |
| Geburtsname | Stapleton | |
| Vorname | **Andrew** | |
| Geschlecht | männlich | Familienstand |
| Tätigkeit | | |

## Mutter

|  |  |  |
|---|---|---|
| Name | **Stapleton** | |
| Geburtsname | Dawson | |
| Vorname | **Georgie Mae** | |
| Geschlecht | weiblich | Familienstand |
| Tätigkeit | | |

## Vermerk

Eltern des Freddie Lee Stapleton

EXT-STAPLETON-00087

# 2

**Ermittlungsbericht**
Ermittlungsauftrag der StA Ulm vom 22.08.2019
Aktenzeichenmitteilung
Sachstandsanfrage/-mitteilung 04.03.2020
Abschlussbericht vom 24.10.1986
Einstellungsverfügung der StA Ulm vom 07.11.1986

Polizeipräsidium Ulm
Kriminalinspektion 1 - Deliktspezifische Ermittlungen
Lindenstraße 1
89077 Ulm

# Ermittlungsbericht

| | | |
|---|---|---|
| **Ermittlungsverfahren** | **wegen** | **versuchten Mordes gemäß § 211 StGB** |
| | <u>**gegen**</u> | **STAPLETON Freddie Lee,** <br> **geboren 15.09.1957 in Brandon/Vereinigte Staaten (USA),** <br> **amerikanischer Staatsangehöriger,** <br> **39208 Pearl Mississippi (Vereinigte Staaten (USA),** <br> **310 Barrow Street 310, Apt. D-1** |
| | **z. Nt.** | **A████-G████, Susanne** <br> **geborene ████** <br> **geboren ██.1956 in Göppingen,** <br> **verheiratet/deutsch,** <br> **wohnhaft in 73033 Göppingen, ████** |
| | <u>**Tatzeit/-ort:**</u> | **23.10.1985 in 73033 Göppingen, Nördliche Ringstraße** <br> **(Höhe Parkanlage)** |

**Ermittlungsverfahren der Staatsanwaltschaft Ulm – Aktenzeichen: 11 Js 19684/13**

### I.  Anzeige:

Am Donnerstag, dem 24.10.85, um 00:43 Uhr, teilte der verheiratete Landwirt

> Eugen **H Ä G E N L Ä U E R**,
> geb.████ 1938,
> wohnhaft in 73037 Göppingen-Hohrein,
>
> Telefon:

dem Polizeirevier Göppingen fernmündlich mit, dass bei ihm eine Frau wäre, die offensichtlich überfallen worden war.
Aufgrund dieser Mitteilung fuhren POM Becks und PHW Hummel nach Göppingen-Hohrein, wo im Hausflur des Anwesens HÄGENLÄUER die verheiratete Hausfrau

Susanne **A**          **-G,**                    ,
geb.        .1956 in Goppingen,
wohnhaft: 73033 Göppingen,

Telefon:

vorgefunden wurde. Sie war lediglich mit einer Bluse und einem Unterhemd bekleidet, wies unter anderem eine stark blutende Kopfverletzung auf und konnte, unter starker Schockeinwirkung stehend, nur angeben, mit einem „Neger" Kontakt gehabt zu haben, der ein Messer bei sich hatte.

Näheres hierzu kann der „Anzeigenaufnahme" des POM Becks vom 24.10.85 entnommen werden.

*(Quelle: Anzeigenaufnahme des Polizeirevier Göppingen vom 24.10.1985 – siehe Register 3 der Hauptakte (HA))*

Aufgrund der Gesamtumstände musste davon ausgegangen werden, dass Frau A        -
G            Opfer eines Sexualdelikts geworden war.

Sie wurde in der Folge unverzüglich mit einem zwischenzeitlich verständigten Sanitätskraftwagen in die Klinik am Eichert, Göppingen, verbracht, wo sie stationär aufgenommen wurde.

## II.     Übernahme der Ermittlungen durch die Kriminalpolizei

### II.1.

Zuständigkeitshalber wurde die Abteilung II – Kriminalpolizei –, Kommissar vom Dienst (KvD-K) der Polizeidirektion Göppingen am 24.10.1985, gegen 01:10 Uhr, vom Polizeirevier Göppingen telefonisch über den Vorfall in Kenntnis gesetzt. Die daraufhin durchgeführten Ermittlungen, Feststellungen und Maßnahmen sind dem von KHM Amstädter gefertigten Bericht „Erste Ermittlungen zum angezeigten Sachverhalt" zu entnehmen.

**Erste Erkenntnisse und getroffene Maßnahmen / Ermittlungen zum angezeigten Sachverhalt:**

Erkenntnisse in der Klinik am Eichert, Göppingen:

Aufgrund der obigen Erstmeldung, dass in Göppingen eine Frau von einem „Farbigen" vermutlich vergewaltigt wurde, veranlasste KOK SGOLIK (KvD-K) unverzüglich bei den COOKE BARRACKS in Göppingen eine Einfahrkontrolle und verständigte telefonisch den Unterzeichner.

Im Zuge einer ersten Befragung in der Klinik am Eichert ergab sich, dass die verheiratete, derzeit beurlaubte Beamtin S        A        -G,        , geb. A        , geb.        .1956 in Göppingen, wh. 73033 Göppingen,        , auf dem Heimweg vom Nähkurs im „Haus der Familie" (Göppingen, Olgastraße 6), im Bereich der Nördlichen Ringstraße, auf dem Gehweg bei den Parkanlagen hinter dem Stadtbad von einem Farbigen mit einem Messer bedroht, in den Park gedrängt und dort unter Gewaltanwendung bis auf Hemd, Bluse und Unterhemd ausgezogen und zum Geschlechtsverkehr gezwungen wurde.

Nach Tatausführung (Vergewaltigung) wurde sie im Pkw des Täters nach Göppingen-Hohrein verbracht und dort an noch unbekannter Stelle aus dem Pkw geworfen und mit Laub zugedeckt. Von dort konnte sie den Bauernhof des Eugen HÄGENLÄUER, Göppingen-Hohrein, Unterer Weiler 15, erreichen, der telefonisch um 00:43 Uhr das Polizeirevier Göppingen verständigte.

Die Geschädigte A      -G      wurde durch das Deutsche Roten Kreuz (DRK) Göppingen in die Klinik am Eichert nach Göppingen verbracht und dort nach ärztlicher Erstversorgung stationär aufgenommen.

Verletzungsbild der Geschädigten:

Im Rahmen der ärztlichen Erstversorgung durch Herrn Dr. STEHLI konnte über diesen in Erfahrung gebracht werden, dass die Geschädigte durch die massive Gewalteinwirkung und Schläge des Täters mit einem nicht bekannten Gegenstand erhebliche Verletzungen (Platzwunden an der Schläfe, Verletzungen am Ohr und an der linken Hand) sowie eine Gehirnerschütterung erlitten hatte. Aufgrund des geschilderten Tatgeschehens wurde durch Frau Dr. HOFGÄRTNER in der Folge eine gynäkologische Untersuchung durchgeführt.

Frau A      -G      verblieb in der Klinik am Eichert zur stationären Behandlung letztendlich bis zum 06.11.1985. Wie den nachgehefteten Untersuchungsbefunden zu entnehmen, wurden bei der Geschädigten folgende Verletzungen festgestellt:

> › Bruch der 6. u. 7. Rippe,
> › Riss des linken Trommelfells,
> › Platzwunde an der linken Stirn- u. Schläfenseite,
> › 2 Druckstellen linksseitig am Kehlkopf und ein
> › Bluterguss rechtsseitig am Kehlkopf,
> › Schwellungen und Schürfwunden am Körper.

Die ausführliche Aufzählung und Beschreibung der festgestellten Verletzungen sind dem ärztlichen Befundsbericht des Herrn Dr. med. GOLD -Facharzt für Chirurgie- von der Klinik am Eichert/Göppingen zu entnehmen. Hierzu darf auf die beiden beigefügten Untersuchungsberichte verwiesen werden.

*(Quelle: Ärztlicher Befundbericht KaE, Göppingen, vom 30.10.1985 / Gynäkologischer Untersuchungsbericht KaE, GP, vom 25.10.1985 – siehe Register 6 der HA)*

Weitere Erkenntnisse:

Um 00:50 Uhr war der Ehemann der Geschädigten, **M      G**      , beim Streifendienst des Polizeirevier Göppingen erschienen, nachdem seine Frau nicht vom Nähkurs nach Hause zurückgekehrt war. Er bekundete hierbei, dass er bereits vergeblich nach seiner Frau gesucht hätte.

Kurz nach dem Eintreffen der Polizei in der Klinik am Eichert erschien dort auch der M      G      , der vom Vorgefallenen noch keine Kenntnis hatte. Er konnte nur mitteilen, dass seine Frau beim Nähkurs gewesen sei und er sie nicht habe von dort abholen können bzw. wollen, weil sie

zu Hause ein 2-jähriges Kind hätten. Nachdem seine Frau nicht rechtzeitig nach Hause gekommen wäre, hätte er sich auf die Suche nach ihr gemacht.

Über den eingesetzten Sanitäter des DRK, **Horst PLAPP**, wohnhaft in Göppingen-Bartenbach, Göllerstraße 4, wurde mitgeteilt, dass die S. A      -G      davon gesprochen habe, dass sie von einem „Farbigen" vergewaltigt worden und aus dem Pkw des Täters rausgeworfen worden sei, der sie dann noch mit Laub zugedeckt hätte.

Sicherstellung der getragenen Opferbekleidung:
Als Bekleidungsstücke der S. A      -G.      wurde eine stark verblutete weiße Hemdbluse, ein Unterhemd und ein schwarz-grau-blau-gemustertes Halstuch sichergestellt.

Informatorische Angaben der Geschädigten:
Nach der ärztlichen Erstversorgung der S. A      -G      konnte von ihr lediglich bruchstückhaft erfahren werden, dass sie auf ihrem Heimweg, auf dem Gehweg beim Park hinter dem Stadtbad, von einem „Farbigen" von hinten angefallen, mit einem Messer bedroht und in den Park gedrängt worden sei. Er habe sie hingeworfen, gewürgt und geschlagen, dann vergewaltigt. Danach habe er sie, als sie sich wieder bewegt habe, wiederum mit einem metallischen Gegenstand geschlagen, in einen Pkw geladen - könnte auch Kofferraum gewesen sein - und sei mit ihr weggefahren.

Schätzungsweise ein paar hundert Meter nach der Abzweigung der Straße in Göppingen-Bartenbach, Richtung Hohenstaufen, habe er sie aus dem Auto geworfen und mit Laub zugedeckt.

Täterbeschreibung / Erkenntnisse zum Täterfahrzeug:
Zu dem vom Täter benutzten Pkw konnten von ihr keine konkreten Angaben gemacht werden; sie konnte sich lediglich an ein eingeschaltetes Autoradio erinnern.

Den ihr unbekannten Täter beschrieb die Geschädigte wie folgt:
Farbiger, ca. 175 cm groß, schlanke Statur, dunkle Haare, trug möglicherweise rote Jacke – Trainingsjackenart-, möglicherweise mit weiß abgesetzten Taschen. Der Farbige sei alkoholisiert gewesen. Zudem soll der Täter, laut S. A      -G.      , eine Bisswunde an einem Finger haben, da sie ihn bei Tatausführung in den Finger gebissen habe, dass es blutete.

Weiterhin konnte die Geschädigte noch zum Verbleib ihrer mitgeführten Gegenstände angeben, dass sich ihre Tasche im Bereich des Tatorts, in der Nähe des Wasserbeckens (Springbrunnen) der Parkanlage befinden müsse.
Zur näheren Eingrenzung hinsichtlich des Vergewaltigungstatortes konnte sie angeben, dass sich dort wohl ein Maschendrahtzaun befand.

Gesprächsweise wurde in der Klinik am Eichert vom Personal mitgeteilt, dass die Schwester Simone, Station 04, berichtet habe, dass sie am 22.10.1985 gegen 22:45 Uhr, von Salach kommend,

EXT-STAPLETON-00092

beginnend ab der Umgehungsstraße in Eislingen bis zum Krankenhaus (Klinik am Eichert), von einem Pkw –silberfarbener US-Schlitten mit 8 Lichtern - verfolgt und mit Lichthupe und durch Winken belästigt worden sei. Dies wurde berichtet aufgrund gedanklicher Überlegung, dass vielleicht irgendein Zusammenhang bestehen könnte.

Erste Tatortsuche/-besichtigung / Sicherstellung von Beweismitteln:

Beim nächtlichen Absuchen des als Tatort benannten Parkgeländes konnte im Bereich des Spielplatzes, unmittelbar am Maschendrahtzaun, eine Damenbrille aufgefunden werden.

In der Nähe des diagonal ca. 150 – 200 m entfernten Wasserbeckens (Springbrunnen) konnte am Gehweg eine Tasche sowie eine weitere Brille (Damenbrille) aufgefunden werden.

Die weitere Bekleidung der Geschädigten, vermutlich ein von ihr getragener Mantel usw. konnte zunächst noch nicht aufgefunden werden.

II.2.

**Einrichtung und weitere Ermittlungsführung durch die „SOKO A        ":**

Zu Dienstbeginn wurde am Montag, den 24.10.1985, bei der Kriminalpolizei der Polizeidirektion Göppingen zur sachgerechten Bearbeitung des Vorkommnisses eine achtköpfige Sonderkommission (SOKO A       ) unter Leitung von KOK Friedrich eingerichtet.

Als Hauptsachbearbeiter wurde am 25.10.1985 KHM Witke benannt. In die Ermittlungen wurden ferner Beamte der US-Verbindungsstelle der Landespolizeidirektion Stuttgart I sowie des CID Göppingen eingeschaltet.

**Vernehmungserkenntnisse der Geschädigten (1. Vernehmung):**

Nachdem am 24.10.1985, gegen 08:00 Uhr, von Herrn Dr. Gold - Klinik am Eichert - zu erfahren war, dass Frau A        -G,        nunmehr vernehmungsfähig ist, wurde KHM'in Herrlinger-Misch und KOM Reutter mit der Durchführung einer ersten förmlichen Vernehmung beauftragt. Hierbei konnte nun folgender Sachverhalt in Erfahrung gebracht werden:

Am 23.10.1985, gegen 22:00 Uhr, verließ die Geschädigte das Gebäude, das „Haus der Familie" in Göppingen, Olgastraße 6, wo sie einen Nähkurs besucht hatte. Sie ging alleine nach Hause und war gegen 22:20 Uhr auf der Nördlichen Ringstraße in Höhe des Stadtbades, bzw. der dort angrenzenden Parkfläche, als sie plötzlich von einem „Farbigen" von hinten angegriffen und mit einem Messer (Klingenlänge ca. 25 cm und hellem Griff), welches ihr der Täter an den Hals hielt, bedroht wurde.

Die genaue Wegstrecke, die Frau A        -G,        zurücklegte, kann einem beigefügten Plan entnommen werden *(Quelle: -siehe Register 7 der HA)*.

Der Täter zerrte die Geschädigte vom Gehweg in die Parkanlage, in den Bereich eines Brunnes, der mit Büschen umgeben ist, wobei sich die Geschädigte ständig wehrte und um Hilfe schrie.

Diese Hilfeschreie wurden, so ergaben weitere Ermittlungen, von dem Zeugen

Thomas **MAYER**,
geboren am        1967 in Göppingen,
wohnhaft: 73033 Göppingen,

gehört *(Quelle: Zeugenvernehmung Thomas Mayer vom 24.10.1985 – siehe Register 5 der HA).*

Dieser befand sich bei der Hohenstaufenhalle, ca. 120 Meter (Luftlinie) vom Tatort entfernt. Herr Mayer wollte diesen Hilfeschreien zunächst auch nachgehen, da dann jedoch keine weitere mehr zu hören waren und er auch niemanden sah, dachte er an einen Scherz und drehte um.

Unmittelbar vor den Hilferufen sah er jedoch eine Frau auf der Nördlichen Ringstraße in Richtung Albert-Schweizer-Schule gehen. Ihr folgte eine männliche Person, bei der er einen metallischen Gegenstand von ca. 25 bis 30 cm Länge im Schein einer Straßenlampe aufblitzen sah. Zu diesem Zeitpunkt schaute Herr MAYER auf die Uhr in der Hohenstaufenhalle. Sie zeigte 22:22 Uhr. Ein bis zwei Minuten später vernahm er die oben angeführten Hilferufe. Aufgrund der Gegebenheiten ist davon auszugehen, dass es sich bei den von Herrn MAYER beobachteten Personen um Frau A       -G       und den Täter gehandelt hat.

Weiter schilderte Frau A       -G       , dass sie den Täter in der Anfangsphase der Tat in eine Hand beißen konnte; in welche, steht jedoch nicht fest. Als gesichert kann jedoch angesehen werden, dass diese Bissverletzung so stark war, dass sie blutete.

### Sicherstellung und KT-Untersuchung einer Blutspur:

Im Tatortbereich konnte im Rahmen der kriminaltechnischen Spurensicherung tatsächlich unter anderem eine Blutspur, die aus der Parkanlage (gepflasterter Weg) über den Gehweg und die Fahrbahn der Nördlichen Ringstraße bis hin zum Parkplatz der Hohenstaufenhalle (Südwestseite) führte, festgestellt werden. Ferner befand sich in einem Schuh der Geschädigten ein Blutstropfen. Sowohl Blutspur als auch Blutstropfen erbrachten durch eine Auswertung des LKA Baden-Württemberg die Blutgruppe 0 (die Geschädigte hat die Blutgruppe A 1).

Nach dem Fingerbiss begann der Täter zu toben und bedrohte sein Opfer weiter massiv. Nunmehr sah die Geschädigte aber das Messer nicht mehr. Wo dieses abgeblieben ist, ist bislang nicht bekannt. Trotz intensiver Absuche konnte es im Bereich des Tatorts nachweislich nicht aufgefunden werden. In der Folge begann der Täter nun sein Opfer zu entkleiden. Der Täter zerrte sein Opfer unter Schlagen und Würgen weiter zu dem ca. 100 m (Luftlinie) vom Brunnen entfernt gelegenen Spielplatz der Parkanlage. Dort zog ihr der Täter die Kleidung bis auf Bluse, Unterhemd und Halstuch aus und

vergewaltigte sein Opfer mehrfach. Frau A         -G,         führte hierzu konkret aus, dass der Täter dreimal den vaginalen und einmal den analen Geschlechtsverkehr mit ihr durchführte.

### Erkenntnisse aus der gynäkologischen Untersuchung:

Die von Frau Dr. HOFGÄRTNER in der Klinik am Eichert am 24.10.1985, um 02:30 Uhr, durchgeführte gynäkologische Untersuchung ergab einen Nachweis von immobilen Spermien in der Scheide der Geschädigten A         -G         . Im Abstrich aus dem Anus ließen sich keine Spermien nachweisen *(Quelle: siehe hierzu Untersuchungsbericht der Klinik am Eichert / Dr. Hofgärnter – siehe Register 6 der HA).*

Nachdem der Täter von Frau A         -G.         abließ, blieb diese zunächst ruhig liegen, da sie den Täter in der näheren Umgebung herumschleichen hörte. Nach ca. 5 Minuten kam der Täter zu seinem Opfer zurück und schlug unvermittelt mit einem stabähnlichen Gegenstand mindestens dreimal massiv auf den Kopf der am Boden liegenden Geschädigten ein. Frau A         -         G         hatte den Eindruck, dass die Schläge mit einem Metallstab geführt wurden.

### Sicherstellung eines Holzknüppels mit Blutantragungen:

Am Tatort konnte ein solcher Metallstab jedoch nicht aufgefunden werden, stattdessen wurde dort ein Holzknüppel mit Blutantragungen sichergestellt *(Quelle: Tatortbefunds-/Spurensicherungsbericht der KP Göppingen vom 16.10.1986 – siehe Register 7 der HA).*

Der Geschädigten gelang es, nach dem zweiten Schlag ruhig liegen zu bleiben und sich tot zu stellen. Es kann als sicher unterstellt werden, dass der Täter davon ausging, dass sein Opfer tot ist, was nicht zuletzt aus dem weiteren Täterverhalten zu folgern ist.

Nachdem er nämlich auf sein Opfer eingeschlagen hatte, entfernte er sich erneut und kam nach ca. 10 Minuten mit einem PKW zurück. Mit diesem fuhr er bis unmittelbar zu der noch immer am Boden liegenden Geschädigten. Diese war dort verblieben, da sie in Todesangst davon ausging, dass sich der Täter erneut in unmittelbarer Nähe aufhält und sie beobachtet. Der Täter benutzte als An- und Abfahrtsweg den westlich des Stadtbades und parallel zu diesem verlaufenden asphaltierten Fußweg, der dort bis an den Spielplatz führt und an der Nördlichen Ringstraße beginnt.

Frau A         -G.         stellte sich weiterhin tot und wurde von diesem nunmehr in das Kraftfahrzeug (vermutlich PKW des Täters) verbracht. Hierbei hat der Täter auch die ausgezogenen Kleidungsstücke mitgenommen.

Um was für ein Kraftfahrzeug es sich genau gehandelt hat, kann die Geschädigte nicht angeben. Auch ist es ihr nicht möglich, die Fahrstrecke anzugeben, die der Täter mit ihr in der Folge zurücklegte. Sie kann nicht einmal angeben, ob sie im Kofferraum oder im Fahrgastinnenraum transportiert wurde. Alleiniger Hinweis bezüglich des Fahrzeugs ist der, dass während der Fahrt ein Radio spielte.

An der K 1407, zwischen Göppingen-Hohrein und der L 1075, wurde die Geschädigte vom Täter aus dem Fahrzeug herausgeholt und in den dortigen Straßengraben gelegt. Der Täter deckte sein Opfer

EXT-STAPLETON-00095

anschließend mit Laub und Ästen ab und fuhr davon. Da die Geschädigte auch jetzt nicht ausschloss, dass der Täter in der Nähe lauert, verblieb sie noch geraume Zeit (genauere Angaben sind nicht möglich) im Straßengraben liegen, bis sie sich schließlich nach Göppingen-Hohrein schleppte, wo sie am 24.10.1985, gegen 00:40 Uhr beim Anwesen HÄGENLÄUER um Hilfe bat.

**Die Geschädigte beschrieb den Täter / Bekleidung wie folgt:**

> › Farbiger, nicht ganz schwarz,
> › ca. 175 cm groß,
> › ca. 28 bis 32 Jahre alt,
> › schlank mit schlankem Gesicht,
>   der Kopf wirkte im Verhältnis zum Körper eher kleiner,
> › kurze krause Haare mit leichtem Kotelettenansatz,
> › Nase und Augen erschienen normal,
> › Lippen leicht wulstig,
> › kleine Ohren,
> › feingliederige Finger,
> › sprach deutsch mit amerikanischem Akzent,
> › seine Atemluft roch nach hochprozentigem Alkohol,
> › der Täter müsste von der Tat herrührend eine Bissverletzung
>   an einer Hand aufweisen,
> › er trug eine rote blousonartige Jacke und er führte ein Messer mit
>   hellem Griff mit sich (Klingenlänge ca. 25 cm).

Bezüglich der Jacke wurde versucht, ein Vergleichsstück zu beschaffen. Es gelang bisher jedoch lediglich, eine ähnliche Jacke im PX-Laden (Post-Exchange), der sich auf dem Gelände der Cooke Barracks/Göppingen befindet, ausfindig zu machen. Von dieser Jacke wurden Vergleichslichtbilder angefertigt.

**Erstellung eines Phantombildes des Tatverdächtigen:**

Am 29.10.1985 konnte von KHM WERNER von der Tatortgruppe des LKA Baden-Württemberg in der Klinik am Eichert nach den Angaben von Frau A        -G,        **ein Phantombild** gefertigt werden *(Quelle: Phantombild – siehe Register 10 der HA).*

Aufgrund der gewonnenen Erkenntnisse war mit hoher Wahrscheinlichkeit davon auszugehen, dass es sich bei dem Täter um einen „farbigen Amerikaner" handelt, wobei jedoch bei den angestellten Ermittlungen andere Nationalitäten nicht außer Acht gelassen wurden, bzw. werden.

**Durchführung einer Öffentlichkeitsfahndung:**

Noch am 24.10.1985 wurden **Handzettel in englischer Sprache** verfasst und in den Cooke Barracks sowie in von Amerikanern bewohnten Hausanlagen im Bereich Göppingen verteilt. Weitere Handzettel wurden auch im Bereich Schwäbisch Gmünd zur Verteilung gebracht. Es erfolgte ferner am 25.10.1985, in Absprache mit der Staatsanwaltschaft Ulm, Staatsanwalt Freund, im **amerikanischen Radiosender AFN** stündlich ein **Fahndungsaufruf**. Diese Fahndungsmaßnahmen, die in erster Linie amerikanische Staatsangehörige ansprechen sollten, wurden durch mehrere **Veröffentlichungen in**

der örtlichen Presse (NWZ und GZ) sowie aus dem Bereich des Ostalbkreises (Remszeitung, Schwäbische Post, Aalener Volkszeitung, Gmünder Tagespost) ergänzt.

*(Quelle: Handzettel – siehe Register 10 der HA).*

Die eingegangenen Hinweise wurden, soweit brauchbar, überprüft, führten jedoch bislang zu keinem Erfolg. Anzuführen bleibt hier jedoch, dass die Resonanz aus amerikanischen Kreisen gleich Null war.

## Auslobung der Staatsanwaltschaft und Angehörigen:

Auch eine von den Angehörigen der Geschädigten und der Staatsanwaltschaft 89073 Ulm/Donau ausgesetzte Auslobung in einer Gesamthöhe von 10.000,00 DM (7.000 DM von Seiten der Angehörigen und 3.000 DM von der Staatsanwaltschaft Ulm) erbrachte nicht den gewünschten Erfolg.

## Erkenntnisse aus kriminaltechnischen Spurensicherungsmaßnahmen:

Bezugnehmend des nachgehefteten umfassenden Tatortbefundberichts der Kriminaltechnik der KP Göppingen ließen sich im Zuge der durchgeführten kriminaltechnischen Spurensicherungsmaßnahmen letztendlich Blutspuren sowohl an der Opferbekleidung als auch am Tatort sichern, welche nach Untersuchungen beim Landeskriminalamt Baden-Württemberg zweifelsfrei dem unbekannten Täter (Blutgruppe 0) zuzuordnen waren.

Ein Tatverdächtiger konnte dennoch nicht identifiziert und ermittelt werden.

Dem Bericht sind Tatort-Übersichtspläne, -skizzen sowie detaillierte Lichtbildmappen zum Opfer, Verletzungen, Spuren an Opferbekleidung und am Tatort gesicherte Spuren sowohl visuell als auch in digitaler Form (1 CD) beigefügt.

*(Quelle: Tatortbefund--/Spurensicherungsbericht / Pläne, Lichtbildmappen + 1 CD / Untersuchungsbericht LKA BW vom 06.05.1986 – siehe Reg. 7 der HA)*

## Weitergehende Ermittlungs-/Überprüfungsmaßnahmen:

## Systematische Überprüfung von Stationierungsstreitkräften in amerikanischen Kasernen:

Da nach den Aussagen der Geschädigten und der am Tatort gesicherten Blutspuren davon auszugehen war, dass der unbekannte Täter eine Bissverletzung an der Hand erlitt, wurden am 25.10.1985 in den **Cooke Barracks in Göppingen** und am 26.10.1985 in der **Bismarck- und Hardt-Kaserne in Schwäbisch-Gmünd** sämtliche an diesem Tag erreichbaren „Farbige" auf Handverletzungen überprüft. Folgeüberprüfungen in dieser Richtung wurden in den darauffolgenden Tagen durchgeführt. Sie führten letztendlich allesamt nicht zum Erfolg.

## Nachbarschaftsbefragung im Bereich des Tatorts:

Durch eine **Nachbarschaftsbefragung**, in der auch die Besucher der Hohenstaufenhalle vom 23.10.1985 einbezogen wurden, ergab sich ein Hinweis auf einen weißen PKW Ford neuestes Modell, mit AA-Kennzeichen, der zur tatkritischen Zeit bei der Hohenstaufenhalle geparkt war und keinem Besucher der Hohenstaufenhalle zuzuordnen war.

Bei der Aufnahme des Tatortsbefundes war darüber hinaus festgestellt worden, dass wenige Meter vor dem angegebenen Standort des Pkw Ford, die von der Parkanlage herführende Blutspur endete. Zur Ermittlung des Fahrzeugs wurden, neben einem Presseaufruf, nahezu sämtliche Halter von weißen PKW Ford-Escort aus dem Ostalbkreis überprüft, wobei jedoch erst durch eine Überwachung der Hohenstaufenhalle am Mittwoch den 30.10.1985 Fahrzeug und Halter ermittelt werden konnten. Die Überprüfung des Fahrzeughalters, es handelt sich um

Winfried **HOFELE**,
geboren am      1947
wohnhaft: Schwäbisch-Gmünd,

erbrachte jedoch zweifelsfrei, dass er mit der Tat nicht in Verbindung zu bringen ist.

### Durchführung einer Wahllichtbildvorlage bei der Geschädigten:
Durch den Umstand, dass ein Großteil der Angehörigen der US-Armee, Standort Göppingen, in den Jahren 1982 und 1984 von dem Fotostudio Schuster (91126 Schwabach, Lindenstraße 8) fotografiert wurde und es nicht auszuschließen ist, dass es sich bei dem Täter entweder um einen Angehörigen der US-Streitkräfte oder einen ehemaligen Angehörigen der US-Streitkräfte des Standortes Göppingen handelt, wurden die Negative dieser Lichtbilder im Zusammenwirken mit der CID Göppingen von dem Fotostudio Schuster erbeten und von diesem zur Fertigung von je einem Abzug der Sonderkommission der Kriminalpolizei der Polizeidirektion Göppingen übergeben.
Im Rahmen der Wahllichtbildvorlage der gefertigten Lichtbilder konnte Frau A        -G. jedoch keine abgebildete Person als Täter identifizieren.
*(Quelle: Lichtbildvorlage – siehe Register 10 der HA).*

### Einzelüberprüfungen von Tatverdächtigen (Blutgruppe 0):
Nach der Feststellung, dass der unbekannte Täter die Blutgruppe 0 hat, wurden nunmehr von sämtlichen „farbigen" Soldaten der Cooke-Barracks, die die Blutgruppe 0 aufweisen und zwischenzeitlich nicht in die Staaten zurückgekehrt waren, in Zusammenarbeit mit der CID Göppingen, Lichtbilder angefertigt, die der Geschädigten ebenfalls vorgelegt wurden.

Bislang hat Frau S        A        -G.        aus ca. 100 vorgelegten Lichtbildern dieser Personengruppe zwei Personen herausgezogen, von denen sie sagt, dass diese dem Tätertypus sehr nahekommen würden. Es handelt sich hierbei um:

1. **P**        , **K**        und
2. **W**        , **K**        .

Die nähere eingehende kriminalpolizeiliche Überprüfung dieser beiden Personen verlief gleichfalls negativ.

P    ; K    weist nicht die Blutgruppe 0 auf.

W    ; K    weist die Blutgruppe 0 auf, weshalb mit seinem Einverständnis eine Blutprobe erhoben wurde. Die Auswertung dieser Probe ergab schließlich, dass er nicht als Spurenverursacher (Täter) in Betracht kommt. (Spur Nr. 92).

Gleich zu Beginn der Ermittlungen lag unter anderem ein vielversprechender Hinweis auf den Zivilamerikaner

C    L    **S**    ,
geboren    1956 in Mobile/Alabama/USA,
wohnhaft:    ,
63571 Gelnhausen,

vor. Er war bis April 1984 Angehöriger der US-Armee und in Göppingen stationiert.

S    wurde deshalb nach Rücksprache mit der Staatsanwaltschaft 89073 Ulm/Donau, Herrn Staatsanwalt FREUND, am 26.10.1985 zur Festnahme ausgeschrieben. S    konnte am 26.10.1985 in 6467 Hasselroth festgenommen werden.

Zur Überprüfung seiner Person begab sich KOM REUTTER und der Unterzeichner noch am selben Tag nach Gelnhausen.

Die hierbei durchgeführten Ermittlungen erbrachten dann jedoch zweifelsfrei, dass S    als Täter ausgeschieden werden kann.

Im Zuge weiterer Ermittlungen wurde aufgrund einer BKA-Blatt-Veröffentlichung (152/86) M
G    in die Überprüfung mit einbezogen. Eine Bestimmung seiner Blutgruppe durch das Institut für Rechtsmedizin in Giessen im Vergleich mit dem ausgewerteten Spurenblut ergab eindeutig, dass G    als Spurenverursacher im hier anstehenden Ermittlungsverfahren ausscheidet.

Im August 1986 wurde

R    . G. F
geboren am    .1960,
wohnhaft: 73035 Göppingen-Faurndau,

wegen mehrerer Sexualdelikte bei hiesiger Dienststelle anhängig. Er wurde Frau S
A    -G    in einer Wahlgegenüberstellung gegenübergestellt. Hierbei konnte Frau

A    -G,    den F    nicht zweifelsfrei ausschließen, weshalb von Fl    eine Blutprobe erhoben wurde, die dem Landeskriminalamt Baden-Württemberg zur Auswertung

zugeleitet wurde. Die Untersuchung ergab, dass F          als Spurenverursacher auszuschließen ist.

## Weitere Überprüfungsmaßnahmen:

Nach den eben aufgeführten Überprüfungsmaßnahmen von farbigen US-Soldaten wurden parallel dazu auch Farbige andere Nationalitäten wie z.b. Eritreaer, Inder und Afrikaner, die im Bereich Göppingen aufhältig sind, überprüft.

Darüber hinaus wurde versucht, sämtliche farbigen Zivilamerikaner, die im Landkreis Göppingen wohnhaft sind, abzuklären, was zum Großteil erfolgte. Zum Großteil und bislang nicht vollständig deshalb, da die Maßnahme von der Anmeldung der Zivilamerikaner abhängig ist und hier wird von hiesiger Seite aus vermutet, dass einige Personen nicht angemeldet sind.

Aus diesem Grund erfolgten auch schwerpunktmäßige Überprüfungen von Wohnbereichen im Landkreis Göppingen, die von Amerikanern bevorzugt bewohnt werden. Auch diese Überprüfung verlief ebenfalls negativ.

## Durchführung von Fahndungs- und Überwachungsstreifen:

Die bis zum Abschluss des Verfahrens gegen Unbekannt und Abgabe an die Staatsanwaltschaft Ulm durchgeführten Fahndungs- und Überwachungsstreifen im Nordstadtbereich Göppingen erbrachten ebenfalls keine weiteren Ansatzpunkte.

## III.    Abschluss des Ermittlungsverfahrens / Vorlage an Staatsanwaltschaft Ulm:

Da sich im Rahmen der durchgeführten umfangreichen kriminalpolizeilichen Ermittlungen sowie der Überprüfungs- und durchgeführten Fahndungsmaßnahmen bis zum 24.10.1986 keine weiteren Ermittlungsansätze zur Ermittlung und Identifizierung des unbekannten Täters bzw. Aufklärung des Verbrechens ergaben, wurde das Ermittlungsverfahren mit derzeitigem Sachstand gegen Unbekannt abgeschlossen und der Staatsanwaltschaft Ulm vorgelegt.

## IV.    Vorläufige Einstellung des Ermittlungsverfahrens durch die Staatsanwaltschaft Ulm    Fortführung des Verfahrens – Aktenzeichen 11 Js 19684/13

Das Ermittlungsverfahren war letztendlich mit Datum vom 07.11.1986 seitens der Staatsanwaltschaft Ulm (Aktenzeichen 7 Js 7284/85) gegen Unbekannt einzustellen, da keine weiteren erfolgsversprechenden Ansatzpunkte für Ermittlungen vorhanden waren.

Nach Identifizierung des u.a. Beschuldigten wurde das Ermittlungsverfahren bei der **Staatsanwaltschaft Ulm unter Aktenzeichen 11 Js 19684/13** fortgeführt.

000023

ie weitere Sachbearbeitung erfolgte zunächst fortlaufend federführend durch EKHK Witke bei der Kriminalaußenstelle der Polizeidirektion Göppingen und nach Inkrafttretens der Polizeistrukturreform beginnend ab Ermittlungsauftrag der Staatsanwaltschaft Ulm vom 22.08.2019 durch den Unterzeichner, EKHK Bartosch, bei der Kriminalinspektion 1 der Kriminalpolizeidirektion beim Polizeipräsidium Ulm.

**V.    Weitergehende kriminaltechnischen DNA-Untersuchungen Speicherung und Abgleich in der DNA-Analyse-Datei (DAD)**

Im Zuge der wissenschaftlich fortschreitenden bzw. weiterreichenden kriminaltechnischen Erkenntnissen und Möglichkeiten im Bereich der DNA-Spurenauswertung erfolgte im Jahr 2001 nochmals mit Beschluss des Amtsgerichts Göppingen die gezielte Untersuchung und Auswertung von damals gesicherten DNA-Spurenträgern (Blutspuren an Bekleidungsstücken der Geschädigten Albrecht-Ganthaler sowie zwei gesicherten Pflastersteinen vom Tatort) beim Landeskriminalamt Baden-Württemberg.

Hierdurch konnte zunächst an den **2 Pflastersteinen (Blutspuren - Asservate 17 h / 17 i)** jeweils ein gleichartiges zu Identifizierungszwecken geeignetes DNA-Identifizierungsmuster erstellt werden, welches an die DAD-Analyse-Datei (DAD) zur Erfassung weitergeleitet wurde. Trotz Einstellung in der DAD ließ sich hierbei kein Treffer feststellen.

*(Quelle: Untersuchungsantrag der PD KP Göppingen vom 07.11.2001 / Beschluss des AG Göppingen 9 Gs 780/01 Kurzbericht des LKA BW vom 29.01./12.03.2002 - siehe Register 8 der HA)*

In einem KT-Folge-Untersuchungsauftrag wurde das Landeskriminalamt Baden-Württemberg (LKA BW) ersucht, nochmalig an weiterer Opferbekleidung sowie gesicherten Spuren an der Geschädigten (Unterhose, Strumpfhose, Hosenrock, Spermaprobe, Hautschuppen, Haare (Asservate 1a bis 11b1) nach Täter-DNA zu untersuchen.

Wie dem nachgehefteten Molekulargenetischen Untersuchungsbericht des LKA BW zu entnehmen, konnten auch an der **Unterhose (Asservat 15) und Strumpfhose (Asservat 16)** mehrere Blutspuren ein- und derselben männlichen Person gesichert und betreffend dieser ein DNA-Profil erstellt werden.

Dieses DNA-Profil entsprach zweifelsfrei dem bereits oben gesicherten, in der DAD eingestellten DNA-Identifizierungsmuster ID 172001.

*(Quelle: KT-Folge-U-Antrag an das LKA BW am 10.03.2009 / Untersuchungsbericht des LKA BW vom 22.10.2009 - siehe Register 8 der HA)*

**Veranlassung eines DNA-Musterabgleichs in den Vereinigten Staaten von Amerika (USA)**

Aufgrund des begründeten Verdachts, dass es sich bei dem unbekannten Täter um einen amerikanischen Soldaten gehandelt hat, wurde über das Landeskriminalamt BW / BKA –OA 37, Interpol Wiesbaden, eine Anfrage hinsichtlich des DNA-Datenbankbestand-Abgleichs (Combined DNA

Index System CODIS) in den USA bezugnehmend des DNA-Spurenprofils ID 172001 in Auftrag gegeben.

Diesbezüglich wurde um ein justizielles förmliches Rechtshilfeersuchen unter Einhaltung des Geschäftsweges gebeten.

*(Quelle: Antrag des LKA BW vom 12.03.2002 / EMail des LKA BW vom 21.07.2008*
*Rechtshilfeersuchen in die USA vom 04.05./15.05.2012 deutsch / englisch – siehe Register 9 der HA)*

## VI. Identifizierung des Beschuldigten STAPLETON Freddie Lee

Mit Memorandum der Justiz der Vereinigten Staaten von Amerika vom 01.07.2013 teilte das Federal DNA Database Unit des FBI Laboratory (FBI DNA Datenbank) auf justiziellem Geschäftsweg am 27.06.2013 der sachleitenden Staatsanwaltschaft Ulm mit, dass das mit Ersuchen übermittelte DNA-Profil zweifelsfrei mit dem Profil eines

> Freddie L. **STAPLETON**.
> geboren           1957,
> männlich schwarz,

entspricht bzw. vollständig übereinstimmt.


Polizeiliche Erkenntnisse zur Person Freddie Lee STAPLETON:

Zudem wurde mitgeteilt, dass benannte Person in 1988 von der Jackson, Mississippi Police Department wegen Entführung, Vergewaltigung und Angriff eines Polizisten festgenommen und am 02.10.1989 zu 30 Jahren Gefängnis verurteilt wurde; 10 Jahre einzusitzen und 5 Jahre danach auf Bewährung. Am 21.07.2006 ist STAPLETON als Vorbestrafter im Besitz einer Feuerwaffe festgenommen und am 01.12.2006 zu 3 Jahren Gefängnis verurteilt worden. Danach wäre er auf Bewährung unter der Aufsicht des US Probation Office, Jackson, Mississippi, 501 E Court St. Suite 1, Jackson, MS, 39201. Laut NCIC ist STAPLETON gegenwärtig in den USA nicht ausgeschrieben.

Für den amerikanischen Staatsangehörigen Freddie L STAPLETON wurden folgende mögliche Adressen mitgeteilt:

> › **Rt 10 Bx 348, Jackson, Mississippi, 39208**
> › **245 McKenzie Lane, Pearl, Mississippi, 39208 .**

Weitere Recherchen weisen auf eine Adresse des STAPLETON in

> › **310 Barrow St. Apt D-1, Pearl, Mississippi,**
> **tel 601-932-0229, 601-566-3402,**
> **Arbeitsplatz Wasserwerk von Pearl, Mississippi,**

hin.

Eine Anfrage an die US Army CID, ob STAPLETON im Jahr 1985 in Deutschland stationiert war, stand noch aus.

Hinsichtlich einer DNA-Beprobung des STAPLETON wurde um Übermittlung eines ergänzenden justiziellen Rechtshilfeersuchens über BfJ (Office of International Affairs New York, US Department of Justice) gebeten.

*(Quelle: Schreiben/Rückantwort des U.S.-amerikanischen JuMi / Memorandum vom 01.07.2013 – siehe Register 9 der HA)*

## VII. Weitergehende beweiserhebliche Feststellungen

Ermittlungen hinsichtlich der Stationierungszeit des STAPLETON in Deutschland:

Die durchgeführten Ermittlungen über das CID Office in den Patch Barracks in Stuttgart ergaben, dass das FBI über das Amerikanische Konsulat in Frankfurt bereits hinsichtlich der Fragestellung zur genauen Stationierungszeit/-standort des STAPLETON Anfrage gehalten habe und die in Betracht kommenden Personalakten dorthin gesandt wurden.

Erhebungen aus / bei Überprüfungen Cooke Barracks, Göppingen:

Anhand einer nochmaligen retrograden Auswertung der bisherigen Ermittlungsakten und Überprüfungsergebnisse im Zusammenhang der Suche nach dem unbekannten Täter im Bereich der Stationierungskräfte in den **Cooke Barracks in Göppingen** ließ sich anhand der dortigen Personallisten feststellen, dass Freddie Lee STAPLETON tatsächlich nachweislich im Zeitraum zwischen **03.12.1982 bis 15.11.1985** dort als SGT registriert war. Er war dort als Sgt. Bzw. SP 5 bei den Cooke Barracks in Göppingen stationiert und zwar bei der HHC, 4 BN 16 INF.

Bei den im Zeitraum von 25.10. bis 07.11.1985 durchgeführten Überprüfungen und Abklärungen der Angehörigen der US-Armee in den Cooke Barracks in Göppingen wurde auch der SGT STAPLETON Freddie mit einbezogen, wobei sich jedoch damals wohl kein weiterer ermittlungsrelevanter Verdacht gegen ihn ergeben hatte.

Abklärungen über Meldebehörden:

Angestellte Recherchen über das Einwohnermeldeamt der Stadt Göppingen und Karlsruhe belegen, dass der Beschuldigte Freddie Lee STAPLETON, geboren am        1957 in Brandon/Vereinigte Staaten (USA), im Jahr 1977 in Karlsruhe seine jetzige Frau U        B        S        , geborene R        , geboren am        1953 in Neuweiler, geheiratet hat und aus dieser Ehe die Tochter N        S        , geboren am        1978 in Karlsruhe hervorging.

Am **01.11.1982** kamen Frau und Kind in der **Freihofstraße 99 in 73033 Göppingen** aus den USA kommend zur Anmeldung. Der Beschuldigte Freddie STAPLETON war unter dieser Adresse nicht gemeldet. Mit Datum **30.11.1986** erfolgte die Abmeldung in die USA.

Erkenntnisse aus Fahndungs-/Überwachungsmaßnahmen:

Gleichfalls ergab sich bei nochmaliger Auswertung der Ermittlungsunterlagen, dass im Zuge der durchgeführten Fahndungs- und Überwachungsmaßnahmen der im Stadtgebiet Göppingen registrierten Fahrzeuge mit amerikanischen Kennzeichen auch der auf den Beschuldigten Freddie STAPLETON zugelassene gelbe **Pkw Pontiac / Plymouth mit dem Kennzeichen EC-7830** polizeilich aufgefallen war. Sowohl am **06.11.1985** als auch in der Nacht von **08. auf den 09.11.1985** stand dieses Fahrzeug in Göppingen geparkt in der **Freihofstraße bzw. gegenüber dem Gebäude Freihofstraße 99.**

Lichtbildvorlage bei der Geschädigten A      -G      :

Die Geschädigte A      -G      erkannte den beschuldigten Freddie STAPLETON bei einer am 22.11.1985 bei ihr durchgeführten Vorlage unter einer Vielzahl von Lichtbildern von Angehörigen der amerikanischen Streitkräfte, unter anderem beinhaltete es ein Foto des Täters, nicht wieder.

Abklärungen über IP Washington –Verjährungsfrist:

Zur Frage der Verjährungsfrist in den USA in Bezug der hiesigen Tat ließ sich im Rahmen einer polizeilichen Anfrage über IP Washington abklären, dass im Zuge einer Rücksprache beim Department of Justice (DoJ) erklärt wurde, dass Tötungsdelikte in den USA in den meisten Bundesstaaten grundsätzlich keiner Verjährung unterliegen. Im vorliegenden Fall war zu überprüfen, ob die Verjährung im US Bundesstaat Mississippi (derzeit bekannter Wohnort des Verdächtigen) eintritt. Dies sei nicht der Fall. Da die nunmehr in Betracht kommende Tat aus dem Jahr 1985 in Deutschland stattfand, findet in dieser Konstellation das Recht des Staates Mississippi keine Anwendung, sondern es greifen vielmehr die Bundesgesetze. Auch diese sehen im Fall von Kapitalverbrechen, zu denen sowohl Vergewaltigung als auch Tötungsdelikte gehören, keine Verjährung vor. Somit dürfte im vorliegenden Fall eine Verjährung nicht eingetreten sein.

Die Stellung eines Rechtshilfeersuchens bzw. Antrags auf Verfahrensübernahme wurde als aussichtsreich eingeschätzt. Auf Grundlage des derzeit gültigen Auslieferungsvertrags wäre grundsätzlich sogar eine Auslieferung des Verdächtigen an die Bundesrepublik Deutschland möglich, was jedoch im Zuge einer Einzelfallprüfung festgestellt werden müsste.

*(Quellen: Ermittlungsauftrag der StA Ulm 09.09.2013 / Vermerk der KP Göppingen vom 10.09.2013 / Memorandum des FBI Legal Attache USGK Frankfurt vom 01.07.2013 / EMail des BKA vom 27.11.2013 / Ermittlungs-/Überprüfbericht US-Angehöriger vom 12.11.1985 mit Personalliste / Bericht zur Lichtbildvorlage bei Geschädigter 22.11.1985 / Vermerk Feststellung des abgeparkten Pkw EC-7830 / Melderegister-/Standesamtsauskünfte samt beglaubigter Kopie des Familienbuchs  - siehe Register 10 der HA)*

**VIII. Ergänzendes Rechtshilfeersuchen – Erhebung und Abgleich Speichel-/Blutprobe des Beschuldigten in der DNA-Datenbank (CODIS) in den Vereinigten Staaten (USA)**

Bezugnehmend eines ergangenen Beschlusses des Amtsgerichts Ulm, zur zwangsweisen Erhebung einer Blutprobe oder freiwilligen Abgabe einer Speichelprobe des Beschuldigten Freddie Lee STAPLETON, zum Zwecke einer molekulargenetischen Untersuchung und Vergleich des DNA-Musters mit den gesicherten DNA-Merkmalen der am Tatort und der Bekleidung des Opfers gesicherten Spuren, übersandte die Staatsanwaltschaft Ulm nunmehr auf dem justiziellen Rechtshilfeweg ergänzende Ersuchen an die zuständigen Justizbehörden der Vereinigten Staaten von Amerika. Zum einen zum beweisrelevanten Abgleich des molekulargenetischen Profils der Tatortspuren mit der DNA-Analysedatei der Vereinigten Staaten (DNA-Datenbank – CODIS) sowie zur Erhebung bzw. Entnahme einer gerichtsverwertbaren Blut-/Speichelprobe beim Beschuldigten STAPLETON und deren Auswertung und Übersendung des DNA-Profils in einem deutschen Ermittlungsverfahren.

*(Quellen: Beschluss des AG Ulm 3 Gs 1210/14 / 2 Rechtshilfeersuchen an Vereinigte Staaten von Amerika (USA) vom*
*10.05.2017 und 16.01.2018 / Rückantwortschreiben des US-Justizministeriums vom 16.04.2019 mit DNA-Probe*
*- siehe Register 11 der HA)*

**IX. Kriminaltechnische DNA-Untersuchung LKA BW**
**Identifizierung des Beschuldigten STAPLETON**

Wie dem beigefügten detaillierten Untersuchungsbericht des LKA BW – KTI – vom 31.07.2019 zu entnehmen, konnte der Beschuldigte Freddie Lee STAPLETON anhand seines aktuell erhobenen und ausgewerteten DNA-Identifizierungsmusters sowie der molekulargenetischen Untersuchung bzw. dem Abgleich zweifelsfrei als Spurenleger seiner Blutspur auf gesicherter Opferbekleidung (Unterhose – Ass. 15, Strumpfhose – Ass. 16) sowie an Pflastersteinen (Ass. 17 h i) identifiziert werden.

*(Quelle: Untersuchungsantrag der StA Ulm vom 13.03.2019 / Molekulargenetischer Untersuchungsbericht des LKA BW vom*
*31.07.2019 – siehe Register 12 der HA)*

**X. Beweismittelverzeichnis / Verbleib der Asservate**

Hinsichtlich des Verbleibs sämtlicher Asservate (gesicherte Tatortspuren sowie Bekleidung des Opfers mit Spurenbefunden und DNA-Vergleichsprobe sowie der DNA-Probe des Beschuldigten) wird auf das nunmehr beigefügte Beweismittelverzeichnis bzw. die im Rahmen der Tatbefundsaufnahme erstellten Verzeichnisse verwiesen.

*(Quelle: Beweismittelverzeichnis – siehe Register 13 der HA)*

## XI.   Polizeikosten-Nachweis

Betreffend der in dem Ermittlungsverfahren entstandenen Kosten wird zudem auf die beigefügte Polizeikostennachweisung verwiesen.

*(Quelle: Polizeikostennachweis – siehe Register 14 der HA)*

# Schlussvermerk:

Die Ermittlungsakte mit förmlicher Strafanzeige gegen den Beschuldigten Freddie Lee STAPLETON wird der Staatsanwaltschaft Ulm nunmehr nach Aufbereitung der Ermittlungsakte nach heutigen Standards, chronologischer sachlogischer Einarbeitung der jeweiligen Ermittlungsergebnisse (siehe Ermittlungsauftrag der StA Ulm vom 22.08.2019) und Erstellung eines umfassenden Ermittlungsberichts (1 Leitz-Ordner) mit samt der 2 Bände Ermittlungsakte (Altakte) übersandt.

Von einer Kontaktaufnahme mit dem damaligen Opfer, der Geschädigten Frau A    -G        ,
wurde weisungsgemäß bislang Abstand gehalten.

Sollten weitere Ermittlungen notwendig sein, wird um entsprechende Weisung gebeten.

Bartosch, EKHK

**Anlage**
1 LO - Hauptakte
2 LO - Altakte

000029



**Baden-Württemberg**

STAATSANWALTSCHAFT ULM

Staatsanwaltschaft Ulm · Postfach 38 63 · 89028 Ulm

Polizeipräsidium Ulm
Kriminalinspektion 1
Lindenstraße 1
89077 Ulm

Polizeipräsidium Ulm
Kriminalpolizeidirektion

Eingang:
2 3. Aug. 2019

| K 1 | K 2 | K 3 | K 4 | K 5 | K 6 | K 7 | K 8 |
|-----|-----|-----|-----|-----|-----|-----|-----|
| KK BC | KK HDH | KK GP | KPD L | FüGr | Ds Rev | | |

☐ zur Bearbeitung

Datum 22.08.2019
Name Herr Adamski
Durchwahl 0731/189-1111
Aktenzeichen 11 Js 19684/13
(Bitte bei Antwort angeben)

**Ermittlungsverfahren gegen Freddie Stapelton
wegen versuchten Mordes**

Anlage:
2 Bände Ermittlungsakten

Anbei übersende ich 2 Bände Ermittlungsakten in dem o.g. Verfahren gegen Freddie Stapelton wegen versuchten Mordes, begangen am 23.10.1985 in Göppingen. Aufgrund der besonderen Bedeutung des Verfahrens, bitte ich trotz des Tatorts in Göppingen um Bearbeitung des Falles bei der Kriminalinspektion 1.

Nach hiesiger Auffassung wird der Beschuldigte anhand eines am 09.08.2019 eingegangenen DNA-Gutachtens der Tat vom 23.10.1985 überführt werden können. Da es sich bei dem Beschuldigten um einen US-Staatsangehörigen handelt, ist beabsichtigt das Ermittlungsverfahren in die USA abzugeben. Hierzu ist es erforderlich, die Ermittlungsakte nach heutigen Standards aufzubereiten (Aufbereitung der Lichtbilder in digitaler Form etc.), die Ergebnisse der Rechtshilfe einzuarbeiten und einen umfassenden Ermittlungsbericht zu fertigen.

Da derzeit noch nicht absehbar ist, ob eine Abgabe in die USA erfolgreich sein wird, bitte ich derzeit noch davon abzusehen mit der Geschädigten Kontakt aufzunehmen.

Es wird gebeten, dass der zuständige Sachbearbeiter zeitnah mit dem Unter-
zeichner Kontakt aufnimmt.

Adamski
Oberstaatsanwalt



# Baden-Württemberg
### STAATSANWALTSCHAFT ULM

Bitte sofort zurücksenden!

Staatsanwaltschaft Ulm
Postfach 38 63

89028 Ulm

**Zum Aktenzeichen:**

*11 Js 13684/13*
Etikett

Das Ersuchen ist hier eingegangen. Es wird bearbeitet unter

Tagebuch-Nummer: ST/185/087/2019

Sachbearbeiter: KPDir Ulm, kA, Bardosch, EkHk

Telefonnummer: 0731/188-4101

Polizeipräsidium Ulm
Kriminalpolizeidirektion
Münsterplatz 47
89073 Ulm

Bardosch, EkHk

Stempel der Dienststelle          Unterschrift

000033



**Polizeipräsidium Ulm**

Eingang: **2 6. Feb. 2020**

| Leitung | | | |
|---|---|---|---|
| C/QM | ÖA | Ref.Präv. | FESt |
| V | DirPRev | KPDir | VPDir |
| Ref.: | PR: | KK/KI: | VK: |

Staatsanwaltschaft Ulm

Staatsanwaltschaft Ulm, 89028 Ulm

Polizeipräsidium Ulm
Kriminalpolizeidirektion Ulm
Münsterplatz 47
89073 Ulm

*H. Bartosch*

Datum 25.02.2020/dey
Name Herr Oberstaatsanwalt Adamski
Durchwahl Tel. 0731 189-1170
Fax. 0800 66 44 92 81 352
Aktenzeichen 11 Js 19684/13
(Bitte bei Antwort angeben)

Ihr Zeichen 1851087/2019

Ermittlungsverfahren gegen Freddie Stapleton
wegen versuchten Mordes

Polizeipräsidium Ulm
Kriminalpolizeidirektion
Eingang: **2 7. Feb. 2020**

| K 1 | K 2 | K 3 | K 4 | K 5 | K 6 | K 7 | K |
|---|---|---|---|---|---|---|---|
| KK BG | HDH | KK GP | KPDir L | FüGr | SV Rev. | | |

☐ zur Bearbeitung ☐ ..........

weisungsgemäß wird um Sachstandsmitteilung gebeten.

Mit freundlichen Grüßen

Deyle
Justizangestellte

Olgastraße 109 – 89073 Ulm
**Behindertenparkplatz:** Zufahrt von der Karl-Schefold-Straße **Parkplatz:** Parkhaus Salzstadel
**Verkehrsanbindung:** Linie 1 Haltestelle Justizgebäude
Telefon: 0731 189-0 Telefax: 0800 66 44 92 81 352 poststelle@staulm.justiz.bwl.de
Die E-Mail-Adresse eröffnet keinen Zugang für formbedürftige Erklärungen in Rechtssachen
Sprechzeiten: (allgem.) Mo-Fr 09.00-11.30 Uhr, Mo-Do nachm. 13.00-15.30 Uhr u. n. Vereinb.
EXT-STAPLETON-00111



# Baden-Württemberg

POLIZEIPRÄSIDIUM ULM

KRIMINALINSPEKTION 1 - DELIKTSPEZIFISCHE ERMITTLUNGEN

Kriminalpolizeidirektion Ulm . Lindenstraße 1 . 89077 Ulm

|  |  |
|---|---|
| Datum | 04.03.2020 |
| Name | Bartosch |
| Durchwahl | 0731 188 4101 |
| CNP |  |
| Aktenzeichen | ST/1851087/2019 |
|  | (Bitte bei Antwort angeben) |

Staatsanwaltschaft Ulm
zu Az. 11 Js 19684/13
Olgastraße 109

89073 Ulm

Ermittlungsverfahren gegen Freddie Stapleton wegen versuchten Mordes, begangen am 23.10.1985 in Göppingen z. Nt. S    :A    -G

Sachstandsanfrage der StA Ulm vom 25.02.2020 - Az. 11 Js 19684/13

Sehr geehrter Herr Adamski,

bezugnehmend Ihrer o.a. Sachstandsanfrage und fernmündlichen Absprache wird mitgeteilt, dass die Aufarbeitung der damaligen Ermittlungsakte nach den heutigen Standards, insbesondere

> › Erstellung einer formgerechten ComVor-Strafanzeige
> › Aktenaufbau und /–zusammenstellung gemäß des landeseinheitlichen Aktenaufbaus polizeilicher Ermittlungsakten in Fällen schwerer Kriminalität und EV mit umfangreichen Ermittlungsmaßnahmen
> › Fertigung eines kompletten umfassenden Ermittlungsberichts
> › Aufarbeitung der Spurenakten / Lichtbilder in digitaler Form,

bedingt durch hier bei der Kriminalinspektion 1 der KPDir Ulm aktuell zu bearbeitender (umfangreich, personal- und zeitintensiv bzw. Haftsachen) anderweitiger Ermittlungsverfahren, noch andauert.
Aufgrund meiner alsbald anstehenden Pensionierung wird Ihr Ermittlungsauftrag gemäß Absprache mit dem Leiter der KI1, KOR Held, von meinem hier zum 01.04.2020 beginnenden Nachfolger, KHK Schmid, fertiggestellt und unverzüglich vorgelegt.
Eine formgerechte ComVor-Strafanzeige sowie zusammenfassender Ermittlungsbericht wurde bereits erstellt; derzeit erfolgt über hiesige Kriminaltechnik die Digitalisierung bzw. das Einscannen der aus der „Altakte" zu entnehmenden Lichtbildmappen.

Mit freundlichen Grüßen

Bartosch, EKHK

EXT-STAPLETON-00113

Polizeidirektion Göppingen
-Abt.II - Kriminalpolizei-
Tgb.Nr. D 1 - 1549/85/Wi/Sp.

Göppingen, den 24.10.198

Betr.: Ermittlungsverfahren wegen vers. Mord und
       Vergewaltigung z.N. S          A        -G
       am 23.10.85 in 7320 **Göppingen;**

hier: Ermittlungsbericht


Am Donnerstag, dem 24.10.85, um 00.43 Uhr, teilte der
verh. Landwirt

              Eugen  H ä g e n l ä u e r ,
              geb. 19.8.1938,

              wohnh.: 7320 Göppingen-Hohrein,
                      Unterer Weiler 15,
              Telefon:     07165/8017

dem Polizeirevier Göppingen fernmündlich mit, daß bei ihm
eine Frau wäre, die offensichtlich überfallen worden war.
Aufgrund dieser Mitteilung fuhren POM Becks und PHW Hummel
nach Göppingen-Hohrein, wo im Hausflur des Anwesens
HÄGENLÄUER die verh. Hausfrau

              S          A        -G.        ,
              geb.      .1956 in Göppingen,
              wohnh.: 7320 Göppingen,

              Telefon:

vorgefunden wurde. Sie war lediglich mit einer Bluse und
einem Unterhemd bekleidet, wies u.a. eine stark blutende
Kopfverletzung auf und konnte, unter starker Schockein-
wirkung stehend, nur angeben, mit einem Neger Kontakt ge-
habt zu haben, der ein Messer bei sich hatte.
(Näheres hierzu kann der "Anzeigenaufnahme" des POM Becks
vom 24.10.85 entnommen werden).

Aufgrund der Gesamtumstände wurde davon ausgegangen,
daß Frau A      -G      Opfer eines Sexualdelikts
geworden war. Sie wurde mit einem zwischenzeitlich ver-
ständigten Sanka in die Klinik am Eichert verbracht, wo
sie stationär aufgenommen wurde.

Die Abt. II - Kriminalpolizei- KvD K der PD Göppingen
wurde am 24.10.85, gg. 01.10 Uhr, von dem Vorfall in
Kenntnis gesetzt. Die daraufhin durchgeführten Ermittlunge
Feststellungen u. Maßnahmen sind dem von KHM Amstädter
gefertigten Bericht "Erste Ermittlungen zum angezeigten
Sachverhalt" zu entnehmen. -sh. folgende Blätter-

## Erste Ermittlungen zum angezeigten Sachverhalt:

Am Mittwoch, den 24.10.85, gegen 01.10 Uhr, wurde
der KvD der PD KP Göppingen vom PRev. Göppingen
telefonisch davon unterrichtet, daß in Göppingen eine
Frau von einem Farbigen vermutlich vergewaltigt
wurde. KOK SGOLIK (KvD) veranlaßte daraufhin bei
den COOKE BARRACKS eine Einfahrkontrolle und ver-
ständigte telefonisch den Uz. Gemeinsam wurden die
Ermittlungen aufgenommen.

Dabei ergab sich, daß die verh., beurlaubte Beamtin
S        A        -G        , geb. A        , geb.        56
in Göppingen, wh. 7320 Göppingen,                    , auf
dem Heimweg vom Nähkurs im "Haus der Familie" (Göppingen,
Olgastr. 6), im Bereich der Nördl. Ringstraße, auf dem
Gehweg bei den Parkanlagen hinter dem Stadtbad von einem
Farbigen mit einem Messer bedroht, in den Park gedrängt
und dort unter Gewaltanwendung bis auf Hemd, Bluse und
Unterhemd ausgezogen und zum GV gezwungen wurde.
Dabei erlitt sie durch massive Schläge mit einem unbe-
kannten Gegenstand Verletzungen,-Platzwunde an der Schläfe
und Verletzungen am Ohr und an der linken Hand-.

Nach der Vergewaltigung wurde sie im Pkw des Täters
nach Göppingen-Hohrein verbracht und dort an noch un-
bekannter Stelle aus dem Pkw geworfen und mit Laub zuge-
deckt. Von dort konnte sie den Bauernhof des Eugen HÄGEN-
LÄUER, Göppingen-Hohrein, Unterer Weiler 15, erreichen,
der telefonisch um 00.43 Uhr das Polizeirevier Göppingen
verständigte. Vom DRK Göppingen wurde die Geschädigte in
die Klinik am Eichert verbracht und stationär aufgenommen.

Um 00.50 Uhr war beim Streifendienst Göppingen der Ehe-
mann M        G        erschienen, nachdem seine Frau nicht
vom Nähkurs nach Hause zurückgekehrt war.

Er hatte bereits vergeblich nach seiner Frau gesucht.

Nach Kenntnis des noch ungenauen Sachverhalts begaben
sich KOK SGOLIK und der Uz. in die Klinik am Eichert.
Dort wurde die S. A        -G        gerade von Dr.STEHLI
ambulant versorgt, der die angeführten Platzwunden fest-
gestellt und Gehirnerschütterung diagnostizierte.
Ärztlicher Bericht wird übersandt. Nach Untersuchung
durch Dr. STEHLI erfolgte die gynäkologische Unter-
suchung von Frau Dr.HOFGARTNER, die ihren Bericht eben-
falls übersendet.

Kurz nach dem Eintreffen in der Klinik am Eichert er-
schien dort auch der M.      G.        , der vom Vorge-
fallenen noch keine Kenntnis hatte. Er konnte nur mit-
teilen, daß seine Frau beim Nähkurs gewesen sei und er
sie nicht habe von dort abholen können bzw. wollen, weil
sie zu Hause ein 2jähriges Kind hätten. Nachdem seine
Frau nicht rechtzeitig nach Hause gekommen wäre, hätte
er sich auf die Suche nach ihr gemacht.

Vom Sanitäter des DRK, Horst PLAPP, Göppingen-Bartenbach,
Göllerstr. 4 wh., wurde mitgeteilt, daß die S. A        -
G.        davon gesprochen habe, daß sie von einem Farbigen
vergewaltigt worden und aus dem Pkw des Täters
rausgeworfen worden sei, der sie dann noch mit Laub zu-
gedeckt hätte.

Als Bekleidungsstücke der S. A        -G.        wurde
eine stark verblutete weiße Hemdbluse, ein Unterhemd
und ein schwarz-grau-blau-gemustertes Halstuch sicher-
gestellt.

Nach der ärztlichen Versorgung der S. A        -G
konnte lediglich bruchstückhaft mitgeteilt werden, daß
sie auf ihrem Heimweg, auf dem Gehweg beim Park hinter
dem Stadtbad, von einem Farbigen von hinten angefallen,
mit einem Messer bedroht und in den Park gedrängt wurde.

Er habe sie hingeworfen, gewürgt und geschlagen,
dann vergewaltigt. Danach habe er sie, als sie sich
wieder bewegt habe, wiederum mit einem metallischen
Gegenstand geschlagen, in einen Pkw geladen -könnte
auch Kofferraum gewesen sein- und weggefahren.
Ein paarhundert Meter nach der Abzweigung der Straße
Bartenbach Richtung Hohenstaufen habe er sie aus  dem
Auto geworfen und mit Laub zugedeckt.

Zum Pkw konnten keine konkreten Angaben gemacht werden;
sie konnte sich lediglich an ein eingeschaltetes Auto-
radio erinnern.

Zur Täterperson konnte mitgeteilt werden:
Farbiger, ca. 175 cm groß, schlank, dunkle Haare,
möglicherweise rote Jacke -Trainingsjackenart-,
möglicherweise mit weiß abgesetzten Taschen.
Der Farbige sei alkoholisiert gewesen.

Zum Verbleib ihrer mitgeführten Gegenstände konnte
sie angeben, daß sich ihre Tasche in der Nähe des
Wasserbeckens (Springbrunnen) der Parkanlage befinden
müsse.
Hinsichtlich des Vergewaltigungstatortes konnte sie
angeben, daß sich dort ein Maschendrahtzaun befand.

In der Klinik am Eichert wurde vom Personal gesprächs-
weise mitgeteilt, daß die Schwester Simone, Station 04,
berichtet habe, daß sie am 22.10.85, gg. 22.45 Uhr,
von Salach kommend, ab Umgehungsstraße in Eislingen bis
zum Krankenhaus (Klinik am Eichert), von einem Pkw
-silberfarbener US-Schlitten mit 8 Lichtern- verfolgt
und mit Lichthupe und durch Winken belästigt worden sei.
Dies wurde berichtet aufgrund gedanklicher Überlegung,
daß vielleicht irgendein Zusammenhang bestehen könnte.

Beim nächtlichen Absuchen des als Tatort benannten Park-
geländes konnte im Bereich des Spielplatzes, unmittelbar
am Maschendrahtzaun, eine Damenbrille aufgefunden werden.

In der Nähe des diagonal ca. 150 - 200 m entfernten
Wasserbeckens (Springbrunnen) konnte am Gehweg eine
Tasche sowie ehe weitere Brille (Damenbrille) aufge-
funden werden.

Zum vorliegenden Sachverhalt wird vom Streifendienst
Göppingen, Kollegen BECKS, eine A 1 gefertigt.

Die weitere Bekleidung der Geschädigten, vermutlich
Mantel usw., konnte bisher noch nicht genau festge-
stellt werden.

Täter soll, laut S. A      -G      , eine Bißwunde
an einem Finger haben.

- AMSTÄDTER, KHM -

000042

Am Montag, den 24.10.1985, wurde bei der PD KP Göppingen
zur Bearbeitung des Falles eine achtköpfige Sonderkommission
(SOKO A      ) unter Leitung von KOK Friedrich einge-
richtet. Der Unterzeichner, KHM Witke, wurde am 25.10.1985
zum Sachbearbeiter benannt. In die Ermittlungen wurden
ferner Beamte der US-Verbindungsstelle der LPD Stuttgart I,
sowie des CID Göppingen eingeschaltet. Nachdem am 24.10.1985,
gegen 08.00 Uhr von Herrn Dr. Gold von der Klinik am Eichert
zu erfahren war, daß Frau A      /G      vernehmungs-
fähig ist, wurde KHM'in Herrlinger-Misch und KOM Reutter
mit der Vernehmung beauftragt. Hierbei konnte nun folgender
Sachverhalt in Erfahrung gebracht werden:

Am 23.10.1985, gegen 22.00 Uhr, verließ die Geschädigte das
Haus der Familie in Göppingen, Olgastraße 6, wo sie einen
Nähkurs besucht hatte. Sie ging alleine nach Hause und war
etwa gegen 22.20 Uhr auf der Nördlichen Ringstraße in Höhe
des Stadtbades, bzw. der dort angrenzenden Parkfläche, als
sie plötzlich von einem Farbigen von hinten angegriffen und
mit einem Messer (Klingenlänge ca. 25 cm und hellem Griff),
welches ihr der Täter an den Hals hielt, bedroht wurde.

(Die Wegstrecke, die Frau A      -G      ' zurücklegte,
kann einem beigefügten Plan entnommen werden).

Der Täter zerrte die Geschädigte vom Gehweg in die Parkan-
lage, in den Bereich eines Brunnens, der mit Büschen umgeben
ist, wobei sich die Geschädigte wehrte und um Hilfe schrie.
Diese Hilfeschreie wurden, so ergaben weitere Ermittlungen,
von dem Zeugen

> Thomas  MAYER,
> geb. am      1967 in Göppingen,
> wohnh.: 7320 Göppingen,

gehört.

000043

Der befand sich bei der Hohenstaufenhalle, ca. 120 m
(Luftlinie) vom Tatort entfernt. Herr Mayer wollte diesen
Hilfeschreien zunächst auch nachgehen, da dann jedoch
keine weiteren zu hören waren und er auch niemanden sah,
dachte er an einen Scherz und drehte um.
Unmittelbar vor den Hilferufen sah er jedoch eine Frau auf
der Nördlichen Ringstraße in Richtung Albert-Schweizer-
Schule gehen. Ihr folgte eine männliche Person, bei der er
einen metallischen Gegenstand von ca. 25 bis 30 cm Länge
im Schein einer Straßenlampe aufblitzen sah. Zu diesem Zeit-
punkt schaute Herr MAYER auf die Uhr in der Hohenstaufen-
halle. Sie zeigte 22.22 Uhr. Ein bis zwei Minuten später
vernahm er die oben angeführten Hilferufe. Aufgrund der
Gegebenheiten ist davon auszugehen, daß es sich bei den von
Herrn MAYER beobachteten Personen um Frau A        -G
und den Täter gehandelt hat.

Frau A        -G        konnte den Täter in der Anfangs-
phase der Tat in eine Hand beißen, in welche, steht jedoch
nicht fest. Als gesichert kann jedoch angesehen werden, daß
diese Bißverletzung so stark war, daß sie blutete.
Im Tatortbereich konnte unter anderem eine Blutspur, die aus
der Parkanlage (gepflasterter Weg) über Gehweg und Fahrbahn
der Nördlichen Ringstraße bis zum Parkplatz der Hohenstaufen-
halle (Südwestseite) führte, festgestellt werden. Ferner be-
fand sich in einem Schuh der Geschädigten ein Blutstropfen.
Sowohl Blutspur als auch Blutstropfen erbrachten durch eine
Auswertung des LKA Baden Württemberg die Blutgruppe 0 (die
Geschädigte hat die Blutgruppe A 1).

Nach dem Biß begann der Täter zu toben und bedrohte sein
Opfer weiter. Nunmehr sah die Geschädigte aber das Messer
nicht mehr. Wo dieses geblieben ist, ist bislang nicht bekannt.
Am Tatort konnte es nicht aufgefunden werden. Der Täter be-
gann nun, sein Opfer zu entkleiden. Der Täter zerrte sein
Opfer unter schlagen und würgen weiter zu dem ca. 100 m
(Luftlinie) vom Brunnen entfernt gelegenen Spielplatz der
Parkanlage. Dort zog ihr der Täter die Kleidung bis auf Bluse,
Unterhemd und Halstuch aus und vergewaltigte sein Opfer mehr-

EXT-STAPLETON-00121

000044

fach. Frau A    -G    führte hierzu aus, daß der
Täter dreimal den vaginalen und einmal den analen Ge-
schlechtsverkehr durchführte.
Die von Frau Dr. HOFGÄRTNER von der Klinik am Eichert am
24.10.1985, um 02.30 Uhr durchgeführte gynäkologische Unter-
suchung ergab einen Nachweis von immobilen Spermien in der
Scheide. Im Abstrich aus dem Anus ließen sich keine Spermien
nachweisen - siehe hierzu den Untersuchungsbericht der
Frau Dr. HOFGÄRTNER. -

Nachdem der Täter von Frau A    -G    abließ, blieb
diese ruhig liegen, da sie den Täter in der näheren Umgebung
herumschleichen hörte. Nach ca. 5 Minuten kam der Täter zu
seinem Opfer zurück und schlug unvermittelt mit einem stab-
ähnlichen Gegenstand mindestens dreimal massiv auf den Kopf
der am Boden liegenden Geschädigten ein. Frau A    -G
     hatte den Eindruck, daß die Schläge mit einem Metall-
stab geführt wurden. Am Tatort konnte ein solcher jedoch
nicht aufgefunden werden, stattdessen wurde dort ein Holz-
knüppel mit Blutantragungen sichergestellt.
Der Geschädigten gelang es, nach dem zweiten Schlag ruhig
liegen zubleiben und sich tot zu stellen.
Es kann als sicher unterstellt werden, daß der Täter davon
ausging, daß sein Opfer tot ist, dies ist nicht zuletzt aus
dem weiteren Täterverhalten zu folgern. Nachdem er nämlich
auf sein Opfer eingeschlagen hatte, entfernte er sich erneut
und kam nach ca. 10 Minuten mit einem PKW zurück. Mit diesem
fuhr er bis unmittelbar zu der noch immer am Boden liegenden
Geschädigten. Diese war dort verblieben, da sie in Todesangst
davon ausging, daß sich der Täter erneut in unmittelbarer
Nähe aufhält und sie beobachtet. Der Täter benutzte als
An- und Abfahrtsweg den westlich des Stadtbades und parallel
zu diesem verlaufenden asphaltierten Fußweg, der dort bis an
den Spielplatz führt und an der Nördlichen Ringstraße beginnt.

Frau A    -G    stellte sich weiterhin tot und wurde
nunmehr in das KFZ (vermutlich PKW) des Täters verbracht.
Hierbei hat der Täter auch die ausgezogenen Kleidungsstücke
mitgenommen.

Um was für ein Kraftfahrzeug es sich genau gehandelt hat,
kann die Geschädigte nicht angeben. Auch ist es ihr nicht
möglich, die Fahrstrecke anzugeben, die der Täter mit ihr
zurücklegte. Sie kann nicht einmal angeben, ob sie im Koffer-
raum oder im Fahrgastinnenraum transportiert wurde. Einzig-
ster Hinweis, bezüglich des Fahrzeugs, ist der, daß während
der Fahrt ein Radio spielte.

An der K 1407, zwischen Göppingen-Hohrein und der L 1075,
wurde die Geschädigte aus dem Fahrzeug herausgeholt und in
den dortigen Straßengraben gelegt. Der Täter deckte sein
Opfer anschließend mit Laub und Ästen ab und fuhr davon. Da
die Geschädigte auch jetzt nicht ausschloß, daß der Täter in
der Nähe lauert, verblieb sie noch geraume Zeit (genauere
Angaben sind nicht möglich) im Straßengraben liegen, bis sie
sich schließlich nach Göppingen-Hohrein schleppte, wo sie am
24.10.1985, gegen 0.40 Uhr beim Anwesen HÄGENLÄUER um Hilfe
bat.

Wie bereits angeführt, wurde Frau A        -G.        in die
Klinik am Eichert verbracht, wo sie zur stationären Behandlung
bis zum 6.11.1985  verblieb. Bei Frau A        -G.
wurden u.a. folgende Verletzungen festgestellt:

> Bruch der 6. u. 7. Rippe,
> Riß des linken Trommelfells,
> Platzwunde an der linken Stirn- u. Schläfenseite,
> 2 Druckstellen linksseitig am Kehlkopf und ein
> Bluterguß rechtsseitig am Kehlkopf,
> Schwellungen und Schürfwunden am Körper.

Die ausführliche Aufzählung und Beschreibung der festgestellten
Verletzungen sind im ärztlichen Befundsbericht des Herrn
Dr.med GOLD - Facharzt für Chirurgie - von der Klinik am
Eichert/Göppingen zu entnehmen.

Frau A        -G.        konnte von dem Täter folgende Personen-
beschreibung abgeben:

EXT-STAPLETON-00123

000046

Farbiger, nicht ganz schwarz,

ca. 175 cm groß,

ca. 28 bis 32 Jahre alt,

schlank mit schlankem Gesicht,

der Kopf wirkte im Verhälnis zum Körper eher kleiner,

kurze krause Haare mit leichtem Kotelettenansatz,

Nase und Augen erschienen normal,

Lippen leicht wulstig,

kleine Ohren,

feingliederige Finger,

sprach deutsch mit amerikanischem Akzent,

seine Atemluft roch nach hochprozentigem Alkohol,

der Täter müßte von der Tat herrührend eine Bißverletzung an einer Hand aufweisen,

er trug eine rote blousonartige Jacke und

er führte ein Messer mit hellem Griff mit sich (Klingenlänge ca. 25 cm).

Bezüglich der Jacke wurde versucht, ein Vergleichsstück zu beschaffen. Es gelang bisher jedoch lediglich, eine ähnliche Jacke im PX-Laden (Post-Exchange), der sich auf dem Gelände der Cooke Barracks/Göppingen befindet, ausfindig zu machen. Von dieser Jacke wurden Lichtbilder angefertigt. Am 29.10.1985 konnte von KHM WERNER von der Tatortgruppe des LKA Baden Württemberg in der Klinik am Eichert nach den Angaben von Frau A      -G.      ein Phantombild gefertigt werden.

Aufgrund der gewonnenen Erkenntnisse ist mit hoher Wahrscheinlichkeit davon auszugehen, daß es sich bei dem Täter um einen farbigen Amerikaner handelt, wobei jedoch bei den angestellten Ermittlungen andere Nationalitäten nicht außer Acht gelassen wurden, bzw. werden.

Öffentlichkeitsfahndung:

Noch am 24.10.1985 wurden Handzettel in englischer Sprache verfaßt und in den Cooke Barracks sowie in von Amerikanern bewohnten Hausanlagen im Bereich Göppingen verteilt. Weitere

Handzettel wurden auch im Bereich Schwäbisch Gmünd zur Ver-
teilung gebracht. Es erfolgte ferner am 25.10.1985, in Ab-
sprache mit der Staatsanwaltschaft Ulm, Staatsanwalt Freund,
im amerikanischen Radiosender AFN stündlich ein Fandungsauf-
ruf. Diese Fahndungsmaßnahmen, die in erster Linie amerika-
nische Staatsangehörige ansprechen sollten, wurden durch
mehrere Veröffentlichungen in der örtlichen Presse (NWZ und
GZ) sowie aus dem Bereich des Ostalbkreises (Remszeitung,
Schwäbische Post, Aalener Volkszeitung, Gmünder Tagespost)
ergänzt.
Die eingegangenen Hinweise wurden, soweit brauchbar, über-
prüft, führten jedoch bislang zu keinem Erfolg. Anzuführen
bleibt hier jedoch, daß die Resonanz aus amerikanischen
Kreisen gleich Null war.


Weitere Ermittlungsmaßnahmen:

Da nach den Aussagen der Geschädigten und der am Tatort ge-
sicherten Blutspuren davon auszugehen ist, daß der Täter eine
Bißverletzung an einer Hand erlitt, wurden am 25.10.1985 in
den Cooke Barracks in Göppingen und am 26.10.1985 in der
Bismarck- und Hardt-Kaserne in Schwäb.-Gmünd sämtliche an
diesem Tage erreichbaren Farbige auf Handverletzungen über-
prüft. Folgeüberprüfungen in dieser Richtung wurden in den
darauffolgenden Tagen durchgeführt. Sie führten nicht zum
Erfolg.

Durch eine Nachbarschaftsbefragung, in der auch die Besucher
der Hohenstaufenhalle vom 23.10.1985 einbezogen wurden, ergab
sich ein Hinweis auf einen weißen PKW Ford neuestes Modell,
mit AA-Kennzeichen, der zur tatkritischen Zeit bei der Hohen-
staufenhalle geparkt war und keinem Besucher der Hohenstaufen-
halle zuzuordnen war.
Bei der Aufnahme des Tatortsbefundes war darüberhinaus festge-
stellt worden, daß wenige Meter vor dem angegebenen Standort
des PKW Ford, die von der Parkanlage herführende Blutspur
endete. Zur Ermittlung des Fahrzeugs wurden, neben einem
Presseaufruf, nahezu sämtliche Halter von weißen PKW Ford-
Escort aus dem Ostalbkreis überprüft, wobei jedoch erst durch

003048

eine Überwachung der Hohenstaufenhalle am Mittwoch, dem
30.10.1985 Fahrzeug und Halter ermittelt werden konnten.
Die Überprüfung des Fahrzeughalters, es handelt sich um

> Winfried  HOFELE ,
> geb. am     .1947,
> wohnh.: Schwäb.-Gmünd,

erbrachten jedoch zweifelsfrei, daß er mit der Tat nicht
in Verbindung zu bringen ist. (siehe hierzu die Vernehmung
HOFELE). - siehe Abschnitt V, Spur Nr. 2 -

Durch den Umstand, daß ein Großteil der Angehörigen der US-
Armee, Standort Göppingen in den Jahren 1982 und 1984 von dem
Fotostudio Schuster (8540 Schwabach, Lindenstr. 8) foto-
grafiert wurden und es nicht auszuschließen ist, daß es sich
bei dem Täter entweder um einen Angehörigen der US-Streit-
kräfte oder einen ehemaligen Angehörigen der US-Streitkräfte
des Standortes Göppingen handelt, wurden die Negative dieser
Lichtbilder im Zusammenwirken mit der CID Göppingen von dem
Fotostudio Schuster erbeten und von diesem zur Fertigung von
je einem Abzug der PD KP Göppingen übergeben. Bei der Vorlage
der gefertigten Lichtbilder konnte Frau A        -G
jedoch keine abgebildete Person als Täter identifizieren.

Nach der Feststellung, daß der Täter die Blutgruppe O hat,
wurden nunmehr von sämtlichen farbigen Soldaten der Cooke-
Barracks, die die Blutgruppe O aufweisen und zwischenzeitlich
nicht in die Staaten zurückgekehrt sind, in Zusammenarbeit
mit der CID Göppingen, Lichtbilder angefertigt, die der Ge-
schädigten ebenfalls vorgelegt wurden.

Bislang hat Frau S       A       -G       aus ca.
100 vorgelegten Lichtbildern dieser Personengruppe zwei
Personen herausgezogen, von denen sie sagt, daß sie dem
Tätertypus sehr nahe kommen würden. Es handelt sich
hierbei um:

        1. F       , K       und
        2. W       , K       .

Die nähere Überprüfung dieser beiden Personen verlief
negativ.
P       , K       weist nicht die Blutgruppe O auf.
W       , K       weist die Blutgruppe O auf, weshalb mit
seinem Einverständnis eine Blutprobe erhoben wurde.
Die Auswertung dieser Probe ergab schließlich, daß er
nicht als Spurenverursacher (Täter) in Betracht kommt.
(Spur Nr. 92).

Neben den eben aufgeführten Überprüfungsmaßnahmen von
farbigen US-Soldaten wurden parallel dazu auch Farbige
anderer Nationalitäten wie z.B. Eritrear, Inder und
Afrikaner, die im Bereich Göppingen aufhältig sind,
überprüft.
Darüberhinaus wurde versucht, sämtliche farbigen Zivil-
amerikaner, die im Landkreis Göppingen wohnhaft sind,
abzuklären, was zum Großteil erfolgte. Zum Großteil und
bislang nicht vollständig deshalb, da die Maßnahme von
der Anmeldung der Zivilamerikaner abhängig ist und hier
wird von hiesiger Seite aus vermutet, daß einige Personen
nicht angemeldet sind.
Aus diesem Grund erfolgten auch schwerpunktmäßige Über-
prüfungen von Wohnbereichen im Landkreis Göppingen, die
von Amerikanern bevorzugt bewohnt werden. Diese Über-
prüfung verlief bislang ebenfalls negativ.

Fahndungs- und Überwachungsstreifen im Nordstadtbereich
Göppingen, die bis zum heutigen Tage andauern, erbrachten

bislang ebenfalls keine weiteren Ansatzpunkte.

Gleich zu Beginn der Ermittlungen lag unter anderem
ein vielversprechender Hinweis auf den Zivilamerikaner

        (       L   S
        geb.    ¨¨ ¯ .1956 in Mobile/Alabama/USA
        wohnh.:

                6460 Gelnhausen

vor. Er war bis April 1984 Angehöriger der US-Armee
und in Göppingen stationiert.
S       wurde deshalb nach Rücksprache mit der Staats-
anwaltschaft 7900 Ulm/Donau, Herrn Staatsanwalt FREUND,
am 26.10.1985 zur Festnahme ausgeschrieben. S
konnte am 26.10.1985 in 6467 Hasselroth festgenommen
werden.
Zur Überprüfung seiner Person begaben sich KOM REUTTER
und der Unterzeichner noch am selben Tag nach Gelnhausen.
Die hierbei durchgeführten Ermittlungen erbrachten dann
jedoch zweifelsfrei, daß S       als Täter ausgeschieden
werden kann. Näheres hierzu ist der Spur Nr. 9, die
beigefügt ist, zu entnehmen.

Im Zuge weiterer Ermittlungen wurde auf Grund einer
BKA-Blatt-Veröffentlichung (152/86) M      C
in die Überprüfungen mit einbezogen. Eine Bestimmung
seiner Blutgruppe durch das Institut für Rechtsmedizin
in Giessen im Vergleich mit dem ausgewerteten Spurenblut ergab
eindeutig, daß (       als Spurenverursacher im hier
anstehenden Ermittlungsverfahren ausscheidet.
Auch hier kann der Spur Nr. 98, die ebenfalls angeschlossen
ist, Näheres entnommen werden. Das Gutachten des Instituts
für Rechtsmedizin ist im Abschnitt III zu finden.

Im August 1986 wurde

        R       G. F
        geb.     .1960
        wohnh.: 7320 Göppingen-Faurndau

wegen mehrerer Sexualdelikte bei hiesiger Dienststelle

000051

anhängig. Er wurde Frau S        A        -G
in einer Wahlgegenüberstellung gegenübergestellt.
Hierbei Konnte Frau A        -G        F        nicht
zweifelsfrei ausschließen, weshalb von F        eine
Blutprobe erhoben wurde, die dem Landeskriminalamt
Baden-Württemberg zur Auswertung zugeleitet wurde.
Die Untersuchung ergab, daß F        als Spurenverursacher
auszuschließen ist. Näheres hierzu ist der beigefügten
Spur Nr. 100 zu entnehmen. Das Gutachten des LKA BW
ist unter Abschnitt II zu finden.

Beim derzeitigen Stand der Ermittlungen ist eine
Täterfeststellung nicht erkennbar. Weitere Ansatz-
punkte liegen derzeit nicht vor.
Auch eine von den Angehörigen der Geschädigten und
der Staatsanwaltschaft 7900 Ulm/Donau ausgesetzte
Auslobung in einer Gesamthöhe von 10.000.- DM
(7.000 DM von Seiten der Angehörigen und 3.000.- DM
von der Staatsanwaltschaft Ulm) erbrachte bislang
nicht den gewünschten Erfolg.
Aus diesem Grund werden die Ermittlungen mit diesem
Sachstand zunächst abgeschlossen. Sollten sich weitere
Ansatzpunkte ergeben werden diese aufgegriffen und
der Staatsanwaltschaft Ulm/Donau nachberichtet.

Witke, KHM

EXT-STAPLETON-00129

000052

000053

**Staatsanwaltschaft**

7 Js 7234/85

Es wird gebeten, dieses Aktenzeichen und den
Betreff bei weiteren Schreiben anzugeben.

7900 Ulm,   7.Nov.85/MM
Olgastraße 109
Postfach 3863
Tel. (07 31) 1 89-   2216

Das Ermittlungsverfahren gegen

U n b e k a n n t

wegen versuchten Mordes und Vergewaltigung zum Nachteil von S
A    -G

wird   e i n g e s t e l l t .

GRÜNDE:

Am späten Abend des 23.10.1985 wurde die 29 Jahre alte S
A    -G    auf dem Heimweg von einem Nähkurs im Bereich
der Nördlichen Ringstrasse in Göppingen auf Höhe der Parkanlage
hinter dem Stadtbad von einem Farbigen überfallen, der sich ihr
von rückwärts genähert hatte und sie mit einem Messer bedrohte.
Der Täter zerrte sie in die Parkanlage und begann sie unter Ge-
waltanwendung auszuziehen. Dabei biss die Geschädigte den Täter
in die Hand. Nachdem die Geschädigte bis auf Bluse und Unterhemd
entkleidet war, wurde sie vom Täter mehrfach vaginal und anal ver-
gewaltigt. Nachdem sich der Täter kurzzeitig entfernt hatte, kehrte
er mit einem Holzknüppel zurück und schlug mindestens 3-mal heftig
auf den Kopf der Geschädigten. Als sich der Täter wieder entfernte,
blieb die Geschädigte reglos liegen, da sie der Annahme war, der
Täter halte sich noch in der Nähe auf. Dieser kehrte kurze Zeit
später mit einem Pkw zurück, schleppte die Geschädigte in das Fahr-
zeug und fuhr mit ihr in die Gegend von Göppingen-Hohrein, wo er sie

-2-

EXT-STAPLETON-00131

000054

in einen Strassengraben warf und mit Ästen und Laub zudeckte.
Nachdem sich der Täter entfernt hatte, begab sich die Geschädigte
zu einem nahe gelegenen Anwesen, von wo aus die Polizei ver-
ständigt wurde.

Die Geschädigte erlitt einen Bruch der 6. und 7. Rippe, einen Riss
des linken Trommelfells, Platzwunde an der linken Stirn- und Schlä-
fenseite, 2 Druckstellen linksseitig am Kehlkopf und einen Bluter-
guss rechtsseitig am Kehlkopf sowie Schwellungen und Schürfwunden
am Körper.

Nach den Angaben der Geschädigten handelte es sich um einen nicht
ganz schwarzen Farbigen, etwa 175 cm gross, 28 - 32 Jahre alt, schlank
mit schmalem Gesicht, kurze krause Haare und leicht wulstige Lippen.
Der Täter sprach deutsch mit amerikanischem Akzent. Die Ermittlungen
der Kriminalpolizei richteten sich in erster Linie auf farbige US-
Soldaten, jedoch wurden auch Farbige anderer Staatszugehörigkeit in
die Ermittlungen einbezogen.

Da nach den Aussagen der Geschädigten und den am Tatort gesicherten
Blutspuren davon auszugehen war, dass der Täter eine Bissverletzung
an einer Hand erlitten hatte, wurden zunächst in den US-Kasernen in
Göppingen und Schwäbisch Gmünd sämtliche erreichbaren Farbigen auf
Handverletzungen überprüft. Diese Ermittlungen führten nicht zum
Erfolg.

Da ein Grossteil der Angehörigen der US-Armee im **Standort Göppingen** in
den Jahren 1982 und 1984 von einem Fotostudio fotografiert worden wa-
ren, wurden sämtliche Negative ausgewertet und je 1 Abzug hergestellt
Bei der Vorlage der gefertigten Lichtbilder konnte die Geschädigte
keine der abgebildeten Personen als Täter identifizieren.

Nachdem festgestellt worden war, dass der Täter die Blutgruppe 0 hat,
wurden von allen farbigen Soldaten der Cooke Barracks in Göppingen,di
die Blutgruppe 0 aufweisen und zwischenzeitlich nicht in die Staaten
zurückgekehrt waren, Lichtbilder angefertigt, die der Geschädigten
ebenfalls vorgelegt wurden. Von den etwa 100 vorgelegten Lichtbildern
war die Geschädigte bei 2 Personen der Meinung, dass sie dem Täter-
typus sehr nahe kommen würden. Bei einer dieser Personen stellte es
sich heraus, dass er nicht die Blutgruppe 0 aufweist. Bei der anderen
Person wurde eine Blutprobe erhoben, deren Auswertung jedoch ergab,
dass er als Spurenverursacher nicht in Betracht kommt.

EXT-STAPLETON-00132

000055

Auch die Überprüfung von Wohnbereichen im Landkreis Göppingen,
die von Amerikanern bevorzugt bewohnt werden, sowie Fahndungs-
und Überwachungsstreifen im Nordstadtbereich von Göppingen er-
brachten keine weiteren Ansatzpunkte.

Ein Hinweis auf den Zivilamerikaner C      L   S      blieb
ebenfalls ergebnislos. S      konnte zwar am      85 vorläufig
festgenommen werden, seine Überprüfung ergab jedoch, dass er als
Täter ausscheidet.

Von 2 weiteren Amerikanern wurden Blutproben entnommen, deren Aus-
wertung jedoch ebenfalls ergab, dass diese Personen als Täter aus-
scheiden.

Eine Auslobung seitens der Staatsanwaltschaft Ulm in Höhe von
3 000 DM und seitens der Angehörigen der Geschädigten in Höhe von
7 000 DM blieb ohne den erhofften Erfolg.

Da nunmehr keine weiteren erfolgsversprechenden Ansatzpunkte für
Ermittlungen vorhanden sind, war das Verfahren einzustellen.

Sollten sich noch Hinweise auf den Täter ergeben, werden die Er-
mittlungen von Amts wegen wieder aufgenommen.

(Villwock)
Oberstaatsanwalt

Weisung:

1 1. Nov. 1986

1. Mitt.m.Gr.o.RM.-Bel.an Frau S      A      -G
2. Bericht an GenStA
3. Weglegen.

EXT-STAPLETON-00133



# Staatsanwaltschaft Ulm

Landesarchiv BW
Abt. Staatsarchiv ....wigsburg
2 3. JAN. 2008
Az: 5 - 7512 BV
51 | 52 | 53 | 54 | 55

Aktenzeichen: 11 AR 7/09
(Bitte stets angeben)

Telefon-Nr.: 0731/189-0
Telefax-Nr.: 0731/1892290
Durchwahl-Nr.: 0731/1892254
Sachbearbeiter: Herr OStA Mengele

Staatsanwaltschaft Ulm
Postfach 3863, 89028 Ulm

Staatsarchiv Ludwigsburg
Arsenalplatz 3

71638 Ludwigsburg

Ulm, 22.01.2009/mi

Ermittlungsverfahren

gegen    **S    A    -G**
        wohnhaft:
        geb. am    1956,
        Staatsangehörigkeit: deutsch

wegen    DNA-Musterabgleich in den USA

Übergabeverzeichnis Nr. 37542

Es wird um Übersendung der Akten **7 Js 7284/85** gebeten.

Auf Anordnung

*Milazzo*

Milazzo
Justizsekretärin

EL 322, Z. 2000/77, Bü 37542, 7-Js-7284/85
330. 262, 3 - 268. 2
240, 139, 6 - 140. 7

Dienstgebäude Ermittlungsabteilungen: Olgastraße 109, 89073 Ulm   Vermittlung: 0731/189-0   Telefax: 0731/189-2290   E-Mail:poststelle@StaUlm.justiz.bwl.de
Dienstgebäude Strafvollstreckungsabteilung: Olgastraße 107, 89073 Ulm   Vermittlung: 0731/189-0   Telefax: 0731/189-2270
Sprechzeiten: Mo.-Fr. vorm.: 8.30 Uhr - 11.30 Uhr oder nach telefonischer Vereinbarung
|P| Parkhaus Salzstadel   |UNV| Linie 1. Haltestelle "Justizgebäude"
Bankverbindung: Landesoberkasse Baden-Württemberg, Baden-Württembergische Bank AG, BLZ: 600 501 01, Konto-Nr.: 7 469 534 608

EXT-STAPLETON-00134

000057



# Baden-Württemberg

## LANDESARCHIV
STAATSARCHIV LUDWIGSBURG

Staatsarchiv Ludwigsburg · Arsenalplatz 3 · 71638 Ludwigsburg

Staatsanwaltschaft Ulm
z.Hd. Frau Milazzo
Olgastraße 109
89073 Ulm

| | |
|---|---|
| Datum | 27.01.2009 |
| Bearbeiter/in | Herr Reiff/Gr |
| Durchwahl | (07141) 18-6353 |
| E-Mail | staludwigsburg@la-bw.de |
| Aktenzeichen | 5–7512 BV/S3/18/2009 |
| | (Bitte bei Antwort angeben) |

> Staatsanwaltschaft
> · · · · · ·
> 3 0. Jan. 2009
> _____ Js _____

**Az.: 11-AR-7/09**

Anlage: 1 Empfangsbescheinigung z.R.

Es werden in der Anlage die angeforderten, nachstehend angegebenen Unterlagen

Ermittlungsverfahren im Fall S      A      -G      Archivsignatur:
EL 322, Zugang 2000/77, Übergabeverzeichnis-Nr. 37542, 7-Js-7284 aus 1985

bis zum 15.04.2009

zur Nutzung übersandt. Es wird gebeten, die Sendung sofort genau nachzuprüfen und die beiliegende Empfangsbestätigung umgehend unterzeichnet zurückzusenden.
Reklamationen sind bei dieser Gelegenheit schriftlich vorzubringen.
Bei der Nutzung ist darauf zu achten, dass die Ordnung der Unterlagen erhalten bleibt, keine Schriftstücke entnommen oder verändert werden. Die Unterlagen sind gegen Verlust, Beschädigung und unbefugte Nutzung zu schützen. Sie dürfen von der Behörde/dem Gericht nicht fortgeführt werden.
Es wird um sofortige Rücksendung nach Ende der Nutzung, spätestens jedoch nach Ablauf der Leihfrist gebeten. Die Unterlagen sind in einer stabilen Verpackung zurückzusenden.

Mit freundlichen Grüßen

gez. Reiff

*Jammer*

F.d.R. Grammer

Arsenalplatz 3 · 71638 Ludwigsburg · Telefon (07141) 18-6310 · Fax (07141) 18-6311 · staLudwigsburg@la-bw.de · www.landesarchiv-bw.de/stal
Lesesaal geöffnet: Montag nur Gruppen nach Vereinbarung, Tel. (07141) 18-6337, Dienstag, Mittwoch und Donnerstag 8.30 – 18.00 Uhr,
Freitag 8.30 – 15.30 Uhr · Aktenanlieferung (nur nach vorheriger Vereinbarung): Mathildenstraße 1 (Zeughaus)
Bankverbindung: Landesoberkasse, Postfach 10 02 63, 76232 Karlsruhe, BW-Bank Kontonr. 7495530102 (BLZ 600 501 01)

000058



# Baden-Württemberg

## LANDESARCHIV
### STAATSARCHIV LUDWIGSBURG

Staatsarchiv Ludwigsburg · Arsenalplatz 3 · 71638 Ludwigsburg

Staatsanwaltschaft Ulm
z.Hd. Frau Milazzo
Olgastraße 109
89073 Ulm

| | |
|---|---|
| Datum | 27.01.2009 |
| Bearbeiter/in | Herr Reiff/Gr |
| Durchwahl | (07141) 18-6353 |
| E-Mail | staludwigsburg@la-bw.de |
| Aktenzeichen | 5–7512 BV/S3/18/2009 |

(Bitte bei Antwort angeben)

**Az.: 11-AR-7/09**

Anlage: 1 Empfangsbescheinigung z.R.

Es werden in der Anlage die angeforderten, nachstehend angegebenen Unterlagen

Ermittlungsverfahren im Fall S   A   -G   , Archivsignatur:
EL 322, Zugang 2000/77, Übergabeverzeichnis-Nr. 37542, 7-Js-7284 aus 1985

bis zum 15.04.2009

zur Nutzung übersandt. Es wird gebeten, die Sendung sofort genau nachzuprüfen und die beiliegende Empfangsbestätigung umgehend unterzeichnet zurückzusenden.
Reklamationen sind bei dieser Gelegenheit schriftlich vorzubringen.
Bei der Nutzung ist darauf zu achten, dass die Ordnung der Unterlagen erhalten bleibt, keine Schriftstücke entnommen oder verändert werden. Die Unterlagen sind gegen Verlust, Beschädigung und unbefugte Nutzung zu schützen. Sie dürfen von der Behörde/dem Gericht nicht fortgeführt werden.
Es wird um sofortige Rücksendung nach Ende der Nutzung, spätestens jedoch nach Ablauf der Leihfrist gebeten. Die Unterlagen sind in einer stabilen Verpackung zurückzusenden.

Mit freundlichen Grüßen

gez. Reiff

**Empfangsbescheinigung**
(bitte sofort nach Erhalt der Unterlagen zurücksenden)

Ort, Datum                    Unterschrift
                              (Mengele)

Oberstaatsanwalt

Arsenalplatz 3 · 71638 Ludwigsburg · Telefon (07141) 18-6310 · Fax (07141) 18-6311 · staLudwigsburg@la-bw.de · www.landesarchiv-bw.de/stal
Lesesaal geöffnet: Montag nur Gruppen nach Vereinbarung, Tel. (07141) 18-6337, Dienstag, Mittwoch und Donnerstag 8.30 – 18.00 Uhr,
Freitag 8.30 – 15.30 Uhr  ·  Aktenanlieferung (nur nach vorheriger Vereinbarung): Mathildenstraße 1 (Zeughaus)
Bankverbindung: Landesoberkasse, Postfach 10 40 43, 70035 Stuttgart · BW-Bank Kontonr. 7495530102 (BLZ 600 501 01)

EXP-STAPLETON-00138

000059



# Baden-Württemberg

STAATSANWALTSCHAFT ULM

Staatsanwaltschaft Ulm · Postfach 38 63 · 89028 Ulm

Landesarchiv Baden-Württemberg
Dr. Elke Koch
Abteilung Staatsarchiv Ludwigsburg
Arsenalplatz 3
71638 Ludwigsburg

Datum 21.10.2013
Dezernent OStA Staudenmaier
Durchwahl 0731/189-2224
Aktenzeichen **11 Js 19684/13**
**11 AR 7/09**
(Bitte bei Antwort angeben)

**Anzeigensache gegen NN z.N. A  -G      , S     ·- 7 Js 7284/85 -**
**wegen versuchten Mordes**

**Ihr Zeichen 37542 - 330.264/1**

**Anlage:**
Aktenbogen des Staatsarchivs Ludwigsburg

Sehr geehrte Frau Dr. Koch,

wie bereits telefonisch vorab besprochen reiche ich den Aktenbogen mit dem Hinweis zurück, dass sich nunmehr neue Erkenntnisse bezüglich des bislang unbekannten Täters ergeben haben und die dort verwahrten Akten deshalb jetzt Bestandteil der Ermittlungsakte im hiesigen Verfahren 11 Js 19684/13 sind.

Für Rückfragen stehe ich gerne zur Verfügung.

Mit freundlichen Grüßen

(Staudenmaier)
Oberstaatsanwalt

Olgastr. 109 · 89073 Ulm · Telefon 0731/189-0 · Telefax 0731/189-2290 · poststelle@staulm.justiz.bwl.de
www.staatsanwaltschaft-ulm.de · www.service-bw.de
EXT-STAPLETON-00137

Staatsarchiv Ludwigsburg

EL 322

Zugang 2000/Nr. 77

Anzeigesache
gegen
NN z. N. A          - G          , S

37542

7-Js-Nr. 7254 aus 1955

330, 264/1



[ a ]   Sg.: 20

**11 Js 19684/13**

*qs.Ueb, 21/2*

# Verfügung

1. **Personendaten** und **Schuldvorwurf** überprüft. Änderung nicht veranlaßt.
2. ☐ Das Verfahren wird übernommen. ○ Übernahmenachricht erteilen.
3. Vermerk:
   a, Tatzeit(en): _____ (Bl. _____ )
      Verjährungsunterbrechung: _____ (Bl. _____ )
      Verjährungstermin: _____
      Eintritt der absoluten Verjährung: _____
   b, ☐ Das Verfahren **wurde** wegen Abwesenheit d. Besch. am
      _____ gemäß § 154f StPO **vorläufig eingestellt** (Bl. _____ )
   c, ☐ Das Verfahren wurde gemäß § 205 StPO durch gerichtlichen Beschluß vom
      _____ vorläufig eingestellt (Bl. _____ )
4. ☑ a, Das Verfahren **wird** wegen Abwesenheit d. Besch. (Bl. _____ )
      gemäß § 154f StPO eingestellt.
   b, Abtragen ZK 37 (I) (I A)

   ┌─────────────────────────────────┐
   │ Sachgebietsschlüssel überprüft. │
   │ ⊙ In Ordnung   ○ Ändern in:     │
   └─────────────────────────────────┘
   ┌─────────────────────────────────┐
   │ ○ Jugendschutzsache             │
   │ ○ Organisierte Kriminalität     │
   │ ○ Gewinnabschöpfung             │
   │ ○ Rechtshilfe/Auslieferung      │
   │ ○ DNA - Identitätsfeststellung  │
   └─────────────────────────────────┘

5. ☐ **Auslandsfahndung** ist neben der nationalen
   Fahndung **veranlaßt**. Rücksprache mit **Auslandsref.**, insbesondere zur räumlichen
   Ausdehnung der Fahndung, ist erfolgt, vgl. Vermerk Bl. _____
6. ☐ **AL** _____ z.K.
7. ☐ **Mitteilung von Ziff. 4. a,** an          *Bericht JM / BMJ)*
   ○ **Antragst.** (Bl. _____ )
   ○ **Vertreter(in) d. Antragst.** (Bl. _____ )
   mit dem Hinweis, daß Fahndungsmaßnahmen eingeleitet wurden
8. ☐ **Örtliche Fahndung:**
   Ausfertigung(en) des Haftbefehls (Bl. _____ ) _____-fach ○ mit Telefax
   an _____ m.d. Bitte um Vollzug übersenden
9. ☐ **Aufenthaltsermittlung/Suchvermerk:**
   a, Beschuldigten zur Aufenthaltsermittlung ausschreiben
      ○ Zusatz (Feld FSV):
         ○ Zustellungsbevollmächtigter AG _____ benennen.
         ○ Sicherheitsleistung (in Höhe von _____ €) erheben.
         ○ Beschuldigtenvernehmung durchführen (Feld FAA):
            Straftat, Tatort, Tatzeit, Schaden:
            _____
            _____
   b, Suchvermerk zum BZR/AZR

EXT-STAPLETON-00139

10. ☐ **Festnahme/Suchvermerk:**

    a,   Besch. zur Festnahme ausschreiben

         ○   <u>national:</u> (räumliche Ausdehnung: Deutschland)

         ○   <u>international</u> mit Formular des **Europäischen Haftbefehls:**

             ○   **Fahndungsraum Europäische Union, Island, Norwegen, Schweiz**

             ○   zusätzlich in den oben nicht aufgeführten Ländern d. Interpol-Fahndungszone 2

             ○   zusätzlich in folgenden Interpol-Fahndungszonen: _____

             ○   **weltweit**

             ○   nur in folgenden Einzelstaaten:

             _____

             _____

    b,   ○   **Personengebundene Hinweise:**

            ○ Bewaffnet ○ Gewalttätig ○ Ausbrecher ○ Ansteckungsgefahr ○ Geisteskrank ○ BtM-Konsument

            ○ Freitodgefahr ○ Prostitution ○ Andere Personalien:

            _____

            (z.B. Aliaspersonalien, unterschiedliche Schreibweise – max. 1.000 Zeichen)

    c,   Suchvermerk zum BZR und AZR

    d,   ○   Feld FLD: _____ (Löschungstermin f. Ausschreibung; z.B. Verjährung)

    e,   **Beglaubigte Mehrfertigung des Haftbefehls** (Bl. _____ )

         ○   und des Wiederinvollzugsetzungsbeschlusses (Bl. _____ ) übersenden an:

         **Landeskriminalamt** mit Anlagen

         ○   **Polizeidienststelle des (letzten) Wohnsitzes:** _____

         ○   **sachbearbeitende Dienststelle:** _____

         zu Geschäftszeichen _____

11. ☐ _____

      _____

12. WV _____

_____
(Unterschrift, Namenstempel)

    – OSA –

# 3

Anzeige Vergewaltigung / vers. Sexualmord
**Anzeigenaufnahme** des Polizeirevier Göppingen

EXT-STAPLETON-00141



**Strafanzeige-Straftat**

Eingangsstempel StA
Staatsanwaltschaft Ulm
2 9. OKT. 1986
Js

000064

Dienststellen-Schlüssel
TSD | 1,5,1,1,0,1 | PDKP Göppingen
Sachbearbeitende Dienststelle

Tagebuch-Nr. (1. Stelle numerisch)
TVG 1549/85 - D 1

Tatort-Schlüssel
TGM | 1 1 7 0 2 6 | Göppingen
Tatort (Klartext)

Sachbearbeiter        Telefon:
Witke, KHM    07161/63 - 1

An die
Staatsanwaltschaft

7900 Ulm/Donau

Az.: 7 Js 7284/85

Zuständige Datenstation        Sofortfahndung eingeleitet
7320 Göppingen        ja X    nein

Anlage
† Aktenzeichen Mitteilung        Strafantrag    Mitteilung über Ausgang d. Verfahrens
2.
3.

PGB Geburtsname/Namensbestandteile    Geburtsdatum
| T T M J J J |

TAT Anzahl/insgesamt 1 | Geschlecht d. Tatverdächtigen davon M 1 | W
Straftaten-Schlüssel
1,1,1,0 | 0,0,1 | 0    0=Vollendung Altersuch    Sonderkennung    A=Anstiftung B=Beihilfe V=Verbrechensverabredung
TSH Straftat/Pol. Ereignis (Klartext)
Vergewaltigung

TWK Wirtschaftskriminalität
ja 1    nein 0 X

TTZ Tatzeit/Tatzeitraum
2,3,1,0,1,9,8,5 | T T M M J J J
Tag    Zeit    Stunde von - bis
TTS M I | D,U | 2,2 | 2,4

TSS Sachschaden (bei PKS-Schadensdelikten-Mußfeld)

TVS Tatbegehung unter Verwendg. von Schußwaffen
nein 0 X    gedroht 2    geschossen 3
TFS Freigabe für Statistik
ja 1    nein 0 X

TWS We-Meldung/Statistik
WE-/KPMD-/Sofortmeldung X    PKS-Vorgang
TAP Angegriffene Person
Spaziergänger

TSA Straftat aufgeklärt
ja 1    nein 0 X
TAF Anzahl aufgeklärter gleicher Fälle

Abgabe-Datum
2,4,1,0,1,9,8,6 | ja X 225 v. 24.10.85    WE-Meldung/FS-Nr./Datum

Anzahl d. Beschuld. Personalien PAD 02 | Anzahl Personen-beschreibung PAD 03 | Anders Personalien PAD 04 | Weitere Personalien PAD 05 | Weitere Tatgemessen PAD 06 | Weiteres Opfer über USI ja X | SNR ja X | Sachfahndung (SFB) ja

TTO Tatörtlichkeit
Park
TAG Angegriffenes Objekt/erstrebtes, erlangtes Gut

TTM Tatmittel
Körpergewalt, Messer, Knüppel, Pkw
TBU Besondere Tatumstände
Überfallen, Bedrohen, Schlagen, Ausziehen, GV, Straftat unter Alkohol
TBK BKBL-Ausschreibung
0,0,4 | 0,0,1 L | 8,6 |
TLK LKBL-Ausschreibung
B W 0,0,1 | 0,0,3 L | 8,6 |

TOA Opferangaben (Bei PKS-Opferdelikten Mußfeld)
Verwandtschaft Schwägerschaft 1 | Bekanntschaft 2 | Landsmann 3 | Flüchtige Vorbeziehung 4 | Keine Vorbeziehung X | Ungeklärt 9
Geschlecht des Opfers W | Alter des Opfers (vollendetes Lebensjahr) 2 9

TSV Straftat-Sondervermerke
TBU: Vermeintlich totes Opfer wurde ~~XXXXXXXXXXXXXXXX~~scharrt.    in Waldgebiet ver-
Art der gesicherten Spuren/Spurenverbleib
Blut, Knüppel, Sonnenbrille, Opferbekleidung, Abstrich-PDKP Göppingen/LKA
Geschädigter (Name/Vorname[n], Geburtsdatum, PLZ, Wohnanschrift)
A    -G.    I/S    , geb.    1956, 7320 Göppingen,
Anzeigeerstatter (Name/Vorname[n], Geburtsdatum, PLZ, Wohnanschrift - sofern mit Geschädigtem nicht identisch)    Unterer
HÄGENLÄUER/Eugen, geb. 19.08.1938, 7320 GP-Hohrein, Weiler 15    Einstellungsnachricht erwünscht ja    nein

Sachverhalt - Arbeitsweise

- siehe Blatt 1 versuchter Sexualmord -

systemform (0715) 60/81

PAD 01, 12. 84

EXT-STAPLETON-00142



# Strafanzeige - Straftat

**Eingangsstempel StA**
Staatsanwaltschaft Ulm
2 9. OKT. 1986
Js

000065

**PGB** Geburtsname/Namensbestandteile | Geburtsdatum T T M M J J J

**TSD** Dienststellen-Schlüssel | Sachbearbeitende Dienststelle
1,5,1,1,0,1 | PDKP Göppingen

**TAT** Anzahl/insgesamt | Geschlecht d. Tatverdächtigen davon
M -,1 |w| -,-
0-Vollendung 1-Versuch | Sonderkennung
A=Anstiftung B=Beihilfe V=Verbrechensverabredung

**TVG** Tagebuch-Nr. (1 Stelle numerisch)
1549/85 - D 1

Straftaten-Schlüssel
0,1,2,0,0,0,1 1 x

**TGM** Tatort-Schlüssel | Tatort (Klartext)
1,1,7,0,2,6 | Göppingen

**TSH** Straftat/Pol. Ereignis (Klartext)
Sexualmord

**TWK** Wirtschaftskriminalität ja 1 nein 0 X

Sachbearbeiter | Telefon
Witke, KHM 07161/63 - 1

**TTZ** Tatzeit/Tatzeitraum
2,3 T 1,0 M 0,0 J 9,8 J 5 | T T M M J J J

An die Staatsanwaltschaft
7900 Ulm/Donau

**TTS** Tag | Tat Stunde von - bis
M I |D,U| 2,2,4

**TSS** Sachschaden (bei PKS-Schadensdelikten-Mußfeld)

Az.: 7 Js 7284/85

**TVS** Taitbedingung unter Verwendung von Schußwaffen nein 0 | gedroht X | geschossen

**TFS** Freigabe für Statistik nein 0 | ja X

Zuständige Datenstation
7320 Göppingen | ja X | nein

**TWS** We-Meldung/Statistik
WE-/KP/MD-/Sofortmeldung X | PKS-Vorgang

**TAP** Angegriffene Person
Spaziergänger

**TSA** Straftat aufgeklärt ja | nein 0 X

**TAF** Anzahl aufgeklärter gleicher Fälle

Anlage | Strafantrag | Mitteilung über Ausgang d. Verfahrens
1. Aktenzeichen Mitteilung
2.
3.

Abgabe-Datum M M J J J
2,4,1,0,1,9,8,6 | ja x 225 v. 24.10.8

WE-Meldung/FS-Nr./Datum

Anzahl d. Beschuld. | Anzahl Personen-beschreibung 1 | Andere Personalien | Weitere Opferangaben | Weitere Tatgenossen | Ausschreibung LKBI BKBI | Sachfahndung (SFR)
PAD 02 | PAD 03 | PAD 04 | PAD 05 | PAD 06 | x X ja | ja

**TTO** Tatörtlichkeit
Park

**TAG** Angegriffenes Objekt/erstrebtes, erlangtes Gut

**TTM** Tatmittel
Körpergewalt, Knüppel, Messer, Pkw

**TBU** Besondere Tatumstände
Bedrohen, Schlagen, Überfallen, Ausziehen, GV, Straftat unter Alkohol

**TBK** BKBL-Ausschreibung
0,0,4 / 0,0,1 L 8,6

**TLK** LKBL-Ausschreibung
B,W 0,0,1 / 0,0,3 L 8,6

**TOA** Opferangaben (Bei PKS-Opferdelikten Mußfeld)
Verwandtschaft 1 | Schwägerschaft 2 | Bekanntschaft 3 | Landsmann 4 | Flüchtige Vorbeziehung 5 | Keine Vorbeziehung X | Ungeklärt 9

Geschlecht des Opfers W | Alter des Opfers (vollendetes Lebensjahr) 2,9

**TSV** Straftat-Sondervermerke
TBU: Vermeintlich totes Opfer wurde in Waldgebiet verscharrt.

Art der gesicherten Spuren/Spurenverbleib
Blut, Knüppel, Sonnenbrille, Opferkleidung - PDKP Göppingen/LKA BW

Geschädigter (Name/Vorname[n], Geburtsdatum, PLZ, Wohnanschrift)
A -G /S , geb. .1956, 7320 Göppingen,S

Anzeigeerstatter (Name/Vorname[n], Geburtsdatum, PLZ, Wohnanschrift - sofern mit Geschädigtem nicht identisch) unterer
HÄGENLÄUER, Eugen, geb. 19.08.1938, 7320 GP-Hohrein,Weiler 15

Einstellungsnachricht erwünsc ja | nein

## Sachverhalt - Arbeitsweise

Am 23.10.1985, gegen 22.20 Uhr, befand sich die Geschädigte auf dem Heimweg von einem Nähkurs. Im Bereich der Nördlichen Ringstraße in Göppingen, auf Höhe der Parkanlage hinter dem Stadtbad, wurde sie von einem Farbigen überfallen. Er näherte sich von rückwärts und bedrohte die Geschädigte mit einem Messer, zerrte sie daraufhin in die Parkanlage und begann sie,unter Gewaltanwendung, auszuziehen. Hierbei biß die Geschädigte dem Täter in eine Hand. Der Täter zog die Geschädigte daraufhin weiter in die Parkanlage, entkleidete sein Opfer bis auf Bluse und Unterhemd und vergewaltigtedie Geschädigte mehrfach.(Vaginal und anal) Anschließend entfernte sich der Täter kurzfristig, kehrte dann jedoch zurück und schlug nun mindestens dreimal mit einem Holzknüppel gezielt auf den Kopf des Opfers ein. Er entfernte sich erneut und kam dann mit einem Pkw wenig später wieder zurück. Er verbrachte sein Opfer in den Pkw und fuhr nach Göppingen-Hohrein. Dort verbrachte er sein Opfer, das sich tot stellte, in einen Straßengraben und deckte es mit Ästen und Laub zu.

PAD 01; 12. 84   systemform (0 71 56) 60 81

EXT-STAPLETON-00143

PRev Göppingen-Streifendienst 6613/85
Aufnehmender Beamter                                          Telefon

B<sub>e</sub>cks, POM                                        63865
Datum                                                        Strafantrag    ja   nein

Donnerstag, 24.10.1985

Straftat

Gef. Körperverletzung u.a.

Geschädigter (Familienname/Geb.-Name, Vornamen, Geb.-Datum/-Ort, PLZ/Wohnanschrift m. Telefon)

A         :-G         , S:       , geb.       1956, wh. in 7320 Göppingen,
                         , Tel.

Anzeigeerstatter (sofern nicht Geschädigter)

Eugen Hägenläuer, geb. 19.08.38/GP, GP-Hohrein, Unterer Weiler 15

Tatzeit/Tatzeitraum              Stde.   Min.   Tatort

Tatverdächtiger (Familienname/Geb.-Name, Vornamen, Geb.-Datum/-Ort, Familienstand, erl. Beruf/ausgeübte Tätigkeit, PLZ/Wohnanschrift, Eltern/Vormund/Pfleger - Telefon)


Art des Ausweises              Ausweisnummer              ausstellende Behörde

Paß         Personal-
            Ausweis

## Sachverhalt

### I. Anzeige:

Am Donnerstag, dem 24.10.1985, um 00.43 Uhr, teilte der o.a. An-
zeigeerstatter, Herr Hägenläuer, dem Wachhabenden des Polizeireviers
Göppingen mit, daß bei ihm eine Frau sei, die offensichtlich über-
fallen worden war.


### II. Erforschung des Sachverhalts:

POW Hummel und ich fuhren unmittelbar zum Wohnhaus des Anzeigeer-
statters. Er teilte uns mit, daß wenige Augenblicke vor seinem
Anruf die Geschädigte bei ihm klingelte. Mehr konnte er zum Sach-
verhalt nicht sagen.

Im Flur des Wohnhauses traf ich die Geschädigte auf dem Boden
sitzend an. Sie war, bis auf eine Bluse bzw. ein Oberhemd vollständig
nackt. Ihr Kopf war blutüberströmt. Ihr rechter Handrücken war blau
unterlaufen und stark angeschwollen.
Von Frau Albrecht-Gantaler war zunächst nur der Name zu erfahren.
Zum Geschehensablauf konnte sie lediglich sagen, daß sie im Haus
der Familie war, wo sie eine Veranstaltung besucht hatte. Ver-
mutlich auf dem Nachhauseweg war sie dann mit einem Neger in Kon-
takt gekommen. Sie sprach dann nur noch von einem Messer. Mehr war
von der Geschädigten, die unter sehr starker Schockeinwirkung stand,
nicht mehr zu erfahren.
Sie wurde anschließend mit dem Sanka in die Klinik am Eichert ver-
bracht.

.·/.

2/81

000067

Zu Tgb.-Nr.: 6613/85

Um 00.50 Uhr, erschien der Ehemann der Geschädigten,
Herr M       G       , auf der Wache des Polizeireviers
Göppingen und wollte seine Frau seit 22.00 Uhr als ver-
mißt melden.

Da der Verdacht besteht, daß Frau G       vergewaltigt wurde
und sie bei dem Anzeigeerstatter nahezu nackt erschien, wurde
der Bereich Staufenwald nach den eventuell weggeworfenen
Kleidern bzw. nach dem möglichen Täter oder dessen Fahrzeug
abgesucht.
Die Fahndung ergab jedoch keinen Erfolg.

Die weitere Bearbeitung des Sachverhalts wurde durch die
Abt. II übernommen.

B e c k s
Polizeiobermeister

Ur.
An die
Kriminalpolizei
7320 Göppingen
zuständigkeitshalber weitergeleitet.    Göppingen, den 24. 10.85
                                        P o l i z e i r e v i e r

Polizeidirektion
Göppingen
- Kriminalpolizei -
Eingang: 2 4. OKT. 1985
Tgb.-Nr.: D4 - 1549/85

# 4

**Geschädigtenkomplex**

Vernehmung der Geschädigten Albrecht-Ganthaler vom 24.10.1985
Vernehmung am 25.10.1985
Vernehmung am 26.10.1985
Vernehmung am 07.11.1985
Erklärung – Entbindung ärztlicher Schweigepflicht vom 25.10.1985
Schriftsätze der RA-Kanzlei Schätz, Härle, Halt mit Prozessvollmacht

<u>Zeugenvernehmung</u>:


Am Donnerstag, dem 24.10.1985, wurde gg. 08.00 Uhr
die geschädigte

S        A        -G        ,
geb.        1956 in Göppingen,
wh. 7320 Göppingen,

in der Klinik am Eichert aufgesucht und zum anstehenden
Sachverhalt gehört:

"Am gestrigen Tage war ich auf dem Heimweg von einem Näh-
kurs in Göppingen. Ich war alleine unterwegs und ging
zu Fuß auf dem Bürgersteig vom Hallenbad in Richtung Albert-
Schweizer-Schule. Dies müßte genau gg. 22.00 Uhr gewesen
sein. Als ich etwa in Höhe des Brunnens war, der sich zwischen
dem Hallenbad und der Schule befindet, hörte ich, wie sich
jemand schnell von hinten mir näherte. Ich konnte unmittelbar
darauf dann erkennen, daß eine Person, es handelte sich um
einen Farbigen, direkt von hinten auf mich zukam. Diese Person hielt
in einer Hand ein Messer. Bei dem Messer handelte es sich um
eine Art Fahrtenmesser. Es hatte eine Länge von ca. 25 cm
und war feststehend. Das Messer müßte einen hellen Griff ge-
habt haben. Als der Mann bei mir war, drohte er mir mit dem
Messer und sagte sinngemäß in deutsch: "Komm mit oder ich
bring Dich um.""

<u>Frage</u>: Waren dies genau seine Worte?

<u>Antw.</u>: Nicht genau, aber so ziemlich.

<u>Frage</u>: Fand die Bedrohung auf dem Gehweg statt oder war dies
bereits auf dem links angrenzenden Gelände?

Antw.: Er hat mich auf dem Gehweg bedroht, aber dies ging
ganz schnell. Er hat mich gepackt und ich glaube
das Messer an den Hals gehalten, wobei er mich an-
schließend in die Wiese reinzog. Er hat mich mit
den Händen am Oberkörper gepackt und muß mich dot
an den Kleidern festgehalten haben. Anschließend
zog er mich, wie erwähnt, in die Wiese rein, Richtung
Brunnen. Als ich nun in Nähe des Brunnens war, wollte
er mich zu Boden reißen. Ich wehrte mich und habe
ihn hierbei in den Finger gebissen.

Frage: Glauben Sie, daß der Biß Spuren hinterlassen hatte?

Antw.: Auf jeden Fall, er hat sicher geblutet und hat auch
angefangen zu toben. Ich weiß nicht mehr genau, was
er zu mir in dem Augenblick sagte, als ich ihn biß.
Er gebrauchte schon deutsche Worte, ließ aber auch
englische Worte wie "fuck" einfließen.

Frage: Haben Sie sich zu dem Zeitpunkt irgendwie bemerkbar
gemacht oder haben Sie geschrien?

Antw.: Ja, ich habe geschrien. Ich dachte, er wollte mich zu
dem Brunnen ziehen, um mich dort zu ersäufen. Irgend-
welche Leute konnte ich aber in der Nähe nicht fest-
stellen. Ich bin auch der Meinung, daß er zu diesem
Zeitpunkt nicht mehr im Besitz des Messers war. Ich
glaube, daß er dieses irgendwo dort verloren haben mußte.
Er hat mich aber trotzdem, ohne das Messer, in einer
Weise bedroht, die ich augenblicklich nicht genau be-
schreiben kann.

Frage: Wie hat sich die ganze Sache dann im weiteren abgespielt?

Antw.: Es war so, daß der Mann am Brunnen oben anfing, mich zu
entkleiden. Ich sagte noch zu ihm, er solle mich doch in
Ruhe lassen, er dürfe dies nicht machen. Ich versuchte,
ihn noch zu beruhigen, indem ich sagte, er solle sich doch
eine Frau suchen.

Der Mann entgegnete hierauf lediglich "shut up" oder
"halt's Maul" und sagte: "Du hast mich gebissen".
Ich bin mir jetzt aber nicht sicher, ob die Wunde des
Mannes mit meiner Kleidung in Berührung gekommen ist.
Er zog mich Richtung Sandkasten, der sich am linken
unteren Ende, etwa der Wiese befindet, hinunter. Ich
wurde hierbei am Hals gewürgt und auch geschlagen.
Der Mann schlug mit seinen Fäusten in mein Gesicht.
Wir waren nun zwischenzeitlich in Nähe des Sandkastens,
etwa bei dem dortigen Zaun, angekommen. Ich wurde hier
nochmals geschlagen und lag dann auf dem Boden. Ich
kenne die Örtlichkeit hier näher und wußte in etwa,
wo ich mich befand. Ich dachte bei mir,'jetzt bleibst
du ganz ruhig liegen', der Mann ist so alkoholisiert
und vielleicht schlägt er mich dann nicht mehr. Viel-
leicht denkt er, ich wäre k.o. oder ich würde schon
nicht mehr leben. Ich habe immer noch gehofft, daß
jemand kommen würde und mich findet.

Frage: Was spielte sich nun am Zaun unten ab?

Antw.: Wie schon erwähnt, hat mich der Mann oben am Brunnen
und auf dem Weg zum Zaun teils ausgezogen und dabei
geschlagen. Ich weiß jetzt nicht mehr genau im einzelnen,
zu welchem Zeitpunkt mir die einzelnen Kleidungsstücke
vom Leib gerissen wurden. Wie ich mich entsinne, muß
er aber am Zaun unten noch meine Strumpfhose und meinen
Schlüpfer ausgezogen haben. Ich wurde dann von dem Mann
mehrfach vergewaltigt. Er hat mich zu diesem Zeitpunkt
auch noch gewürgt und geschlagen. Ich war zwar anfangs
noch in der Lage, insbesondere, als ich hierher gezerrt
wurde, mich zu wehren. Zum Zeitpunkt der Vergewaltigung
aber, glaube ich, habe ich mich nicht mehr gewehrt. Ich
habe dies aufgrund des massiven Angriffes des Mannes
nicht mehr gewagt. Wie lange die Sache gedauert hat,
kann ich schlecht sagen, da er sich mehrmals an mir ver-
gangen hatte.

Wenn ich hinsichtlich des Zeitraumes befragt werde,
so weiß ich, daß es bestimmt keine Stunde war. Ich
meine, daß es etwa eine viertel Stunde ging, kann
mich aber nicht festlegen.

Frage: Wie oft wurden Sie vergewaltigt?

Antw.: Vielleicht dreimal in der Scheide und einmal anders.
Hiermit meine ich, daß der Mann einmal den Analver-
kehr durchführte. Ich glaube auch, daß der Mann zu-
meist einen Samenerguß hatte. Während dises Vorganges
lag ich auf der Seite.

Frage: Was unternahm der Mann nach der Vegewaltigung?

Antw. : Er ließ von mir ab und muß dann in meiner Nähe auf
der Wiese bzw. bei dem dortigen Spielplatz herumge-
strichen sein. Ich bin beim Sandkasten bzw. am Zaun
liegengeblieben und habe mich ruhig verhalten. Ich
habe mich so verhalten, daß der Mann kein Lebens-
zeichen von mir vernommen haben kann. Ich wollte ihn
im Glauben lassen, ich sei ohnmächtig. Der Mann hielt
sich etwa 5 Minuten an der vorbeschriebenen Stelle,
also auch etwa in Nähe des Sandkastens, auf. Ich habe
ihn nicht beobachtet, da ich mich nicht traute. Ich
überlegte nur, wie ich am schnellsten zu den Häusern
kommen könnte. Ich glaube auch, daß ich einmal kurz
hochgeschaut habe oder im Laub raschelte. Möglicher-
weise hat der Mann dies gehört. Mit Bestimmtheit kann
ich dies aber nicht sagen. Auf jeden Fall muß mein
Atmen noch zu vernehmen gewesen sein. Wenn ich die
Gegend näher bestimmen soll, muß ich sagen, daß dies
etwa in Richtung Hallenbad, von meinem Platz aus ge-
sehen, war. Auf jeden Fall habe ich dort entsprechende
Geräusche gehört.

Ich lag selbst etwa 15 m vom Saukasten weg. Ich
konnte dann hören, wie der Mann eben aus dieser
Richtung wieder auf mich zukam.

Frage: Als nun diese Person auf Sie zukam, haben Sie da
sofort erkannt, daß es sich um denselben Mann wieder
handelte?

Antw.: Ja, es war identisch mit dem, wie er mich anpackte
und wie der Atem roch. Er sagte hierbei nichts.
Er hat mich dann ganz wüst geschlagen, wobei er
mehrmals mit einem metallischen Gegenstand auf meinen
Kopf einschlug. Der Gegenstand müßte Rohrform haben,
massiv und ca. 25 cm lang sein. Ich habe dann noch
versucht, die Stelle mit meiner linken Hand abzuwehren,
auf die der Mann schlug. Die Stelle war links oben an
meinem Kopf. Zumindest in dem Augenblick muß er mit-
bekommen haben, daß ich bei Bewußtsein war. Ich kann
nochmals wiederholen, daß der Mann ohne Vorwarnung
direkt auf mich zukam und sofort mit dem Metallgegen-
stand auf mich einschlug, als ich noch am Boden lag.
Zuvor habe ich mich ja als bewußtlos gestellt. Es war
eine automatische Abwehrreaktion, indem ich meine Hand
vor meinen Kopf hielt. Ich dachte, der Mann schlägt
mich tot. Der Mann hat, so meine ich, dreimal auf mich
eingeschlagen. Er holte hierbei richtig aus und schlug
zu. Er schlug hierbei immer gegen dieselbe Stelle meines
Kopfes. Er sagte hierbei, so fällt mir jetzt noch ein,
:Du Polizei gehen" oder so. Dies sagte er, während er
auf mich einschlug oder auch schon kurz davor. Er war
sich wohl sicher, daß ich zur Polizei gehen würde, und
mich deshalb umbringen würde. Ich hatte aufgrund der
-Schläge vollkommen den Eindruck, daß der Mann mich
töten wollte.

EXT-STAPLETON-00151

Frage: Waren Sie nach den Schlägen bei Bewußtsein oder
haben Sie die Besinnung verloren?

Antw.: Ich konnte noch mitbekommen, daß der Mann später
mit einem Auto hergefahren ist. Ich konnte da auch
noch die Musik von einem Radio hören, kann aber
nicht beschreiben, um welches Auto es sich handelte.
Es ist so, daß der Mann nach den Schlägen ging und
mich liegen ließ. Ich konnte ihn dann auch nicht mehr
in der Nähe hören. Ich war auch nicht in der Lage,
aufzustehen und wegzugehen. Zudem traute ich mir das
nicht, da ja beim ersten Mal der Mann auch wieder
zurückkam. Als ich das Auto heranfahren hörte, waren
ca. 10 Minuten vergangen. Ich bin der Meinung, daß
das Kraftfahrzeug auf der dortigen Wiese gefahren sein
muß. Das Auto habe ich nur gehört und nicht gesehen.
Der Mann kam dann unmittelbar darauf wieder auf mich
zu und packte mich. Er hat mich dann in das Auto ge-
schmissen. Er hielt mich hierbei unter den Armen fest.

Frage: Sie sagten, der Mann habe Sie in das Auto geworfen.
Heißt das soviel, daß dieses Fahrzeug unmittelbar
bei Ihnen war?

Antw.: Ich weiß nur noch, daß der Mann mich auf keinen Fall
weit geschleift hat, es dürften wenige Meter gewesen
sein. Wo er mich in das Auto hineinwarf, kann ich nicht
sagen. Ich habe noch versucht, die Augen aufzumachen,
konnte aber außer Dunkelheit nichts sehen. Von der Fahrt
selbst habe ich im folgenden nichts mitbekommen.
Meinen Zustand hier kann ich so beschreiben, daß ich
weder bewußtlos noch bei Besinnung war. Der Mann hielt
dann irgendwann einmal an, nahm mich aus dem Auto heraus
und warf mich in den Straßengraben. Er deckte mich dann
anschließend mit Ästen zu. Erst später habe ich mitbe-
kommen, wo ich war.

Der Mann schleifte mich aus dem Auto heraus und hat
mich dann fallen lassen. Ich weiß jetzt nicht, wie
lange dieser Vorgang gedauert hat. Ich habe mich
ruhig verhalten und keinerlei Lebenszeichen mehr von
mir gegeben, als der Mann mich mit den Ästen zudeckte.
Ich glaube aber schon noch, daß ich zu diesem Zeit-
punkt mich hätte irgendwie bemerkbar machen können.
Nachdem der Mann mich zugedeckt hatte, fuhr er mit
seinem Pkw in dieselbe Richtung zurück, aus der wir
gekommen waren. Ich konnte dies an dem Motorgeräusch
hören. Nachdem ich mitbekommen habe, daß das Fahrzeug
des Mannes weg war, wartete ich noch geraume Zeit.
Ich dachte noch in meinem Versteck, er schlägt mich
jetzt vollends tot. Ich habe da nur gehofft, daß ich
noch mit dem Leben davonkomme oder daß, wenn er mich
totschlage, dies schnell gehen möge. Ich hatte immer
Angst, daß wenn ich vorzeitig mein Versteck verlasse,
der Mann noch da wäre. Dies wäre dann mein Ende ge-
wesen.

Ich habe dann mein Versteck verlassen und bin zu den
nächsten Häusern gegangen. Ich hatte lediglich nur
noch meine Buse zu dem Zeitpunkt an. Ansonsten war ich
unbekleidet. Das Laufen bzw. das Gehen ist mir schwer-
gefallen. Ich torkelte mehr als ich ging. Ich gelang
nun an Häuser an, konnte beim ersten Haus aber keinen
Eingang finden. Am Nachbarhaus aber konnte ich mich
durch Klingeln verständlich machen. Es kam dann auch
jemand, der mir half.

<u>Frage</u>: Können Sie den Mann, von dem Sie vergewaltigt wurden,
näher beschreiben?

<u>Antw.</u>: Es handelte sich um einen Neger, vielleicht 10 cm größer
als ich, also etwa 175 cm groß. Der Mann hatte keine
ganz dunkle Hautfarbe, eher das Mittel davon. Er hatte
krause Haare. Sie waren kurz.

Der typische Haarschnitt eines US-Soldaten war es
gerade nicht, sie waren aber schon ziemlich kurz.
Koteletten waren schon vorhanden. Der Mann war
schlank, auch sein Gesicht zeigte schlanke Züge.
Es ist möglich, daß ich die Person bei einer Gegen-
überstellung wiedererkennen würde. Irgendeine Be-
sonderheit an der Person, was deren Beschreibung
anbelangt, ist mir nicht aufgefallen. Zur Bekleidung
kann ich nur sagen, daß er ehe rote Jacke mit so
weißen Taschen an hatte. Es müßte sich um eine Art
Freizeit oder Trainingsjacke gehandelt haben. Die
Jacke hatte eine kräftige rote Farbe. Es ist durch-
aus möglich, daß ich diese Jacke bei einer Vorlage
wiedererkennen könnte. Ich weiß noch, daß die Jacke
nicht enganliegend war, sondern eher blousonartig.
Sie war nicht glänzend, sondern matt.

Frage: Können Sie sich noch an die Kleidungsstücke erinnern,
die Sie zur Tatzeit getragen haben?

Antw.: Ja, es handelt sich um einen grauen Hosen-Rock, um
eine Strumpfhose, um graue, dünne Wollkniestrümpfe
sowie um einen weißen Schlüpfer. Ferner hatte ich
ein weißes Unterhemd und eine weiße Bluse sowie eine
weite, ärmellose, taubenblaue Jacke an. Zudem trug
ich einen grau-blauen Seidenschal mit blauem Garbadin-
Muster. An dem Abend hatte ich meine blauen Schuhe an.
Ich führte noch eine Schulmappe bei mir. Diese Mappe
enthielt eine Brille mit einem durchsichtigen Kunst-
stoffgestell. Die Brille war nach oben hin getönt.
Eine andere Brille hatte ich nicht bei mir. Die Brille
ist für Kurzsichtige geeignet."

Geschlossen:

- REUTTER, KOM -

- HERRLINGER-MISCH, KHM'in '

000077

Polizeidirektion Göppingen          7320 Göppingen, den 25.10.85
-Abt.II - Kriminalpolizei-


Betr.: Versuchter Sexualmord z.N. S      A      -G          ,
       geb.      56, wh. 7320 Göppingen,
       hier: Nachvernehmung der Geschädigten


Am Freitag, dem 25.10.85, gg. 10.15 Uhr, wurde erneut
die Klinik am Eichert angefahren, wo Frau

                    S       A       -G.     ,
                    (nähere Personalien bekannt)

gezielt zu verschiedenen noch offenen Punkten befragt
wurde. Sie erklärte:

"Ich habe in der Schule bis zum Abitur das Fach 'Englisch'
gehabt und beherrrsche diese Sprache soweit recht gut. Wie
es eben so ist, fehlt einem hinterher die Praxis, aber mit
der üblichen Umgangssprache bin ich vertraut.
Ich bin mir auch ziemlich sicher, daß es sich um einen Mann,
sprich Farbigen gehandelt hat, dessen Muttersprache Englisch,
d.h. Amerikanisch ist. Der Farbige sprach für einen solchen
recht gut deutsch, was sonst nicht unbedingt üblich ist,
aber eben mit einem Akzent und mit grammatikalischen Fehlern.
Für mich war es ein farbiger Amerikaner und kein Asylant
oder sonstiger Flüchtling, wie es hier in Göppingen einige
gibt. Ich war vor meiner Beurlaubung beim Arbeitsamt in
Göppingen beschäftigt und vermag die einen von den anderen
sehrwohl zu unterscheiden.

Soweit ich mich erinnern kann, habe ich selbst noch nicht
geblutet, als ich den Mann in den Finger gebissen habe.
Mit dem Messer wurde ich durch ihn nicht verletzt und die

anderen Verletzungen am Kopf kamen ja erst später.

Er hatte nach meiner Ansicht keine sog. Bierfahne, er
roch eher nach etwas 'Hartem', ich meine stärkere Alko-
holika. Ich denke, daß er zwar angetrunken war, aber nicht
richtig volltrunken. Seine Bewegungen waren noch sicher,
er torkelte nicht und hatte auch sonst keine Ausfaller-
scheinungen.

Ich besitze keine Sonnenbrille und schon gar nicht in
der Art, wie mir das soeben beschrieben wurde. Ich habe
noch eine ältere Ersatzbrille daheim, die habe ich aber
ganz bestimmt nicht dabeigehabt. Beide Brillen sind optische
Brillen und stammen von dem Optiker BINDER.

Zu der Personenbeschreibung, die ich gestern abgegeben
habe, kann ich nichts hinzufügen, auch wenn ich mich noch
so besinne. Ich denke aber schon, daß ich den Mann wieder-
erkennen würde, vor allem an seinen harten Gesichtszügen
und (wenn das machbar wäre) an der Art wie er spricht.

Zur Tatzeit habe ich meine Regel nicht gehabt.

Mir ist nachträglich noch folgendes eingefallen:
Wenn ich mich recht entsinne, habe ich eine Damenarbanduhr
mit goldenem Gehäuse und einem schwarzen Lederband getragen,
die ich jetzt nicht mehr habe, Marke EDOX.

Der Täter fragte mich einmal nebenbei, ob ich verheiratet
sei. Ich glaube, das hat er mich auf deutsch gefragt. Auch
wollte er wissen, ob ich vorher schon Verkehr gehabt hätte.
Nach meiner Ansicht war die Frage auf die Zeit vor meiner
Ehe bezogen.

Sollte mir in den nächsten Tagen noch etwas einfallen, werde
ich es mir aufschreiben und der Polizei weitergeben."

*Herrlinger-Misch*
Herrlinger-Misch

000080

<u>Zeugenvernehmung</u>

Am SAmstag, dem 26.10.1985, wurde die Geschädigte

S        A      -G

erneut zum Sachverhalt vernommen. Nachfolgendes
wurde hierzu auf Einzelbefragung angegeben:

<u>Frage:</u>    Frau A      G     , sie haben bereits
bei Ihrer ersten Vernehmung eine Personen -
beschreibung des Täters abgegeben. Am heutigen
Tage sollen Sie erneut zu diesem Punkt be -
fragt werden. Können Sie die Person des Täters
noch näher beschreiben?

<u>Antw.:</u>    Ich habe bereits in meiner Vernehmung vom
Donnerstag gesagt, daß der Mann etwa 175 cm
groß gewesen sein muß. Diesbezüglich bin ich
mir absolut sicher, da ich als Maßstab meine
Körpergröße anlegen kann. Hinsichtlich des
Alters möchte ich erwähnen, daß der Täter so
um die 30 gewesen sein muß. Er war jedenfalls
älter als 25, so zwischen 28 und 32.

<u>Frage:</u>    Können Sie hinsichtlich seiner Gestalt etwas
sagen?

<u>Antw.:</u>    Seine Gestalt war schlank, aber nicht dürr. Er
war insgesamt eine schlanke Erscheinung. An den
Beinen, was die Länge angeht, ist mir im Ver -

000082

gleich zum Oberkörper nicht besonderes aufegefallen.
Die Proportionen stimmten miteinander überein. Ich
weiß aber noch, daß er ziemlich feingliedrige Finger
hatte, wobei die Nägel weißlich hervortrat-en. Ob
nun aber ein Ring am Finger war, weiß ich nicht. Ich
glaube aber, daß ich dies vielleicht hätte bemerken
können.

Frage: Können Sie nähere Einezlheiten über das Gesicht des
Mannes sagen?

Antw.: Er hatte krause Haare, die kurz und überall gleich
lang waren. Dies auch im Nackenbereich. Die Haare
waren dort nicht ausrasiert. Im Ohrenbereich sind
sie an die Ohren gestoßen, also nicht diese nicht be-
deckt. Die Ohren waren bestimmt nicht groß, etwa im
Verhältnis zum Gesamtkörper eher klein. Ob die Ohr -
läppchen nun angewachsen waren oder nicht, kann ich
nicht sagen.

Die Stirn des Mannes möchte ich als normal bezeichnen.
Auffälliges konnte ich dort nicht feststellen. Sie
wurde auf jeden Fall nicht von den Haaren bedeckt.

Die Augen des Mannes waren auch normal. Sie waren
weder hervorquellend noch waren es Schlitzaugen. Ich
konnte aber feststellen, als der Mann sprach, daß er
so richtig die Augen aufriß.

Hinsichtlich der Nase kann ich sagen, daß er weder
eine Stupsnase noch eine breite Nase (Boxernase)
hatte. Sie war durchschnittlich, normal.

EXT-STAPLETON-00160

000083

Auch der Mund ist als normal zu bezeichnen.
Vielleicht war er eine Nuanca breiter als
es bei anderen Menschen ist. Die Lippen waren
nicht gerade wulstig, aber der Ansatz dazu
war schon vorhanden. Sie waren hellrosa, so
wie die Fingernägel.

Insgesamt möchte ich den Mann nicht als abstoßend be -
zeichnen. Für seinen Typus war er gut aussehend. Er -
wähnen möchte ich noch, daß der Kopf zum übrigen Körper
eher etwas klein schien.

Frage:  Sie wurden von dem Mann auch angesprochen. Welche
        Worte benutzte er?

Antw.:  Ich wurde in deutscher Sprache angeredet. Es
        war deutlich ein amerikanischer Akzent, so ein
        rollendes "R" herauszuhören.
        Er sagte zu mir: "komm mit oder ich bring dich
        um, verschdest du" oder " ich bringen dich um".
        Am Brunnen sagte erzu mir, nachdem ich ihn ge -
        bissen hatte: "Du haben mich gebissen" oder
        " Du, du hast mich gebissen". Er war hierbei em-
        pört und wirkte sehr gereizt. Das "S" hat er
        nicht wie "SCH" ausgesprochen, sondern normal.

        Am Zaun unten sagte er: "SHut up, halts Maul oder
        halt die Klappe", dies aber immer akzentuiert.
        Er fragte mich zudem noch: " hast du einen Mann"
        oder " bist du verheiratet" Zudem "hast du vor-
        her andere Männer gehabt. Ich machen das besser."

Frage:  Können sie die Sprache irgendeinem duetschen Dia-
        lekt zuordnen, konkret gefragt, kann es ein
        hessischer Dialekt gewesen sein?

Antw.: Nein, ein typischer hessischer Dialekt war es
mit Sicherheit nicht. Näher kann ich die
Sprache aber auch nicht zuordnen. Mit wurden
zwar die Worte "isch hab a Pistol" soeben
gesagt, jedoch ist dieser Diealekt von dem
Mann nicht gesprochen worden. Das einzige
Wort, das in diese Richtung geht ist das, wo
er sagte : "sei schdill (sei still) ".

Reutter, KOM

EXT-STAPLETON-00162

000085

Polizeidirektion Göppingen        7320 Göppingen, den 8.11.1985
-Abt.II - Kriminalpolizei-
Tgb.-Nr. D 1-1549/85/Her/Schm


Betr.:   Versuchtes Tötungsdelikt z.N. A        -G


Am 7.11.1985 befand sich die Geschädigte,

                    S        A        -G
                  (näh. Pers. Dek.)

in den Räumen der PD KP Göppingen. Sie wurde gegen 15.15 Uhr
neben anderen noch offenstehenden Fragen auch von der UZ
zu dem eigentlichen Vorgang der Vergewaltigung bzw. den
sexuellen Handlungen als solchen befragt. Frau G
versuchte sich so gut es ging zu erinnern und gab auf ent-
sprechende Befragung folgendes an:

"Wie der Polizei bekannt ist, habe ich am eigentlichen Tatort
nur noch mein Unterhemd und darüber eine Bluse angehabt.
Ich wurde von dem Mann auf den Rücken gelegt. Er wird
dann wohl seine Hose irgendwie ausgezogen oder runtergeschoben
haben. Dies ist aber nur eine Vermutung von mir, mir ist das
nicht mehr bewußt. Ich glaube, daß meine Beine in meiner
Rückenlage angewinkelt waren. Er lag nicht direkt auf mir
mit seinem ganzen Körpergewicht sondern stützte sich mit
seinen Armen und Händen auf dem Boden ab. Ich hatte meinen
Kopf auf die Seite gedreht und teilweise die Augen auch
zugehalten, je nach Situation. Nachdem er sein Glied bei mir
einführte und sich auf mir bewegte, ging alles ziemlich schnell.
Ich glaube schon, daß ich seinen Orgasmus bemerkt habe, dieser
verlief aber ziemlich schwach und flach.

Er zog dann sein Glied aus meiner Scheide heraus, dann war
eine ganz kurze Pause, nach meinem Gefühl muß er irgendwie
dann an sich manipuliert haben.

EXT-STAPLETON-00164

000087

Anschließend hat er auf dieselbe Art wieder den Vorgang
fortgesetzt, ich meine, er hat sein Glied wieder bei mir
eingeführt und alles spielte sich auf die gleiche Weise
ab. Die Dauer dieses Vorgangs bis er zum Ende kam, war
unwesentlich länger. Auch dieser Höhepunkt war kaum merkbar.

Ich denke, daß dann der Analverkehr kam. Vielleicht hat er
es auch nur versucht. Ob es ihm eigentlich gelungen ist,
weiß ich jetzt nicht mehr. Zu diesem Zweck hat er mich ein
wenig auf die Seite gedreht.
Er hat nicht irgendwie geschimpft, weil es nicht gegangen
ist, ich hatte eher das Gefühl er war zufrieden. Vielleicht
hat er während des ganzen Vorgangs, als er geschlechtlich mit
mir verkehrte, nebenher irgendetwas gebrabbelt. Es war aber
nicht verständlich für mich. Beim dritten Mal, also bei diesem
Analverkehr wurde für mich ein Orgasmus nicht mehr wahrnehmbar.

Ich versuche mich zwar noch genau daran zu erinnern, ob
er noch einmal einen Scheidenverkehr anschließend mit mir
gehabt hat. Dies will mir aber nicht mehr richtig gelingen.
Vielleicht war es so, vielleicht hat er es nur versucht,
ich weiß es einfach nicht mehr.

Ich mußte seinen Geschlechtsteil nicht anfassen, meine aber,
daß er ganz kurz an meiner Scheide herumspielte.

Meinen tue ich auch, daß ich seinen Geschlechtsteil gesehen
habe. Dieser war nicht sonderlich groß, eher kleiner als
Durchschnitt. Als er sein Glied bei mir einführte, hat es
im Scheidenbereich nicht weh getan. Es wurden bei mir auch
in der Klinik keine Verletzungen festgestellt.

Ich kann mich auch noch erinnern und das war ziemlich zu
Beginn, daß er meinen Busen anfaßte und zwar unter meinem
Hemd. Er hat ganz kurz daran herumgespielt.

000088

Während des eigentlichen Verkehrs wurde ich nicht mehr
von ihm geschlagen, nur vorher. Dies habe ich in meinen
ersten Vernehmungen bereits angegeben. Ich wurde auch
nicht mehr von ihm gewürgt o.ä."

HERRLINGER-MISCH

EXT-STAPLETON-00166

000089

Polizeidirektion
G ö p p i n g e n
Kriminalpolizei

7320 Göppingen, den 25.10.85

Tgb.Nr. D 1 - 1549/85

E r k l ä r u n g

Betr.: Entbindung von der ärztl.Schweigepflicht
gemäß § 53 (1), Ziff. 3 und § 53 (2) StPO

Ich entbinde ~~Herrn~~ ~~Draxxxxx~~ die

behandelnden Ärzte der Klinik am Eichert

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

über die bei mir festgestellten Befunde und meine
Krankengeschichte gemäß der obigen gesetzlichen
Bestimmungen von seiner ärztlichen Schweigepflicht
und bin damit einverstanden, daß er sowohl dem Gericht
als auch der Kriminalpolizei gegenüber Aussagen macht.

*P. Albrecht Gablaler*
(Unterschrift)

z.B.
entgegen genommen:

*Herrlinger-Misch*
Herrlinger-Misch

L60000

000092

**RECHTSANWÄLTE**



**GÜNTHER SCHÄTZ**
**KARL-HEINZ HÄRLE**
**BARBARA HALT**

ANWALTSKANZLEI · SCHILLERSTRASSE 10 · 7320 GÖPPINGEN

An die

Kriminalpolizei

7320 Göppingen



7320 GÖPPINGEN , 20.1.1986
SCHILLERSTRASSE 10
TELEFON (0 71 61) 7 80 48

KREISSPARKASSE GÖPPINGEN 4343
(BLZ 610 500 00)
VOLKSBANK GÖPPINGEN 212 512 005
(BLZ 610 605 00)
POSTSCHECKAMT STUTTGART 245 395-700
(BLZ 600 100 70)

REG.-NR. 28/86 H/sc
BITTE BEI ANTWORT ANGEBEN

Az.: D I/1549/85

Kraft angeschlossener Vollmacht zeigen wir an,
daß wir Frau S       A        -G;            ,
          , 7320 Göppingen, vertreten.

Namens unserer Mandantin erheben wir

    **S t r a f a n z e i g e**

und stellen

    **S t r a f a n t r a g**

wegen gefährlicher Körperverletzung

gegen **Unbekannt**.

      B e g r ü n d u n g :

Am 23.10.1985 ging unsere Mandantin gegen ca. 22.15 Uhr
durch die Anlage hinter dem Hallenbad in Göppingen.
Unsere Mandantin war auf dem Nachhauseweg.

EXT-STAPLETON-00170

Sie wurde dort von einem unbekannten "Farbigen" fest-
gehalten, mit Fäusten geschlagen, mit einem Messer bedroht
und am Hals gewürgt.

Der Unbekannte hat unsere Mandantin über eine Wiese
bis zum Zaun am Spielplatz gezogen und dort vergewaltigt.
Vor und nach der Vergewaltigung wurde unsere Mandantin
noch mehrmals geschlagen. Später wurde ihr von dem Unbekannten
mit einem Knüppel auf den Kopf und den Körper geschlagen.
Der Unbekannte hat unsere Mandantin danach in einen Pkw
gelegt und in der NÄhe von Hohrein in einen Graben
geworfen und mit Ästen und Laub zugedeckt.

Unsere Mandantin erlitt Platzwunden am Kopf und an den Ohren,
eine schwere Gehirnerschütterung, einen Trommelfellriß links,
drei gebrochene Rippen, ein eingedrücktes Jochbein,
Hämatome an beiden Augen und Würgemale am Hals sowie Prel-
lungen am ganzen Körper.

Wir beantragen schon jetzt, in einem evtl. Strafverfahren
unsere Mandantin als Nebenklägerin zuzulassen.

Weiterhin bitten wir um kurzfristige Aktenausfolge, sobald
dies nach den gesetzlichen Bestimmungen möglich ist.

Rechtsanwalt

000094

# Prozeßvollmacht

Soweit Zustellungen statt an den Bevollmächtigten auch an die Partei unmittelbar zulässig sind (z. B. § 16 FGG, § 8 VwZG), bitte ich diese nur an meinen Bevollmächtigten zu bewirken.

De

wird in Sachen ..... S ..... A ..... - G .....

wegen **gefährlicher Körperverletzung**

Prozeßvollmacht gemäß § 81 ff. ZPO und §§ 302, 374 StPO erteilt.

Diese Vollmacht erstreckt sich insbesondere auf folgende Befugnisse:

1. Verteidigung und Vertretung in Bußgeldsachen und Strafsachen in allen Instanzen, auch für den Fall der Abwesenheit sowie auch als Nebenkläger. Vertretung gemäß § 411² StPO mit ausdrücklicher Ermächtigung gemäß § 233¹ StPO. Vertretung in sämtlichen Strafvollzugsangelegenheiten.
2. Strafanträge zu stellen und zurückzunehmen sowie die Zustimmung gemäß §§ 153 und 153a StPO zu erteilen.
3. Entschädigungsanträge nach dem StrEG zu stellen.
4. Empfangnahme und Freigabe von Geld, Wertsachen, Urkunden und Sicherheiten, insbesondere des Streitgegenstandes, von Kautionen, Entschädigungen und vom Gegner, von der Justizkasse oder anderen Stellen zu erstattenden Kosten und notwendigen Auslagen.
5. Übertragung der Vollmacht ganz oder teilweise auf andere.
6. Entgegennahme von Zustellungen, Einlegung und Rücknahme von Rechtsmitteln sowie Verzicht auf solche, Erhebung und Rücknahme von Widerklagen – auch in Ehesachen.
7. Beseitigung des Rechtsstreits durch Vergleich, Verzicht oder Anerkenntnis.
8. Vertretung vor den Familiengerichten gemäß § 78 Absatz I Satz 2 ZPO sowie Abschluß von Vereinbarungen über Scheidungs- folgen und Stellung von Anträgen auf Erteilung von Renten- und sonstigen Versorgungsauskünften.
9. Vertretung im Konkurs- oder Vergleichsverfahren über das Vermögen des Gegners und in Freigabeprozessen sowie als Nebenintervenient.
10. Alle Nebenverfahren, z. B. Arrest und einstweilige Verfügung, Kostenfestsetzung, Zwangsvollstreckung einschließlich der aus ihr erwachsenden besonderen Verfahren, Zwangsversteigerung und Zwangsverwaltung und Hinterlegungsverfahren.
11. Abgabe von Willenserklärungen (z. B. Kündigungen).

Mehrere Vollmachtgeber haften als Gesamtschuldner.

_Göppige_ , den 7. 1. 86

Vordruck Nr. 592 / Prozeßvollmacht für Zivil- und Strafprozeß
Dreske & Krüger · Hannover · Alle Rechte vorbehalten!

Unterschrift

EXT-STAPLETON-00172

000095

# RECHTSANWÄLTE

# GÜNTHER SCHÄTZ
# KARL-HEINZ HÄRLE
# BARBARA HALT

ANWALTSKANZLEI · SCHILLERSTRASSE 10 · 7320 GÖPPINGEN

An die

Staatsanwaltschaft beim Landgericht

7900 Ulm/Donau

7320 GÖPPINGEN, den 28.4.1987
SCHILLERSTRASSE 10
TELEFON (0 71 61) 7 80 48

KREISSPARKASSE GÖPPINGEN 4343
(BLZ 610 500 00)
VOLKSBANK GÖPPINGEN 212 512 005
(BLZ 610 605 00)
POSTSCHECKAMT STUTTGART 245 395-700
(BLZ 600 100 70)

REG.-NR.   28/86 H/A
BITTE BEI ANTWORT ANGEBEN



Staatsanwaltschaft
7900 (Ulm/Donau)
29. APR. 1987
Js

7 Js 7284/85   Bitte Bogen,

In der Ermittlungssache gegen

U n b e k a n n t

wegen versuchten Mordes und Vergewaltigung zum Nachteil von
S        A        -G

bitten wir um kurzfristige Aktenausfolge.
Wir haben Frau G        in dieser Angelegenheit vertreten und
mit Schreiben vom 20.1.1986 um Aktenausfolge gebeten.
Eine Aktenausfolge ist bisher nicht erfolgt.

Rechtsanwalt



EXT-STAPLETON-00173

000096

# RECHTSANWÄLTE

**GÜNTHER SCHÄTZ**
**KARL-HEINZ HÄRLE**
**BARBARA HALT**

---
ANWALTSKANZLEI · SCHILLERSTRASSE 10 · 7320 GÖPPINGEN
---

An die

Staatsanwaltschaft

Postfach 3863

7900 Ulm/Donau



7320 GÖPPINGEN 14.5.1987
SCHILLERSTRASSE 10
TELEFON (0 71 61) 7 80 48

KREISSPARKASSE GÖPPINGEN 4343
(BLZ 610 500 00)
VOLKSBANK GÖPPINGEN 212 512 005
(BLZ 610 605 00)
POSTSCHECKAMT STUTTGART 245 395-700
(BLZ 600 100 70)

REG.-NR. 28/86 H/sc
BITTE BEI ANTWORT ANGEBEN

7 Js 7284/85

In der Ermittlungssache

gegen

Unbekannt

wegen versuchten Mordes u. a. zum
Nachteil von S        A        -G

geben wir die uns überlassenen Akten zurück.

Rechtsanwalt

EXT-STAPLETON-00174

000097

**RECHTSANWÄLTE**



**GÜNTHER SCHÄTZ**
**KARL-HEINZ HÄRLE**
**BARBARA HALT**

ANWALTSKANZLEI · SCHILLERSTRASSE 10 · 7320 GÖPPINGEN

An die

Kriminalpolizei

7320 Göppingen



7320 GÖPPINGEN, 20.1.1986
SCHILLERSTRASSE 10
TELEFON (0 71 61) 7 80 48

KREISSPARKASSE GÖPPINGEN 4343
(BLZ 610 500 00)
VOLKSBANK GÖPPINGEN 212 512 005
(BLZ 610 605 00)
POSTSCHECKAMT STUTTGART 245 395-700
(BLZ 600 100 70)

REG.-NR. 28/86 H/sc
BITTE BEI ANTWORT ANGEBEN

Az.: D I/1549/85

Kraft angeschlossener Vollmacht zeigen wir an,
daß wir Frau S        A       -G          ,
          7320 Göppingen, vertreten.

Namens unserer Mandantin erheben wir

      S t r a f a n z e i g e

und stellen

      S t r a f a n t r a g

wegen gefährlicher Körperverletzung

gegen **Unbekannt.**

      B e g r ü n d u n g :

Am 23.10.1985 ging unsere Mandantin gegen ca. 22.15 Uhr
durch die Anlage hinter dem Hallenbad in Göppingen.
Unsere Mandantin war auf dem Nachhauseweg.

EXT-STAPLETON-00175

Sie wurde dort von einem unbekannten "Farbigen" fest-
gehalten, mit Fäusten geschlagen, mit einem Messer bedroht
und am Hals gewürgt.

Der Unbekannte hat unsere Mandantin über eine Wiese
bis zum Zaun am Spielplatz gezogen und dort vergewaltigt.
Vor und nach der Vergewaltigung wurde unsere Mandantin
noch mehrmals geschlagen. Später wurde ihr von dem Unbekannten
mit einem Knüppel auf den Kopf und den Körper geschlagen.
Der Unbekannte hat unsere Mandantin danach in einen Pkw
gelegt und in der Nähe von Hohrein in einen Graben
geworfen und mit Ästen und Laub zugedeckt.

Unsere Mandantin erlitt Platzwunden am Kopf und an den Ohren,
eine schwere Gehirnerschütterung, einen Trommelfellriß links,
drei gebrochene Rippen, ein eingedrücktes Jochbein,
Hämatome an beiden Augen und Würgemale am Hals sowie Prel-
lungen am ganzen Körper.

Wir beantragen schon jetzt, in einem evtl. Strafverfahren
unsere Mandantin als Nebenklägerin zuzulassen.

Weiterhin bitten wir um kurzfristige Aktenausfolge, sobald
dies nach den gesetzlichen Bestimmungen möglich ist.

Rechtsanwalt

000099

# Prozeßvollmacht

Soweit Zustellungen statt an den Bevollmächtigten auch an die Partei unmittelbar zulässig sind (z. B. § 16 FGG, § 8 VwZG), bitte ich diese nur an meinen Bevollmächtigten zu bewirken.

De

wird in Sachen ...S........A.......-G

wegen **gefährlicher Körperverletzung**

Prozeßvollmacht gemäß § 81 ff. ZPO und §§ 302, 374 StPO erteilt.

Diese Vollmacht erstreckt sich insbesondere auf folgende Befugnisse:

1. Verteidigung und Vertretung in Bußgeldsachen und Strafsachen in allen Instanzen, auch für den Fall der Abwesenheit sowie auch als Nebenkläger. Vertretung gemäß § 411² StPO mit ausdrücklicher Ermächtigung gemäß § 233¹ StPO. Vertretung in sämtlichen Strafvollzugsangelegenheiten.
2. Strafanträge zu stellen und zurückzunehmen sowie die Zustimmung gemäß §§ 153 und 153a StPO zu erteilen.
3. Entschädigungsanträge nach dem StrEG zu stellen.
4. Empfangnahme und Freigabe von Geld, Wertsachen, Urkunden und Sicherheiten, insbesondere des Streitgegenstandes, von Kautionen, Entschädigungen und vom Gegner, von der Justizkasse oder anderen Stellen zu erstattenden Kosten und notwendigen Auslagen.
5. Übertragung der Vollmacht ganz oder teilweise auf andere.
6. Entgegennahme von Zustellungen, Einlegung und Rücknahme von Rechtsmitteln sowie Verzicht auf solche, Erhebung und Rücknahme von Widerklagen – auch in Ehesachen.
7. Beseitigung des Rechtsstreits durch Vergleich, Verzicht oder Anerkenntnis.
8. Vertretung vor den Familiengerichten gemäß § 78 Absatz 1 Satz 2 ZPO sowie Abschluß von Vereinbarungen über Scheidungsfolgen und Stellung von Anträgen auf Erteilung von Renten- und sonstigen Versorgungsauskünften.
9. Vertretung im Konkurs- oder Vergleichsverfahren über das Vermögen des Gegners und in Freigabeprozessen sowie als Nebenintervenient.
10. Alle Nebenverfahren, z. B. Arrest und einstweilige Verfügung, Kostenfestsetzung, Zwangsvollstreckung einschließlich der aus ihr erwachsenden besonderen Verfahren, Zwangsversteigerung und Zwangsverwaltung und Hinterlegungsverfahren.
11. Abgabe von Willenserklärungen (z. B. Kündigungen).

Mehrere Vollmachtgeber haften als Gesamtschuldner.

Göppingen , den 7. 1. 86

Vordruck Nr. 592 – Prozeßvollmacht für Zivil- und Strafprozeß
Dreske & Krüger – Hannover – Alle Rechte vorbehalten!

Unterschrift

EXT-STAPLETON-00177

000100

# RECHTSANWÄLTE

**GÜNTHER SCHÄTZ**
**KARL-HEINZ HÄRLE**
**BARBARA HALT**

ANWALTSKANZLEI · SCHILLERSTRASSE 10 · 7320 GÖPPINGEN

An die

Staatsanwaltschaft beim Landgericht

7900 Ulm/Donau



7320 GÖPPINGEN, den 28.4.1987
SCHILLERSTRASSE 10
TELEFON (0 7161) 7 80 48

KREISSPARKASSE GÖPPINGEN 4343
(BLZ 610 500 00)
VOLKSBANK GÖPPINGEN 212 512 005
(BLZ 610 605 00)
POSTSCHECKAMT STUTTGART 245 395-700
(BLZ 600 100 70)

REG.-NR.    28/86 H/A
BITTE BEI ANTWORT ANGEBEN

7 Js 7284/85

In der Ermittlungssache gegen

U n b e k a n n t

wegen versuchten Mordes und Vergewaltigung zum Nachteil von
S   A   -G

bitten wir um kurzfristige Aktenausfolge.
Wir haben Frau G    in dieser Angelegenheit vertreten und
mit Schreiben vom 20.1.1986 um Aktenausfolge gebeten.
Eine Aktenausfolge ist bisher nicht erfolgt.

Rechtsanwalt

EXT-STAPLETON-00178

000101

# RECHTSANWÄLTE

## GÜNTHER SCHÄTZ
## KARL-HEINZ HÄRLE
## BARBARA HALT

ANWALTSKANZLEI · SCHILLERSTRASSE 10 · 7320 GÖPPINGEN

An die

Staatsanwaltschaft

Postfach 3863

7900 Ulm/Donau



7320 GÖPPINGEN 14.5.1987
SCHILLERSTRASSE 10
TELEFON (0 71 61) 7 80 48

KREISSPARKASSE GÖPPINGEN 4343
(BLZ 610 500 00)
VOLKSBANK GÖPPINGEN 212 512 005
(BLZ 610 605 00)
POSTSCHECKAMT STUTTGART 245 395-700
(BLZ 600 100 70)

REG.-NR. | 28/86 H/sc
BITTE BEI ANTWORT ANGEBEN

7 Js 7284/85

>In der Ermittlungssache
>
>gegen
>
>Unbekannt
>
>wegen versuchten Mordes u. a. zum
>Nachteil von S      A      -G

geben wir die uns überlassenen Akten zurück.

Rechtsanwalt 

EXT-STAPLETON-00179

# 5

**Zeugenkomplex**

ZV Anzeigenerstatter Eugen Hägenläuer 24.10.1985
ZV Thomas Mayer 24.10.1985
ZV Michael Ganthaler 24.10.1985
ZV Rosemarie Kübler 24.10.1985

ZEUGENVERNEHMUNG

Am Donnerstag, den 24.10.1985, gg. 08.50 Uhr, wird der
verh. Landwirt

        Eugen HÄGENLÄUER;
        GEb.     1938,
        wh. 7320 Göppingen-Hohrain,

        Tel.: 07165/8017

in seiner Wohnung von KHM Witke aufgesucht und zu dem
Vorfall der vergangenen Nacht befragt.

Er gab an:

"Ich schlief gestern abend bereits, als es an der Haustür
ständig klingelte. Dies war etwa gg. 0.45 Uhr (24.10.1985).
Ich stand daraufhin auf und ging zur Haustür. Dort sah ich
eine Frau, die sich gegen die Klingel und den Türpfosten
lehnte.
Ich sah, daß die Frau verletzt war und stark am Kopf
blutete. Ich fragte sie, was passiert sei und sie sagte,
sie wäre in Göppingen überfallen worden. Sie weinte ständig
und sagte noch, daß es ihr schlecht wäre. Ich habe die Frau
ins Haus gebracht. Sie konnte noch selber gehen. Sie ging
aber nur in den Hausflur und setzte sich dort dann direkt
hinter die Haustüre. Von hier war sie bis zum Eintreffen
der Polizei nicht mehr wegzubewegen.
Sie sagte auch noch, daß man sie geschlagen hätte. Als ich
die Frau in den Flur gebracht hatte, sah ich erst, daß sie
halb nackt war. Sie hatte nur eine weiße Hemdbluse an, die
aber ebenfalls offen war. Um den Hals trug sie einen Schal,
der jedoch voller Blut war. Weitere Kleidung hatte sie nicht
an, auch keine Schuhe.
Im Haar, am Hinterkopf, sah ich ein Laubblatt. Dies fiel
nachher heraus. Es liegt aber noch im Flur. (Uz.: das Laub-
blatt wird sichergestellt)

Ich habe die Frau noch mehrfach angesprochen, doch sie
weinte nur. Sie sagte lediglich noch, daß sie frieren
würde.

Als die Polizei und der Krankenwagen kamen wurde die Frau
ebenfalls gefragt, was vorgefallen ist. Hierbei erklärte
die Frau, daß sie von einem Neger geschlagen worden wäre,
er hätte auch ein Messer bei sich gehabt und wäre mit diesem
auf sie losgegangen. Sie hatte auch einen Polizisten ihre
Personalien angegeben. Ich hörte auch, daß sie am Abend
einen Kurs im Haus der Familie besucht hatte.
Die ganzen Äußerungen wurden von ihr äußerst stockend
gemacht und immer wieder durch weinen unterbrochen.
Als die Polizei da war, sagte sie auch, daß sie spucken
müsse und sie sich hinlegen wolle. Weiteres sagte die Frau
nicht. Die Frau wurde schließlich um 01.20 Uhr vom Kranken-
wagen mitgenommen.

Witke, KHM

Im Entwurf vorgelesen
gelesen und unterschrieben:

gez. Eugen Hägenläuer

000105

Zeugenanhörung:

Am 24.10.1985, gg. 20.00 Uhr, kommt der led. Groß-
handelskaufmann-Azubi

> Thomas MAYER,
> geb.         1967
> in Göppingen,
> wh. 7320 Göppingen,

zu hiesiger Dienststelle und macht auf Befragung
folgende Angaben:

"Gestern Abend, am 23.10.85, war mein Vater, Werner MAYER,
mit dem DJK beim Handballtraining in der Hohenstaufenhalle
in Göppingen. Das Training war von 21.00 bis 22.30 Uhr.
Ich selbst war an diesem Abend von kurz nach sieben bis
etwa um 22.00 Uhr in der Tanzschule SCHWEHR. Anschließend
begab ich mich zur Hohenstaufenhalle, um mit meinem Vater
nach Hause zu fahren.
Ich war etwa um 22.15 Uhr an der Sporthalle und schaute
meinem Vater noch beim Training zu. Ich stand etwa am
Südwesteingang. Kurz darauf drehte ich mich kurz um und
sah dabei, wie eine Frau vom Stadtbad in Richtung Albert-
Schweizer-Schule lief. Ihre Gangart möchte ich als normal
bezeichnen. Die Frau kann ich wie folgt beschreiben:
Ca. 165 - 170 cm groß, eine etwas hochfrisierte Haar-
frisur; sie trug einen dunklen Mantel. Eine weitere Be-
schreibung kann ich nicht abgeben.
Ich drehte mich dann wieder zu meinem Vater um, der noch
in der Sporthalle trainierte. Die Frau sah ich zum letzten
Mal auf Höhe des Weges, der zum Spielplatz in der dortigen
Parkanlage führt.

Kurze Zeit später drehte ich mich erneut zur Straßenseite
und sah dann, wie ein ca. 180 - 185 cm großer, gut durch-
trainierter, muskulöser Mann, schätzungsweise 80 kg schwer,
bekleidet mit einem Jogging-Anzug von dunkler Farbe und
Schuhen mit einer weißen Sohle, beim Stadtbad lief, eben-
falls in Richtung Albert-Schweizer-Schule.

A.Fr.: Eine konkretere Personenbeschreibung kann ich nicht
   mehr abgeben, da ich den Mann nur kurz gesehen habe.
   Bezüglich der Hautfarbe des Gesichts kann ich nur
   sagen, daß mir nichts "helles" aufgefallen ist.

Er lief nicht wie ein normaler Jogger, sondern von der Gang-
art her eher wie ein Sprinter.
Als er sich auf Höhe der Abzweigung des Weges zum Spiel-
platz befand, sah ich im dortigen Straßenlicht plötzlich,
wie in seiner Hand etwas aufleuchtete. Ich vermute, daß es
sich dabei um einen metallischen Gegenstand, etwa in der
Größe von 25 - 30 cm Länge und ca. 5 cm Breite,gehandelt hat.
In diesem Moment sah ich dann auf die Uhr in der Sporthalle.
Diese zeigte genau 22.22 Uhr.

A.Fr.: Zu diesem Zeitpunkt fuhren auf der Nördlichen Ring-
   straße keinerlei Fahrzeuge. Es war ganz ruhig. In
   dem Moment, wo ich mich rumdrehte, sah ich, wie der
   Mann entweder aus einem Gebüsch auf der Nordseite
   des Stadtbades oder von dem Weg entlang der Gast-
   stätte im Stadtbad herauskam. Dies vermute ich des-
   halb, weil ich ihn zuvor nicht gesehen und auch nicht
   gehört habe.

Ich wendete mich dann wieder dem Trainingsspiel zu. Etwa
1 - 2 Minuten später hörte ich einen Hilferuf aus Richtung
des Parkes hinter dem Stadtbad. Daraufhin lief ich die
Treppen in Richtung Nördliche Ringstraße hinunter. Dabei
hörte ich noch ca. 2 - 3 Mal weitere Hilferufe aus dersel-
ben Richtung.

Unten an den Treppen stehenbleibend habe ich in die
Richtung geschaut, woher die Hilferufe kamen und inten-
siv gehorcht, habe aber keinerlei Wahrnehmungen mehr
aus dieser Richtung festgestellt. Zunächst machte ich
mir keine weiteren Gedanken mehr darüber, nahm an, daß
es sich möglicherweise um einen Jux gehandelt hat,
stellte mich aber dann doch in den beleuchteten Kreuzungs-
bereich Lorcher Straße/Nördliche Ringstraße, da ich es
etwas mit der Angst zu tun bekam. Ich habe dann auch
weiterhin in Richtung Albert-Schweizer-Schule geschaut,
habe aber keine weiteren Wahrnehmungen gemacht.

Etwa zu diesem Zeitpunkt lief dann ein Mann an mir vor-
bei, der ca. 20 - 25 Jahre alt, ca. 175 cm groß und
schlank war, möglicherweise hatte er einen dunkelblonden
bzw. hellbraunen Wuschelkopf. Er trug eine längere Jacke
und eine Hose. Entweder war die Jacke hell und die Hose
dunkel oder umgekehrt. Er hatte einen schlacksigen Gang.
Der Mann überquerte die Nördliche Ringstraße und ging
zur dortigen Telefonzelle. Ob er dort telefonierte, kann
ich nicht sagen. Anschließend lief er auf dieser Straßen-
seite bis zur dortigen Haltestelle und rannte dann schräg
über die Straße, in Richtung Albert-Schweizer-Schule.
Ich verlor ihn dann aus den Augen, sah ihn jedoch kurze
Zeit später, wie er relativ rasch wieder schräg die Straße
überquerte, zur dortigen Litfaßsäule. Anschließend ver-
lor ich ihn ganz aus den Augen.
Zu diesem Zeitpunkt fuhr dann mein Vater mit seinem Fahr-
zeug an mir vorbei und nahm mich auf und wir fuhren dann
nach Hause.

A.Fr.: Über etwaige Fahrzeuge, die um die Hohenstaufen-
halle geparkt waren, kann ich nichts sagen. Ich
habe darauf nicht geachtet. Ich kann auch nicht
sagen, ob dort ein Fahrzeug der Marke Ford, spe-
ziell Ford Escort, mit Aalener Kennzeichen, ge-
parkt war."

Geschlossen:                    Laut vom Tonträger vorgespielt,
                                genehmigt.

- HOYLER, KK -                          -Thomas MAYER-

b.w.

<u>Vernehmung des Ehemanns der geschädigten G</u>                    :

An Donnerstag, dem 24.10.198?, gegen 08.30 Uhr, erscheint
auf Vorladung bei der KP Göppingen der verh. Kontrolleur

                    M        G.
                    geb.        55 in Deggingen,
                    wh. 7320 Göppingen,
                    Tel. 24586,

wo er zum Sachverhalt die nachstehenden Angaben machen konnte.

"Seit ca. 1 Monat besucht meine Frau in Göppingen einen
Nähkurs. Dieser Kurs findet jeweils an einem Mittwoch statt.
Bisher war meine Frau also drei- oder viermal bei diesem
Kurs anwesend.

Gestern, kurz nach 19.00 Uhr, verließ meine Frau zusammen
mit ihrer Bekannten Roswitha Kübler, wh. in Mössingen,
Tel. 1008, die Wohnung. Frau Kübler erklärte sich bereit,
meine Frau in die Olgastr. zum Haus der Familie zu fahren,
bevor sie selbst sich wieder nach Mössingen begibt. Im
Normalfall dauert dieser Nähkurs ca. 3 Stunden, so daß das
Ende etwa gegen 22.00 Uht gewesen wäre. Ich machte mit meiner
Frau an diesem Tag aus, daß ich sie evtl. am Haus der Familie
nach Beendigung des Kurses abholen würde, sofern unser kleiner
Sohn zu dieser Zeit bereits geschlafen hätte und ich somit
nicht mehr auf ihn hätte aufpassen müssen. Da dies an diesem
Abend jedoch nicht der Fall war, blieb ich zu Hause. Meine
Frau wußte also, wenn ich nicht am Haus der Familie zur
abgesprochenen Zeit bin, daß sie dann zu Fuß nach Hause müsse.
Sie geht im Normalfall vom Haus der Familie über die
Nördliche Ringstr. in Richtung Hallenbad, sie durchquert
anschließend die hinter dem Hallenbad liegende Parkanlage,
wodurch sie dann auf den Märklinweg gelangt. Von dort aus ist
es dann noch ein kurzer Weg bis zu unserem Haus.

000111

Zur Bekleidung meiner Frau an diesem Abend kann ich lediglich
angeben, daß sie einen dunklen Mantel (schwarz) getragen hat.
Über ihre weitere Kleidung ist mir nichts bekannt, darüber
müßte aber evtl. Frau Kübler besser Bescheid wissen, weil
ich selbst nicht darauf geachtet habe. Ich weiß nur, daß
sie eine kakifarbene Umhängetasche, etwa in der Größe
DIN A 4 mit einer Mindesbreite von ca. 5 - 7 cm dabeigehabt
hat. In dieser Tasche, die im übrigen mit Trägern ausgestattet
war, befand sich meiner Erinnerung nach lediglich Schablonen
für den Nähkurs sowie entsprechende Schnittmuster. Außerdem
hat meine Frau mit Sicherheit einen kleinen hufeisenförmigen
Geldbeutel mit 2 Fächern in der Farbe dunkelbraun dabei gehabt.
Erwähnen muß ich vielleicht noch, daß meine Frau Brillen-
trägerin ist, sie besitzt eine neuwertige Brille mit einem
hellen leichten Kunststoffgestell. Bezüglich der Bekleidung
kann ich lediglich angeben, daß meine Frau noch einen Schal
dabeigehabt hat, der allerdings, wie ich zwischenzeitlich
mitbekommen habe, von der Polizei sichergestellt werden konnte.

A.Fr.:      In der vergangenen Zeit hat mir meine Frau nicht
          erzählt, daß ihr auf dem Nachhauseweg von diesem
          Nähkurs irgend etwas besonderes aufgefalllen wäre.
          Über Belästigungen entlang dieser Wegstrecke
          ist mir daher nichts bekannt.

A.Fr.:      Angesprochen auf den letzten Geschlechtsverkehr
          mit meiner Frau muß ich sagen, daß dieser mindestens
          schon 2 Wochen zurückliegt."

In Diktat mitgehört und genehmigt:

LIPTAK, KK                   H      G

EXT-STAPLETON-00189

EXT-STAPLETON-00190

Polizeidirektion Göppingen
-Abt. II - Kriminalpolizei-

7320 Göppingen, den 24.10.85

Betr.: Vergewaltigung am 23.10.85 durch farbigen Täter
z.N. G

Am 24.10.85, gegen 08.00 Uhr, teilt Kollege Unger vom
PRev Göppingen telef. mit, daß soeben der Ehemann der
Geschädigten, Herr G          mitgeteilt habe, daß er noch
etwa 1 Stunde unter der Rufnummer 07161/24586 zu erreichen
sei, anschließend gehe er in die Klinik am Eichert zu seiner
Ehefrau.
Er teilte weiter mit, daß die befreundete Rosemarie Kübler,
wh. 7406 Mössingen, Listenstr. 19/1 (Straßennamen nicht
genau bekannt) Tel. 07473/1003, erreichbar sei, sie könne
nähere Angaben über die gestrige Bekleidung der
Geschädigten machen.
Gegen 8.20 Uhr konnte mit der led. Bekleidungstechnikerin,
z.Z. nicht berufstätig,

            Rosemarie KÜBLER,
            geb.      49 in Tübingen,

            7406 Mössingen,
            Tel.         ,

telef. erreicht werden.  Auf Befragen gab sie folgendes an:

"Ich habe früher in Göppingen gearbeitet und habe in diesem
Zusammenhang das Ehepaar G          kennengelernt. Zwischen-
zeitlich bin ich wieder nach Mössingen verzogen, habe jedoch
nach wie vor einen sehr guten Kontakt zu diesem Ehepaar.
Vom letzten Montagmorgen bis zum gestrigen Abend habe ich
dort in Göppingen bei der Familie übernachtet. Gestern
abend, dem 23.10.1985, so gegen 19.00 Uhr, habe ich dann
Frau G        zum Haus der Familie in Göppingen gefahren,

weil sie dort gerade einen Nähkurs besucht. Ich selbst habe
dann die Heimfahrt nach Mössingen angetreten. An die
Bekleidung von ihr kann ich mich noch sehr gut erinnern.

Mutmaßliche Opferbekleidung:

- Weißes Unterhemd und weißer Schlüpfer, (keinen BH)
- hautfarbene Perlonstrumpfhose
- anthrazitfarbene fast schwarze Kniestrümpfe
- anthrazitfarbener Hosenrock (Wollflanell)
- evtl. weiße Bluse, jedoch nicht sicher
- auffallende grobgestrickte ärmellose Strickweste
  Farbe Hellblau (Mohair)
- dunkelblauer Gabardinmantel mit verdeckter Knopfleiste
  und Stehkragen
- grau- bis rauchblaues (stahlblau) Kopftuch von glänziger
  Machart, wirkt wie Seide, ist jedoch höchstwahrscheinlich
  Polyester. Das Kopftuch ist mehr von grauem Grund und hat
  blaue und graue Punkte
- schwärze Collegeschuhe
- sie führte höchstwahrscheinlich eine Schulmappe (Leinen oder
  Jute) mit aufgesetzten Außentaschen und Schubverschluß mit,
  vermutlich waren einige wenige Lederflecke an der Tasche
  verwendet. In der Tasche befand sich außer Nähutensilien wie
  Schere u.ä. ein dunkelblauer Stoff, mit dem sie einen Rock
  nähen wollte.

Heute nacht bin ich gegen 0.50 Uhr von M        G
zu Hause angerufen worden, der nach dem Verbleib seiner
Ehefrau fragte. Ob er zu diesem Zeitpunkt erst selbst nach
Hause gekommen war, oder aufgewacht ist und seine Frau vermißt
hat, kann ich nicht sagen. Ich konnte ihm auch nur sagen,
daß ich seine Frau am Nähkurs abgesetzt hatte. Er sagte dann,
daß er sich sofort an die Polizei wenden wolle, um eine
Vermißtenanzeige zu erstatten. Er fragte mich zuvor noch, was
seine Frau an hätte, weil dies sicherlich für die Polizei von
Wichtigkeit sei.

FORGEMER

000115

**6**

**Ärztlicher Befundsbericht** der Klinik am Eichert GP vom 30.10.1985
**Gynäkologischer Befundsbericht** der Klinik am Eichert GP vom 25.10.1985



KLINIK AM EICHERT GÖPPINGEN

Klinik am Eichert, Postfach 660, 7320 Göppingen

LANDKREIS GÖPPINGEN
AKADEMISCHES LEHRKRANKENHAUS

An die
Polizeidirektion Göppingen

Kriminalpolizei                                    Telefon 07161/641
- z.H. Frau Herrlinger-Misch -                     Durchwahl: 64
7320 Göppingen                                     Den 30.10.1985
                                                   Dr.Go./fz


ÄRZTLICHER   BEFUNDBERICHT


Betr.:    A       - G      , S      geb.      1956
                         732u Göppingen
          Tgb.Nr.:  D 1 - 1549/85


Wir erstellen im Folgenden gemäß Ihrer mündlichen Auf-
forderung vom 25.10.85 folgenden Befundbericht.

Die o.g. Patientin wurde am 24.10.1985 gegen 1.30 Uhr in
unsere Ambulanz gebracht. Zur Vorgeschichte war zu erfahren,
daß sie schwer mißhandelt und vergewaltigt worden sei.

Folgende Verletzungen wurden festgestellt:

  Ausgedehnte Schwellung, Druckmarke und Blauverfärbung
  im Bereich des linken Handrückens. Zahlreiche, ober-
  flächliche Schürf- und Prellmarken über den gesamten
  Rücken bis zum Gesäß reichend, teilweise mit Bluterguß-
  verfärbung. Zwei Druckstellen mit beginnender Blut-
  ergußverfärbung linksseitig am Kehlkopf, ein kleiner
  Bluterguß rechtsseitig am Kehlkopf. Sternförmige Platzwunde
  in der Länge 3 + 2 + 1 cm und etwa handflächengroße, ausge-
  dehnte, blauverfärbte Schwellung der linken Stirn-Schläfenseite
  bis zum Wangenbereich reichend.

BDG  Nr. GP 0407/10b

000117

Betr.:   A        - G       , S₁      geb.      1956

Blutergußverfärbung um das linke Auge herum.
Oberflächliche Schürfung und ausgedehnte Schwellung
im Bereich der rechten Schläfenseite. Ausgedehnte
Schwellung der linken Gesichtshälfte. Rißwunde von
ca. 4 cm Länge am Oberrand der linken Ohrmuschel.

Außer den genannten Verletzungen die bei der ersten Unter-
suchung festgestellt wurden konnten folgende Verletzungen
durch weitere fachärztliche Untersuchungen bestätigt werden:

Riß des linken Trommelfelles. Verdacht auf Anbruch des
linken Jochbeines. Einblutung in die Bindehaut des
linken Auges. Bruch der 6. und 7. Rippe mit Verschiebung
auf der linken Brustkorbseite.

Zu den Feststellungen auf frauenärztlichem Fachgebiet
verweisen wir auf das diesbezügliche Gutachten.

Göppingen, den 30.Oktober 1985

Dr. med. Gold
Facharzt für Chirurgie

000118



000119

**KLINIK AM EICHERT GÖPPINGEN**

Kriminalpolizei
Dezernat
z.H.v. Herrn Leist
Schillerstr. 15

7320 Göppingen

LANDKREIS GÖPPINGEN
AKADEMISCHES LEHRKRANKENHAUS

Telefon 07161/641
Durchwahl: 64
Den 25.10.85 Dr. Ho./Ra.

Betr.:   Antrag der Kriminalpolizei auf Ausfertigung des Untersuchungsbefundes
         von Frau S        G            , geb.      56, wohnhaft in Göp-
         pingen,

Die Untersuchung wurde am 24.10.85 um 2.30 Uhr, auf Wunsch der Patientin und
auf Anraten der Polizei in Göppingen durchgeführt.
Der untersuchende Arzt wurde von der Patientin von der ärztlichen Schweige-
pflicht entbunden.
Zeugin der Untersuchung war: Schwester Renate Kohler

Tathergang nach Angaben der Patientin:

Die Patientin gibt auf Befragen an, sie hätte an einem Nähkurs im Haus der Fa-
milie in der Olgastraße in Göppingen teilgenommen. Gegen 22.00 Uhr ging sie
nach Beendigung des Kurses in Richtung auf ihr Zuhause, dabei wurde sie von
einem Neger verfolgt. In der Gegend der Albert-Schweizer-Schule hat dieser Mann
sie mit einem Messer bedroht. Es kam wohl zu einem Handgemenge, im Verlauf des-
sen die Patientin zu Bogen geworfen wurde, sowie gewürgt und von ihm geschla-
gen wurde. Sie hat ihn im Verlauf dieses Handgemenges in einen Finger gebissen.
Der Mann hat sie danach mehrmals vergewaltigt, dabei hat er sowohl vaginalen
als auch analen Verkehr durchgeführt. Die Patientin hat sich aus Angst vor der
Drohung, er würde sie umbringen, zu Boden fallen lassen, danach ging der Mann
zunächst weg, kam jedoch nach kurzer Zeit zurück und schlug sie mit einem
stumpfen , wie sie angibt metallischen Gegenstand, mehrmals auf den Kopf. Sie
glaubt kurzzeitig bewußtlos gewesen zu sein. Anschließend wurde sie von ihm in
ein Auto gebracht und ein Stück weit weggefahren. Er hielt an und warf sie in
den Straßengraben und bedeckte sie mit Laub. Nachdem die Patientin sich totge-
stellt hatte und einige Zeit liegenblieb, aus Angst er würde zurückkommen, ge-

./.

lang es ihr schließlich sich selbst wieder zu befreien. Sie ging zum nächst-
gelegenen Haus, von wo aus die Polizei verständigt wurde.
Die Patientin kommt über die unfallchirurgische Klinik, wo mehrere Platzwun-
den vom dortigen Arzt, Dr. Stehli, bereits versorgt wurden. Wir verweisen da-
zu auf den Bericht der unfallchirurgischen Klinik. Die Kleidungsstücke der
Patientin wurden von der Kriminalpolizei asserviert. Außerdem wurden von der
Kriminalpolizei mehrere fotographische Aufnahmen der Verletzungen gemacht.

Die Untersuchung fand ca. 4 Stunden nach dem angeblichen gewaltsamen Vorfall
statt.

Gynäkologische Anamnese:
Menarche mit 12 Jahren. Patientin nimmt keine Ovulationshemmer. Letzte Perio-
de (regelmäßig) am 5.10.85, unauffällig, Periodendauer regelmäßig 28 Tage.
Patientin verwendet Tampons während der Menstruationsblutung. Eine Entbindung
1983 (Spontangeburt), keine Fehlgeburten, keine gynäkologischen Eingriffe oder
schwerwiegende Erkrankungen. Den Zeitpunkt des letzten Geschlechtsverkehrs vor
dem gewaltsamen Eingriff kann die Patientin (im Zustand der momentanen Ver-
wirrtheit) nicht angeben. Er liege wohl schon länger zurück. Den Zeitpunkt des
gewaltsamen fraglichen Vorfalls gibt sie mit ca. 22.15 Uhr am 23.10.85 an.

Befund:
29-jährige Patientin , normale körperliche Entwicklung. Zum Zeitpunkt der Un-
tersuchung unter Schock stehend,ansprechbar, gibt auf Fragen Auskunft, er-
scheint nicht verwirrt, nur sehr verstört, zittert, kein Hinweis auf Alkohol-
oder Drogeneinfluß. Verletzungen an Kopf, Rumpf und Gliedmaßen. Wir verweisen
auf den Arztbericht der unfallchirurgischen Klinik, in dem die Verletzungen des
Kopfes genau geschildert werden. Es handelt sich dabei um eine in der Zwischen-
zeit genähte Platzwunde an der linken Stirnseite. Eine Verletzung des linken
Ohrs, die linke Hand ist zum Zeitpunkt der Untersuchung bereits verbunden, es
liegt ebenfalls eine Verletzung vor. Die Patientin hat Würgemale und blaue
Stellen im Bereich des Halses, ein Kratzer an der linken Schulter hinten, eine
weitere, ca. 2 - 3 cm lange und 1 cm breite, oberflächliche Schürfung im Be-
reich der Wirbelsäule, LWK 6 - 8, rechts paravertebral. Direkt über der Wir-
belsäule liegt nochmals eine oberflächliche Schürfung. Die linke Pobacke ist

./.

000121

verkratzt, im Bereich der Beine ebenfalls mehrere kleine Kratzspuren. An der Innenseite beider Oberschenkel gibt sie heftigen Juckreiz an. Im Bereich der linken Oberschenkelinnenseite läßt sich eine allergische Reaktion im Sinne eines leichten Ausschlages feststellen.

## Gynäkologische Untersuchung:

Bei der Inspektion des Genitale sieht man keine Zeichen von äußeren Verletzungen oder Gewalteinwirkung im Bereich des Dammes, der Vulva oder der Scheide. Harnröhre und After sind ebenfalls nicht verletzt. Der Bereich perianal, Damm und Scheideneingang sind mit Stuhl verschmutzt. Scheideneingang normal dehnbar, gut für 2 Finger durchgängig.

Spiegeleinstellung: keine Verletzungen des inneren Genitale, Portio o.B., kleine zirkuläre Ektopie, keine Blutung zu sehen.

Innere Untersuchung: Uterus hühnereigroß, anteflektiert, derb, mobil, Adnexe o.B. Gesamter Unterbauch gering druckschmerzhaft.

## Es werden folgende Abstriche entnommen:

1 Abstrich aus dem hinteren Scheidengewölbe, der der Polizei mitgegeben wird. Je 2 Abstriche aus dem hinteren Scheidengewölbe, dem Cervicalkanal und dem Anus, von denen je 1 Abstrich fixiert und zur weiteren Untersuchung und zytologischen Färbung in das Labor der Klinik am Eichert geschickt werden. Je 1 Abstrich wird nativ beurteilt. Dabei finden sich im Abstrich aus dem hinteren Scheidengewölbe und der Cervix reichlich Intermediär- und Superficialzellen, Proliferationsgrad III - IV, reichlich Döderleinflora und Leukozyten. In beiden Abstrichen lassen sich immobile Spermien nachweisen. Im Abstrich aus dem Anus lassen sich keine Spermien nachweisen.

## Beurteilung und Zusammenfassung:

Auf Grund der Allgemeinuntersuchung kan davon ausgegangen werden, daß die Patientin schwer mißhandelt wurde, wir verweisen dazu nochmals auf den Bericht der unfallchirurgischen Klinik. Der Spermiennachweis in den Abstrichen spricht für einen stattgefundenen Geschlechtsverkehr während der letzten 72 Stunden. Ein zytologischer Befundbericht wird Ihnen getrennt zugehen.

Dr. Kraus

Chefarzt

Dr. Hofgärtner

untersuchende Ärztin

CHEFARZT: DR. H. SCHWARZKOPF



000122

### KLINIK AM EICHERT GÖPPING

LANDKREIS GÖPPINGEN
AKADEMISCHES LEHRKRANKENHAI

| | |
|---|---|
| Patient | G.          S |
| | 56 |
| KTR | Kriminalpolizei, Schillerstr. |
| U.-Nr. | C-64 231/24.10.85 |
| Einsender | Dr. Kraus |
| U.-Mat. | cytolog. Abstriche |
| Diagn. früh. U.-Nr. | |
| Station | Gyn Amb. |
| LZ | 3 x 19 |

Histologielabor Telefon (07161) 64-215 GS 1521/1527

---

**Ergebnis der pathologisch-anatomischen und histologischen Begutachtung mit epikritischer Beurteilung**

Sehr geehrter Herr Kollege Kraus,

Sie übersandten 3 Objektträger mit gynäkologischen Abstrichen - (I) Scheide, (II) Cervix, (III) Anus.

In (I) finde ich überwiegend Intermediär- sowie Superfizialzellen. Außerdem Leukozyten/tr Döderleinbakterien und immer wieder eindeutige Spermatozoen (I M/2)
In (II) befinden sich neben überwiegend Intermediär- und Superfizialzellen ebenfalls Döderlein-bakterien sowie reichlich Leukos und Zelldetritus. Auch in diesem leicht entzündlich veränderten Zellbild lassen sich immer wieder eindeutige Spermatozoen erkennen (I M/2)
In (III) zeigen sich ebenfalls Intermediär- und Superfizialzellen sowie Leukozyten, Hyper-keratosen und reichlich Zelldetritus. Im Hintergrund Mischflora. Reichlich körnelige Gebilde/ die auf Spermienköpfe dringend verdächtig sind. (II M 3).

**Diagnose:**   Spermienhaltige Abstriche (I)=Vagina und (II)=Cervix. Dringend auf Spermien-köpfe verdächtige Gebilde in Abstrich (III=Anus).

Mit freundlichen Grüßen

i.V.
(OÄ.Dr.Kovarik)
31.10.85/Dr.Ko/tr

21.1.86

**7**

**Tatortbefunds-/Spurensicherungsbericht** KT Göppingen vom 16.10.1986
Spuren-/Asservatenliste
Auffindebericht von Bekleidung der Geschädigten
Skizzen der Wegstrecken der Geschädigten zum Tatort / Ablegeort
Lichtbildmappen (Tatort, Opfer - Verletzungen, Bekleidung - Spuren, Tatortspuren)
1 CD (digitale Befunde – Lichtbildermappen)
Schreiben – Aufbewahrung verderblicher Spuren an LKA BW 24./25.10.1985
Beweismittelverzeichnisse / Nachweis der Beweismittelketten
KT-Untersuchungsantrag an das LKA BW vom 29.10.1985
Untersuchungsbericht des LKA BW vom 06.05.1986

000124

PD GÖPPINGEN - KRIMINALPOLIZEI      7320 Göppingen, den 16.10.86
KRIMINALTECHNIK

Tgb.Nr.: Dez. 8 - 1549/85

# TATORTBEFUNDSBERICHT

## mit SPURENSICHERUNGSBERICHT

## I.  AUFTRAG:

Auftraggeber   : PRev. Göppingen
Datum/Uhrzeit : 24.10.86, 01.00 Uhr
Delikt         : Vergewaltigung, versuchter Mord
Tatort         : Göppingen, Nördliche Ringstraße
Tatzeit        : 23.10.85, gg. 22.00 Uhr
Geschädigter  : S       A       -G

Eintreffen am TO : 24.10.85, 03.00 Uhr
Spurensicherung
durchgeführt von :  Sgolik, Amstätter, Keierleber

## II.  GESICHERTE SPUREN - KURZÜBERSICHT:

☒ Tatortskizze                    ☒ Lichtbilder
☐ daktyloskopische Spuren         ☒ Mikrospuren
☐ Werkzeug- u. Formspuren         ☐ Schuhspuren
☒ Blut- u. Sekretspuren           ☐ Lackspuren
☒ Haarspuren                      ☐ Brandmittel
☒ Sonstige: Knöpfe, Kleider

## III. BESONDERE HINWEISE:

EXT-STAPLETON-00202

## IV. TATORTBESCHREIBUNG:

### 1. Göppingen, Nördliche Ringstraße:

Der Tatort befindet sich in 7320 Göppingen,
an der "Nördlichen Ringstraße", im sogenannten
REUSCH. Es liegt im nordwestlichen Bereich der
Stadt Göppingen und ist ein ausschließliches
Wohngebiet.
Östlich vom Tatort kreuzt die Lacher Straße die
Nördliche Ringstraße.

Unmittelbar östlich vom Tatort befindet sich das
Hallenbad und gegenüber, auf der anderen Seite
der Nördlichen Ringstraße, die Hohenstaufenhalle
(Sporthalle) mit einem größeren Wiesengelände
(ehem. Schockensee) und einem Parkplatz.
Westlich des Tatorts ist die ALBERT-SCHWEITZER-
Schule.

Beim eigentlichen Tatort handelt es sich um ein
größeres Wiesengelände, das mit einzelnen Bäumen
bewachsen ist. Im nördlichen Teil der Wiese befindet
sich eine Springbrunnenanlage und im südöstlichen
Teil ein Kinderspielplatz.

### 1. a) Springbrunnenbereich:

Parallel zur Nördlichen Ringstraße verläuft ein
2 m breiter Fußgängerweg, welcher etwa 4 m von
der Straße abgesetzt ist. Zwischen Straße und
Weg befindet sich eine mit Büschen und vereinzelt
mit Bäumen bewachsene Rasenfläche.
Von dem Fußgängerweg führt in südliche Richtung
ein schmaler, gepflasterter Weg, der zu der Spring-
brunnenanlage führt.

Dort stehen auch einige Bänke. Die Anlage ist
etwa 10 m von der Straße entfernt und von ihr,
bedingt durch dichtes Buschwerk, nicht einseh-
bar.

Neben dem schmalen Weg zur Springbrunnenanlage
liegt auf dem Rasen die Brille der Geschädigten
und die Tasche. Des weiteren liegen dort auch
2 Knöpfe im Gras. Auf mehreren Pflastersteinen
befinden sich Blutstropfen. Die genaue Lage der
Gegenstände und der Blutspuren wird fotografiert
und in die Tatortskizze eingezeichnet.

## 1. b) Parkplatz Hohenstaufenhalle:

Auf der anderen Seite der Nördlichen Ringstraße
ist der Parkplatz der Hohenstaufenhalle. Auf ihm w
werden einige (ca. 20) Blutstropfen festgestellt,
die über die Nördliche Ringstraße hinweg in Rich-
tung der Springbrunnenanlage führen. Auch diese
werden in die Skizze lagegerecht eingezeichnet.

## 1. c) Kinderspielplatz:

Von der Springbrunnenanlage aus gesehen befindet
sich in südöstlicher Richtung, 100 m entfernt,
ein Kinderspielplatz. Um diesen herum befindet
sich eine Wiesenfläche mit mehreren Laub- und
Nadelbäumen. Durch einen 1,8 m hohen Maschendraht-
zaun ist der Spielplatz zum östlich davon liegen-
den Gartengrundstück abgegrenzt. Von dem Spiel-
platz aus führt ein etwa 2 m breiter asphal-
tierter Weg zur Nördlichen Ringstraße, fast genau
in Richtung Hohenstaufenhalle. Auf diesem Weg
befinden sich Straßenlampen, der Spielplatz selbst
ist nicht beleuchtet. Vom Spielplatz aus führt der
Weg noch in Richtung Wehrstraße und ALBERT-SCHWEITZER-
Schule.

Auf der Wiese, zwischen Spielplatz und dem er-
wähnten Zaun, liegt eine Sonnenbrille. An
mehreren Stellen sind Blutantragungen im Gras
vorhanden. Des weiteren liegen dort zwei Teile
eines 3 cm starken Astes, welcher eventuell
als Tatwerkzeug in Betracht kommen kann. Die
genaue Lage ist in der Skizze eingezeichnet.

## 1. d) Beleuchtung:

Entlang der Nördlichen Ringstraße und auf dem
Weg zum Kinderspielplatz stehen Straßenlampen
(siehe Skizze). Diese brannten zur Tatzeit.
Dadurch war der Tatort schwach beleuchtet.

## 2. Kleiderfundort Göppingen-Hohrein:

## 2. a) Örtlichkeit:

Die Beschreibung erfolgt aus Richtung Hohrein:

Der Fundort der Kleidung von der Geschädigten
befindet sich ab der Kreisstraße 1407, die vom
Ortsteil Göppingen-Hohrein in Richtung Landesstraße
1075 führt. Sie steigt im Bereich des Kleider-
fundorts um etwa 7 % (geschätzt) an. Rechts neben
der Straße befindet sich eine größere Wiese, links
ein Waldstück, das zur Straße hin mit ca. 5 m
hohen Buchen begrenzt ist. Zwischen der Straße
und den erwähnten Buchen befindet sich ein kleinerer,
nicht wasserführender Graben, in welchem auch einige
gefällte Baumstämme liegen. Auch auf der anderen
Seite ist die Straße zur Wiese hin mit einem
kleinen Graben begrenzt. Der Fundort liegt ca.
0,5 km außerhalb von Göppingen-Hohrein.

2. b) <u>Lage der Kleidungsstücke</u>:

Im linken Graben liegen, unmittelbar neben einem
Straßenleitpfosten und den dortigen Baumstämmen,
folgende Kleidungsstücke der Geschädigten:

Mantel, Mohairpulli, Hosenrock und Halbschuhe.

Darauf liegen auch zwei Äste der am Fundort
stehenden Buchen. Die Abbruchstelle dieser Äste
wird ca. 11 m oberhalb der Stelle festgestellt.
Etwas oberhalb der Kleidungsstücke liegt im Wald
die abgerissene Uhr der Geschädigten. Im Geäst
der Buchen, in einer Höhe von ca. 3 m, hängt die
Strumpfhose der Geschädigten, auf der gegenüber-
liegenden Wiese wird die blutige Unterhose der
Geschädigten aufgefunden. Die Lage der einzelnen
Stücke ist auf der Skizze maßgerecht eingezeichnet.

Auf der Straße werden, auf Höhe der Kleidungs-
stücke, mehrere Blutstropfen festgestellt. Deren
Lage ist in die Skizze eingezeichnet.

3. <u>Verbindung zwischen beiden Tatorten</u>:

Vom Tatort Nördliche Ringstraße bestehen zwei Mög-
lichkeiten, um mit einem Fahrzeug zum Fundort der
Kleider zu gelangen:

Weg A    – Vom Tatort in nördlicher Richtung auf
der Lorcher Straße. Abzweigung in Göppingen-
Bartenbach nach rechts über Göppingen-Lerchen-
berg und Göppingen-Hohrein zum Kleiderfundort.
Die Fahrtstrecke beträgt 6,4 km.

Weg B     – Vom Tatort zunächst in östlicher Richtung
           auf der Nördlichen Ringstraße und dann in
           Richtung Hohenstaufen auf der L 1075. Im
           Waldgebiet HÖRNLE zweigt die K 1407 in
           Richtung Hohrein ab. An dieser Stelle steht
           auch ein Wegweiser "Göppingen-Hohrein".
           Der Fundort liegt dann ca. 200 m nach dieser
           Abzweigung. Diese Fahrtstrecke beträgt 6,8 km.
           Bei dieser Strecke kommt man an amerikanischer
           Kaserne vorbei.

4. <u>Wetter</u>:

   Zur Tatzeit war es kühl und trocken. Auch der Boden war
   trocken.

V. SPURENSICHERUNG:
   ─────────────────

1. <u>Krankenhaus Göppingen</u>:

   Die erste Spurensicherung erfolgte bei der Anzeigenauf-
   nahme im Krankenhaus Göppingen durch KOK SGOLIK. Dort
   werden die Kleidungsstücke der Geschädigten, welche
   sie noch zum Schluß getragen hatte, sichergestellt.
   Diese sind allerdings bereits vom Krankenhauspersonal
   in eine Tüte gesteckt worden. Es handelt sich dabei
   um ein Kopftuch (bzw. Seidenschal), eine Hemdbluse und
   ein Unterhemd (Spur 1 - 3). Des weiteren wird sofort
   die Entnahme eines Scheidenabstriches veranlaßt (Spur 4).

   Von den Verletzungen des Opfers werden Lichtbilder ge-
   fertigt. Eine nochmalige Lichtbildfertigung erfolgt
   im Laufe des Tages.

## 2. Tatort Nördliche Ringstraße:

### a) Springbrunnenbereich:

Der Tatort wird im Anschluß an die Anzeigenaufnahme am 24.10.86, gegen 03.00 Uhr, gefunden. Dort werden zunächst nur die Brille (Spur 5) und Tasche (Spur 6) der Geschädigten aufgefunden und originär gesichert.

An diesen beiden Asservaten können später keine weiteren Spuren, z. B. Fingerspuren, gesichert werden.

Die weitere Spurensicherung erfolgt am folgenden Morgen.

Neben dem schmalen Weg, siehe Skizze und Lichtbild Nr. 4, werden zwei Knöpfe (Spur 7) gefunden und originär gesichert.
Diese beiden Knöpfe stammen, wie später festgestellt wird, mit hoher Wahrscheinlichkeit vom Mantel der Geschädigten. Auf Bild 37 der Lichtbildmappe ist dies demonstriert.

Auf den dortigen Pflastersteinen, sog. Knochensteine, werden 8 Blutspuren zusammen mit dem Spurenträger bzw. eine mit Vlies gesichert (Spur 17). Es handelt sich dabei ausschließlich um Blutstropfen, die einen Durchmesser zwischen 6 und 15 mm haben. Bei der Blutspur Nr. 17 a, gesichert auf der obersten Treppenstufe, sind kronenförmige Abspritzungen bis 15 mm Länge vorhanden. Bei den übrigen sind solche Abspritzungen nur teilweise und schwach vorhanden, die Ränder sind aufgrund des saugenden Untergrundes unscharf.
Weitere Spuren sind nicht vorhanden. Eine Absuche des Gebüsches mit einem Metallsuchgerät verlief negativ.

b) Kinderspielplatz:

Auch hier wird noch in der Nacht eine Besichtigung
vorgenommen. Dabei wird eine Sonnenbrille (Spur 9a)
aufgefunden. Diese wird in der originären Lage
fotografiert (Bild 17) und gesichert.

Die Brille trägt an der Innenseite des rechten
Bügels die Aufschrift "ITALY". Besonderheiten sind
nicht vorhanden. Fingerspuren können keine ge-
sichert werden.

Am folgenden Morgen wird die Suche nach weiteren
Spuren fortgesetzt. An der Stelle, an welcher die
oben erwähnte Sonnenbrille gesichert wurde, sind
am Gras Blutantragungen vorhanden. Diese werden als
Spur 9b gesichert. Des weiteren werden daneben 2
kleine weiße Knöpfe gesichert (Bild 45). Diese
stammen, wie später festgestellt wird, von der
Hemdbluse der Geschädigten (siehe Bild 45).
Die Spur 9 ist 1,4 m von dem dortigen Zaun entfernt.

In einer Entfernung von 3,5 m vom Zaun liegt ein
Ast mit Blutantragungen auf dem Boden. Dieser hat
eine Länge von 34 cm und eine Stärke von 3 cm. Der
Ast wird originär gesichert (Spur 8a). Daneben
liegt noch ein weiterer Ast von 17 cm Länge und
gleicher Stärke. Dieser könnte zu dem ersten Ast
passen, eine Anpassung wird jedoch nicht vorgenommen.
An diesem Ast befinden sich jedoch keine Spuren, er
wird originär gesichert (Spur 8c).

Eine weitere Stelle mit Blutantragungen wird 1 m
vom Zaun entfernt festgestellt und als Spur 10 ge-
sichert.

Die Lage der Spuren ist auf der Skizze und in
der Lichtbildmappe Bild 14 und 15 zu entnehmen.

Auch dieser Bereich des Tatortes wird gründlichst
abgesucht. Es werden jedoch keine Spuren gefunden.

c) Parkplatz Hohenstaufenstraße:

Am Parkplatz vor der Hohenstaufenhalle werden
mittels Vlies 4 Blutspuren gesichert. Auch hier
handelt es sich um verschieden große Tropfen
zwischen 5 und 10 mm Durchmesser. Die Umrandung
ist aufgrund des Asphaltuntergrundes verschwommen.
Die Blutstropfen, es sind ca. 20, führen über die
Straße hinweg in Richtung Springbrunnen. Die Lage
ist aus der Skizze zu entnehmen.

3. Tatort Hohrein:

Sämtliche vorgefundenen Kleidungsstücke werden originär
gesichert. Eine weitergehende Spurensicherung an diesen
wird auf der Dienststelle vorgenommen - siehe Be-
schreibung der Bekleidung.

Auf der Straße befinden sich mehrere Blutspuren (Tropfen)
mit einer Größe von 5 bis 15 mm. Die Ränder sind auf-
grund des Untergrundes unscharf. Blutwischer sind je-
doch nicht vorhanden. Die Blutspuren werden genau ver-
messen und sind in der Skizze maßstabsgerecht einge-
zeichnet. Die 5 größten Spuren werden mittels Vlies
gesichert.

Zwei frisch abgerissene Buchenäste, die auf der Kleidung
liegen, werden zum Zwecke einer Mikrospurensicherung
originär gesichert. Auf der Dienststelle werden die
Äste mittels Celluxfolie abgeklebt (Spur 25).

Eine leere Cola-Dose (Classic-Cola) wird 40 m ober-
halb gefunden. Diese dürfte jedoch schon länger dort
gelegen haben. Die Dose wird als Spur 12 gesichert.
Fingerspuren sind auf ihr nicht vorhanden.

Neben den Kleidungsstücken (Spur 11) wird im Gras
ein Büschel heller Haare gesichert (Spur 11e).

## VI. BEKLEIDUNG DES OPFERS:

### 1. Hemdbluse:

Es handelt sich um eine weiße Baumwollhemdbluse mit
langen Ärmeln. Diese wird an der Vorderseite mit ins-
gesamt 7 Knöpfen geknöpft. Die vier untersten Knöpfe
fehlen. Zwei Kragenknöpfe und zwei Manschettenknöpfe
sind zusätzlich noch vorhanden. Die Knopflöcher sind
nicht eingerissen. Die Bluse ist nicht beschädigt.

An der Vorderseite und an beiden Ärmeln sind starke
Blutantragungen vorhanden. An den Manschetten sind
leichte Schmutzantragungen, auch vom Gras, vorhanden.
Die Blutspuren werden fotografiert (Bild 43 und 44).
Die Bluse wird als Spur 2 asserviert.

### 2. Unterhemd:

Es handelt sich um ein weißes Baumwollunterhemd. Dieses
ist im Brustbereich eingerissen (Bild 41 und 42). Im
Brust- und Bauchbereich befinden sich auch mehrere
Blutantragungen. Das Unterhemd wird als Spur 3 gesichert.

### 3. Kopftuch:

Es handelt sich um ein 80 x 80 cm großes Seidenkopf-
tuch (bzw. Seidenschal). Dieses ist unbeschädigt und
nicht verschmutzt.

Es befinden sich jedoch mehrere, handflächengroße
Blutantragungen daran, die insbesondere über der
Diagonallinie liegen (Spur 1).

Die drei vorgenannten Kleidungsstücke sind im Kranken-
haus sichergestellt worden. Die folgenden sind m Tat-
ort Hohrein gesichert worden:

4. Mantel:

   Es handelt sich um einen dunkelblauen, langen
   Damenmantel. Am Stoff des Mantels sind keine Be-
   schädigungen oder Verschmutzungen feststellbar. An
   der Vorderseite fehlen vier der insgesamt 5 Knöpfe.
   Sie sind offensichtlich abgerissen worden. Ledig-
   lich der oberste Knopf befindet sich noch unbe-
   schädigt am Mantel. In der linken Manteltasche
   befindet sich ein benütztes Papiertaschentuch (Spur
   11b).

5. Hosenrock:

   Es handelt sich um einen dunkelgrauen Hosenrock,
   Länge 70 cm. Dieser hat an der Vorderseite einen
   Kunststoffreißverschluß, welcher in geöffnetem
   Zustand und unbeschädigt ist. Des weiteren befindet
   sich oberhalb des Reißverschlusses ein Knopf,welcher
   ebenfalls unbeschädigt ist. Der Rock hat zwei
   Taschen. An der linken Tasche befindet sich eine
   kaum sichtbare Blutantragung, etwa handtellergroß.
   Am linken Bein ist 12 cm von unten in der Mitte
   vorne eine grünfarbene Schmutzantragung von der
   Größe eines Fünfmarkstückes. Inmitten dieser Schmutz-
   antragung befindet sich ein pfenniggroßes Loch. Bei
   dem Bereich der Schmutzantragung könnte es sich um
   den Kniebereich handeln. Am rechten Bein ist ebenfalls
   eine grünlich-braune Schmutzantragung.

Diese ist, 10 cm von unten, in der Mitte vorhanden.
Diese Antragung hat einen Durchmesser von ca. 5 cm.
Auch hier dürfte es sich um den Kniebereich handeln.
An der Rückseite des Hosenrockes sind keine Ver-
schmutzungen oder Beschädigungen feststellbar. Aller-
dings befinden sich am gesamten Rock vereinzelt
Pflanzenteile. Die Gürtelschlaufen des Hosenrockes
sind unbeschädigt. Ein Gürtel ist offensichtlich
nicht vorhanden (Spur 11c).

6. Pulli:

Es handelt sich um einen hellblauen Mohairpulli
ohne Ärmel und ohne irgendeinen Verschluß. Der
Pulli ist unbeschädigt, jedoch befinden sich an ihm
sehr viele Pflanzenteile, wie z. B. Blätter und
kleine Äste. Im vorderen linken Schulterbereich
befindet sich eine silberfarbene Brosche in Form
eines Horns. Im Rückenbereich sind einige teilweise
handtellergroße Verschmutzungen vorhanden. Insbe-
sondere im linken Schulterbereich (Spur 11a).

7. Strumpfhose:

Es handelt sich um eine graufarbene Strumpfhose.
Am rechten Bein befindet sich eine ca. 40 cm lange
Laufmasche. Im Kniebereich links und rechts sind
Grasantragungen vorhanden. Im rechten Kniebereich
sind zusätzlich noch Blutantragungen vorhanden. Am
linken Fuß ist ebenfalls eine großflächige Blut-
antragung vorhanden (Spur 16).
In den Fußteilen der Strumpfhose befindet sich je-
weils ein zusammengerollter Wollsocken. Offensicht-
lich ist die Strumpfhose über die Socken ausgezogen
und somit nach links gewendet worden.

8. <u>Schuhe</u>:

   Es handelt sich um ein Paar Damenhalbschuhe ohne
   Verschluß. Diese sind unbeschädigt. Im Fersen-
   bereich des rechten Schuhs befindet sich ein
   Blutstropfen (Spur 11d).

9. <u>Sonstiges</u>:

   Von den Kleidungsstücken, ausgenommen Strumpfhose
   und Socken, werden Mikrospuren mittels Cellux-Band
   gesichert. Die mit Blut behafteten Teile werden
   unverzüglich dem LKA Stuttgart zugesandt.

VII.   KURZE ZUSAMMENFASSUNG DER SPUREN:

1. <u>Blutspuren</u>:

| <u>Spur Nr.</u> | <u>Ort der Sicherung</u> |
|---|---|
| 1 | Opferbekleidung Kopftuch |
| 2 | Opferbekleidung Hemdbluse |
| 3 | Opferbekleidung Unterhemd |
| 8a | Ast vom Kinderspielplatz |
| 9b | Gras vom Kinderspielplatz |
| 10 | Gras vom Kinderspielplatz |
| 11c | Opferbekleidung Hosenrock |
| 11d | Sohleneinsatz rechter Schuh d. Opers |
| 14 | Straßenbelag Tatort Hohrein |
| 15 | Opferbekleidung Unterhose |
| 17 | Pflastersteine Tatort Springbrunnen |
| 18 | Belag Parkplatz Hohenstaufenhalle |

2. Faserspuren:

| Spur Nr. | Ort der Sicherung |
|---|---|
| 1a | Opferbekleidung Kopftuch |
| 2a | Opferbekleidung Hemdbluse |
| 3a | Opferbekleidung Unterhemd |
| 8b | Ast vom Kinderspielplatz |
| 11-a-1 | Opferbekleidung Mohairpulli |
| 11-b-1 | Opferbekleidung Mantel |
| 11-b-2 | Opferbekleidung Mantel Innenfutter |
| 11-c-1 | Opferbekleidung Hosenrock |

Weitere Faserspuren:

| Spur Nr. | Ort der Sicherung |
|---|---|
| 15a | Bekleidung Opfer, Unterhose |
| 25 | Buchenäste vom Tatort Hohrein |

3. Haarspuren:

| Spur Nr. | Ort der Sicherung |
|---|---|
| 11c | Tatort Hohrein |

4. Sonstige:

| Spur Nr. | Ort der Sicherung |
|---|---|
| 7 | 2 Mantelknöpfe Tatort Springbrunnen |
| 8a und c | 2 Äste vom Tatort Kinderspielplatz |
| 9a | Sonnenbrille vom Tatort Kinderspielplatz |
| 9c | 2 Perlmuttknöpfe Tatort Kinderspielplatz |

5. Vergleichsproben:

| Spur Nr. | Ort der Sicherung |
|----------|-------------------|
| 4 | Scheidenabstrich Opfer |
| 21 | Speichelprobe Opfer |
| 22 | Blutprobe Opfer |

VIII.  UNTERSUCHUNGSANTRÄGE AN DAS LKA:

Die leicht verderblichen Spuren (Blutspuren und
Scheidenabstrich) wurden am 24.10.85 bzw. 25.10.85
dem LKA Stuttgart, Kriminaltechnisches Institut,
zur Asservierung zugesandt. Ein Untersuchungsauftrag
dieser Spuren erfolgte am 29.10.85.

Eine Mehrfertigung der Anträge ist dem Bericht bei-
gefügt.

Das Gutachten des Kriminaltechn. Instituts vom
06.05.86, Az.: 903b-6256/85, ist ebenfalls beigefügt.

Als Fazit der Untersuchungen kann gesagt werden, daß
Täterblut der Blutgruppe O (Null) gesichert worden
ist.

Mit obigem Untersuchungsantrag wurde auch ein Ver-
gleich mit dem Blut des tatverdächtigen Charles SEWELL
veranlaßt.

Weitere vergleichende Untersuchungen mit dem Blut des
Keith WILLIAMS wurden am 07.03.86 und mit dem Blut
des Ricky FREEMAN am 01.09.86 veranlaßt. In allen
Fällen war das Ergebnis negativ (siehe Anlage).

## IX. SKIZZEN UND LICHTBILDMAPPEN:

Von den Tatorten "Nördliche Ringstraße" und
"Hohrein" wurden Skizzen gefertigt. Eine Foto-
kopie der Kreiskarte Göppingen, mit den beiden
möglichen Fahrtstrecken zum Tatort Hohrein,
ist ebenfalls beigefügt.

Insgesamt wurden drei Lichtbildmappen angefertigt,
die wie folgt untergliedert sind:

1. Tatorte "Nördliche Ringstraße" und "Hohrein"   Bild 1 - 30
2. Verletzungen des Opfers                         Bild 31-34
3. Kleidung und sonstige Spuren                    Bild 35-53.

### Sonstiges:

Die nicht ausgehändigten Asservate und die Spuren
werden bei hiesiger Dienststelle belassen, falls in
nächster Zeit noch Untersuchungen vorgenommen werden
sollen. Sie können jederzeit angefordert werden.

Die beim LKA Stuttgart eingelagerten Spuren werden
dort noch bis Jahresende 1987 aufbewahrt.

- SGOLIK, KOK -


### Anlagen:

1 Mf 2fach
3 Libimappen 3fach
3 Skizzen 3fach
3 Untersuchungsantr. 2fach
1 Gutachten Spuren 2fach
1 Untersuchungsantrag FREEMAN 3fach
1 Gutachten FREEMAN 3fach

EXT-STAPLETON-00218

| | Dienststelle: | Delikt/Anlaß: Vergewaltigung vers. Mord | SPUREN-ASSERVATENLISTE Blatt Nr.: 1 |
|---|---|---|---|
| | Tgb. Nr./Az.: 1549/85 | | Göppingen ,den 18.08.86 Ort Sgolik, KOK SB/Amtsbezeichnung |

| Nr. | Bezeichnung | Sicherstellungsort | a) sichergestellt von b) sichergestellt am | Endverbleib |
|---|---|---|---|---|
| 1 | Kopftuch, blau-grau-schwarz gemustert, mit Blutantragungen | Klinik am Eichert, von der Geschädigten | a) Sgolik, KOK b) 24.10.85 | 25.10.85 LKA |
| 1a | 8 Folienabzüge hiervon | Dienststelle KP Göppingen | a) Arlt, POM b) 25.10.85 | KP Göppingen |
| 2 | weiße Hemdbluse mit Blutantragungen | Klinik am Eichert, von der Geschädigten | a) Sgolik, KOK b) 24.10.85 | 25.10.85 LKA |
| 2a | 12 Folienabzüge hiervon | Dienststelle KP Göppingen | a) Sgolik, KOK b) 25.10.85 | KP Göppingen |
| 3 | weißes Damenunterhemd mit Blutantragungen | Klinik am Eichert, von der Geschädigten | a) Sgolik, KOK b) 24.10.85 | 25.10.85 LKA |
| 3a | 8 Folienabzüge hiervon | Dienststelle KP Göppingen | a) Arlt, POM b) 25.10.85 | KP Göppingen |
| 4 | Scheidenabstrich von der Geschädigten | Klinik am Eichert | a) Sgolik, KOK | 25.10.85 LKA |
| 5 | Brille der Geschädigten | Göppingen, Nördliche Ringstraße, TO beim Springbrunnen | a) Sgolik, KOK b) 24.10.85 | am 3.1.86 an Geschädigte übergeben |

EXT-STAPLETON-00219

000141

| | Dienststelle: | Delikt/Anlaß: Vergewaltigung vers. Mord | SPUREN-ASSERVATENLISTE Blatt Nr.: 2 |
|---|---|---|---|
| | | | Göppingen ,den 18.08.86 |
| | | | Ort |
| | Tgb. Nr./Az.: 1549/85 | | Sgolik, KOK |
| | | | SB/Amtsbezeichnung |

| Nr. | Bezeichnung | Sicherstellungsort | a) sichergestellt von b) sichergestellt am | Endverbleib |
|---|---|---|---|---|
| 6 | Tasche der Geschädigten mit div. Handarbeitszeug als Inhalt | wie oben | wie oben | wie oben |
| 7 | 2 abgerissene Mantelknöpfe | wie oben | wie oben | KP Göppingen |
| 8a | Ast, 3 cm Ø, 34 cm lang mit Blutantragungen | Göppingen, Nördliche Ringstraße, beim Kinderspielplatz | a) Sgolik, KOK b) 24.10.85 | 24.10.85 LKA |
| 8b | 2 Fasern, die von obigem Ast gesichert wurden | Dienststelle KP Göppingen | a) Sgolik, KOK | KP Göppingen |
| 8c | Ast, 3 cm Ø, 17 cm lang, evtl. zu 8a passend | wie 8a | a) Keierleber/Arlt b) 24.10.85 | KP Göppingen |
| 9a | Sonnenbrille | Göppingen, Nördliche Ringstraße, beim Spielplatz | a) Sgolik, KOK b) 24.10.85 | Dienststelle |
| 9b | Gras mit Blutantragungen | wie oben | a) Sgolik, KOK b) 24.10.85 | 24.10.85 LKA nur asservieren |
| 9c | 2 weiße Perlmuttknöpfe, 10 mm Ø | wie oben | wie oben | Dienststelle |
| 10 | Gras mit Blutantragungen | wie oben | wie oben | wie 9b |

000142

| | Dienststelle: | Delikt/Anlaß: Vergewaltigung vers. Mord | SPUREN-ASSERVATENLISTE Blatt Nr.: 3 |
|---|---|---|---|
| | | | Göppingen ,den 18.08.86 |
| | | | Ort |
| | Tgb. Nr./Az.: 1549/85 | | Sgolik, KOK |
| | | | SB/Amtsbezeichnung |

| Nr. | Bezeichnung | Sicherstellungsort | a) sichergestellt von b) sichergestellt am | Endverbleib |
|---|---|---|---|---|
| 11a | hellblauer Mohairpulli, ohne Ärmel, mit einer silberfarbenen Brosche | Göppingen-Hohrein, K 1407 | a) Sgolik, KOK b) 24.10.85 | am 3.1.86 an Geschädigte übergeben |
| 11a-1 | 16 Folienabzüge hiervon | Dienststelle KP Göppingen | a) Sgolik, KOK b) 28.12.85 | KP Göppingen |
| 11b | dunkelblauer Mantel der Geschädigten | Göppingen-Hohrein, K 1407 | a) Sgolik, KOK b) 24.10.85 | am 3.1.86 an Geschädigte |
| 11b-1 | 17 Folienabzüge hiervon | Dienststelle KP Göppingen | a) Sgolik, KOK b) 25.10.85 | KP Göppingen |
| 11b-2 | 6 Folienabzüge vom Innenfutter des Mantels | Dienststelle KP Göppingen | a) Arlt, POM b) 21.11.85 | KP Göppingen |
| 11b-3 | 1 Vergleichsknopf vom Mantel | Dienststelle KP Göppingen | a) Sgolik, KOK b) 28.12.85 | KP Göppingen |
| 11c | grauer Hosenrock der Geschädigten | Göppingen-Hohrein, K 1407 | a) Sgolik, KOK b) 24.10.85 | KP Göppingen |
| 11c-1 | 16 Folienabzüge hiervon | Dienststelle KP Göppingen | a) Keierleber, KHM b) 25.10.85 | KP Göppingen |

EXT-STAPLETON-00221

000143

| | Dienststelle: | Delikt/Anlaß: Vergewaltigung vers. Mord | SPUREN-ASSERVATENLISTE Blatt Nr.: 4 |
|---|---|---|---|
| | | | Göppingen ,den 18.08.86 |
| | | | Ort |
| | Tgb. Nr./Az.: 1549/85 | | Sgolik, KOK |
| | | | SB/Amtsbezeichnung |

| Nr. | Bezeichnung | Sicherstellungsort | a) sichergestellt von b) sichergestellt am | Endverbleib |
|---|---|---|---|---|
| 11d | 1 Paar schwarze Damenhalbschuhe von der Geschädigten | Göppingen-Hohrein, K 1407 | a) Sgolik, KOK b) 24.10.85 | 3.1.86 an Geschädigte |
| 11e | 1 Büschel heller Haare mit Fasern | Göppingen-Hohrein, K 1407 | a) Keierleber, KHM b) 24.10.85 | KP Göppingen |
| 12 | 1 leere Dose Classic-Cola | Göppingen-Hohrein, K 1407 | a) Sgolik, KOK b) 24.10.85 | KP Göppingen |
| 13 | Damen-Armbanduhr der Geschädigten | Göppingen-Hohrein, K 1407 | a) Sgolik, KOK | am 7.1.86 an Geschädigte |
| 14 a-f | Blutspuren vom Asphaltbelag | Göppingen-Hohrein, K 1407 | a) Sgolik, KOK b) 24.10.85 | LKA |
| 15 | Unterhose der Geschädigten | Göppingen-Hohrein, K 1407 | a) Sgolik, KOK b) 24.10.85 | KP Göppingen |
| 15 a | 8 Folienabzüge hiervon | Dienststelle KP Göppingen | a) Sgolik, KOK b) 25.10.85 | KP Göppingen |
| 16 | Strumpfhose der Geschädigten | Göppingen-Hohrein, K 1407 | a) Sgolik, KOK b) 24.10.85 | KP Göppingen |
| 16a | 1 Paar Socken aus der Strumpfhose | wie oben | wie oben | KP Göppingen |

EXT-STAPLETON-00222

000144

| | Dienststelle: | Delikt/Anlaß: Vergewaltigung vers. Mord | SPUREN-ASSERVATENLISTE Blatt Nr.: 5 |
|---|---|---|---|
| | Tgb. Nr/Az.: 1549/85 | | Göppingen ,den 18.08.86 Ort |
| | | | Sgolik, KOK SB/Amtsbezeichnung |

| Nr. | Bezeichnung | Sicherstellungsort | a) sichergestellt von b) sichergestellt am | Endverbleib |
|---|---|---|---|---|
| 17 a-i | Blutspuren auf Pflastersteinen | Göppingen, Nördliche Ring-straße, Springsbrunnenbereich | a) Sgolik, KOK b) 24.10.85 | KP Göppingen/LKA |
| 18 a-e | Blutspuren im Asphaltbelag | Göppingen, Nördliche Ring-straße, Parkplatz Hohenstaufen-halle | a) Sgolik, KOK b) 24.10.85 | LKA |
| 19 | Blutspur vom rechten Schuh (Ass. 11d) der Geschädigten | Dienststelle KP Göppingen | a) Sgolik, KOK b) 24.10.85 | LKA |
| 20 | Blutprobe vom Tatverdächtigen Charles Lee Sewell | Bad Orb | a) KP Bad Orb b) 26.10.85 | LKA |
| 21 | Speichelprobe der Geschädigten | Dienststelle KP Göppingen | a) Keierleber, KHM b) 28.10.85 | LKA |
| 22 | Blutprobe von der Geschädigten | KP Göppingen | a) Keierleber, KHM b) 28.10.85 | LKA |
| 23 | Blutprobe vom Tatverdächtigen Keith Williams | Göppingen | a) Witke | LKA |
| 24 | rote Jacke des Tatverdächtigen Keith Williams | Göppingen | a) Witke | an K. Williams zurückgegeben |
| 25 | 2 Folienabzüge von abgebrochenen Buchenästen | Göppingen-Hohrein, K 1407 | a) Keierleber, KHM b) 25.10.85 | KP Göppingen |

EXT-STAPLETON-00223

000145

000146

<u>Betr.:</u> Versuchtes Tötungsdelikt z.N. A        -G
       <u>hier:</u> Suche nach den noch fehlenden Kleidungsstücken
            der Geschädigten


Im Anschluß an die Nachbarschaftsbefragung begaben sich
KK Spiller und KK Leist in den Bereich Göppingen-Hohrein,
um nach den noch fehlenden Kleidungsstücken zu suchen.

Ca. 150 m nach Ortsende Hohrein in Richtung Hohenstaufen

konnte deutlich sichtbar am Rande des linken Straßen-
grabens ein hellblaues, vermutlich wollenes Kleidungsstück
wahrgenommen werden. Eine erste Nachschau ergab, daß neben
diesem Kleidungsstück ein weiteres dunkelblaues Kleidungs-
stück sowie ein Paar Damenschuhe abgelegt war.
Der Fundort wurde in seinem ursprünglichen Zustand belassen.
Über Funk wurde das zuständige Dezernat 8 - Erkennungsdienst -
angefordert, welches die weiteren Ermittlungen an dem
Fundort übernahm.


LEIST


SPILLER

000148

EXT-STAPLETON-00226

000149

Der von Frau S            A        -G.
am 23.10.1985 zurückgelegte Weg, nach dem
Besuch des Nähkurses im Haus der Familie
in 7320 Göppingen bis zum Tatort in der
Nördlichen Ringstraße auf Höhe des Stadtbades.



EXT-STAPLETON-00227

Ablageort und der von
Frau S        A        -G
zurückgelegte Weg vom Ablageort
zum Gebäude Unter Weiler 15
- Anwesen HÄGENLÄUER -



EXT-STAPLETON-00228

EXT-STAPLETON-00229

000152



# TATORTSKIZZE
## Nördl. Ringstr.

**Betrifft** : Vergewaltigung und vers. Mord
z.N. S        A        :-G
am 23.10.85

| | |
|---|---|
| **Aktenzeichen** | : <u>D 8 - 1549/85</u> |
| **Fotograf** | : _____ |
| **Mappe gefertigt** | : <u>Sgolik</u> _____ |
| **Verantwortlich** | : ~~Sgolik~~ |
| **Unterschrift** | : _____ |

Polizeidirektion
- Kriminalpolizei -
Schillerstraße 15
**Dienstgebäude**: 7320 Göppingen

**Fernsprecher Vermittlung**

K 2

EXT-STAPLETON-00230

000153




Kopie vom Stadtplan Göppingen   M 1 : 10 000

Legende:

A: mögliche Fahrtstrecke zum Kleiderfundort über
   GP-Bartenbach und GP-Lerchenberg
B: dto. jedoch in Richtung GP-Hohenstaufen
M: Mütterschule
W: Wohnung der Geschädigten
TO: Tatort Nördliche Ringstraße

TATORTSKIZZE Nördliche Ringstraße

Nr. 5: Brille der Geschädigten
Nr. 6: Tasche
Nr. 7: zwei Mantelknöpfe
Nr. 8: Ast mit Blutantragung
Nr. 9: Sonnenbrille, Hemdknöpfe
Nr. 10: Gras mit Blutantragung
Nr. 17 u. 18: Blutspuren

Maßstab etwa 1 : 500      1 cm entspricht 5 m

EXT-STAPLETON-00231

000154



Mutmaßlicher Fluchtweg
des Täters und
Verlauf aufgefundener
Blutspuren

Tatortbereich
am Maschendraht-
zaun

Haus der
Familie



Kartenausschnitt der Stadt Göppingen

Verbindung zwischen TO Nördliche Ringstraße
und Göppingen-Hohrein.



Weg A: Über GP-Bartenbach und GP-Lerchenberg
       Fahrtstrecke 6,4 km

Weg B: in Richtung Hohenstaufen
       Fahrtstrecke 6,8 km

EXT-STAPLETON-00234

000157

Ablageort der
Frau A
G

HOHREIN

Der von Frau A
G.        zurückgelegte
Weg vom Ablageort

HOHENSTAUFEN



EXT-STAPLETON-00235

EXT-STAPLETON-00236



# TATORTSKIZZE

## HOHREIN

**Betrifft :** Vergewaltigung und vers. Mord
z.N. S      A      -G
am 23.10.85

| | |
|---|---|
| **Aktenzeichen** | : D 8 - 1549/85 |
| **Fotograf** | : Sgolik, Keierleber |
| **Mappe gefertigt** | : Sgolik |
| **Verantwortlich** | : Sgolik |
| **Unterschrift** | : |

Dienstgebaude:

Fernsprether Vermittlung

K 2

EXT-STAPLETON-00237



000160

LEGENDE

Skizze vom Fundort der Kleidungsstücke der Geschädigten auf der K 1407 bei GP-Hohrein. Die genaue Lage ist im Kartenausschnitt eingezeichnet.

Die Nummern auf der Skizze entsprechen den Spurennummern.

Maßstab Skizze: 1 : 50
Maßstab Karte : 1 : 10 000

EXT-STAPLETON-00238



Wald

Buchen

13 Uhr

Strumpf
hose 16

Äste
abgerissen

Graben

Baumstamme

Gras

Gras

Leitpfosten     Kleidung

11

2 m        3,5 m        6 m        10,5 m

Ri. Hohrein

Blut        Blut

Ri. Hohenstaufen u. GP

14 g

14 Gef.        14 abd.

K 1407        aufsteigend ca. 6-8 %

Leitpfosten

Graben        Gras        Gras        Gras

3 m

15  Unter-
hose

Wiese

N

EXT-STAPLETON-00240



# Lichtbildmappe

**Betrifft :** Vergewaltigung und vers. Mord
z.N. S    A    -G
am 23.10.85

| | | |
|---|---|---|
| Aktenzeichen | : | D 8 - 1549/85 |
| Fotograf | : | Sgolik, ~~Meierleber~~ |
| Mappe gefertigt | : | Sgolik |
| Verantwortlich | : | Sgolik |
| Unterschrift | : | |

Polizeidirektion
- Kriminalpolizei -
Dienstgebäude: Schillerstraße 15
7320 Göppingen
Fernsprecher Vermittlung

K 2



31



32

Bild 31 und 32

Aufnahmen der Verletzungen am Kopf
der Geschädigten S███ A███-
G███████ aufgenommen nach der
Einlieferung und ärztlichen Behand-
lung im Krankenhaus.

EXT-STAPLETON-00242





Bild 33

Aufnahme der Kopfverletzung am Tag
nach der Tat.

Bild 34

Schürfungen am Rücken der Geschädigten





EXT-STAPLETON-00243

000165

991000



# Lichtbildmappe

**Betrifft :** Vergewaltigung und vers. Mord
z.N. S░░░░ A░░░░░░G
am 23.10.85

| | |
|---|---|
| Aktenzeichen | : D 8 - 1549/85 |
| Fotograf | : Sgolik, Keierleber |
| Mappe gefertigt | : Sgolik |
| Verantwortlich | : Sgolik |
| Unterschrift | : |

Dienstgebäude:

Fernsprecher Vermittlung

ON-00245

000167



35

Bild 35

Mantel der Geschädigten. Von den
insgesamt 5 Knöpfen fehlen vier,
durch Pfeile bezeichnet.

EXT-STAPLETON-00246

000168





36

BILD 36

zwecks der Zuordnung. Von den
insgesamt 5 Knöpfen fehlen ein-
durch Reihe bezeichnet.

Bild 36

Aufnahme einer Stelle vom Mantel,
an welcher der Knopf herausge-
rissen worden ist.

Bild 37

Aufnahme von den bei der Spring-
brunnenanlage aufgefundenen Knöpfen
(Spur 7). Diese stimmen in Form, Farbe
und Größe mit dem Vergleichsknopf vom
Mantel der Geschädigten überein.

35



Spur Nr. 7          Vergleichsknopf
                    vom Mantel

37

EXT-STAPLETON-00247

000169



Bild 38

Aufnahme vom Mohairpulli (Spur 11).

39



EXT-STAPLETON-00248

Bild 39

Vorderseite vom Rock der Geschädigten.
Im Kniebereich ist der Rock verschmutzt
bzw. an der linken Seite zusätzlich
beschädigt.



39

Bild 40

Aufnahme von der beschädigten Stelle
am Rock im Bereich des linken Knies.



40

38

EXT-STAPLETON-00249



41



42



43





44

**Bild 41**

Zerrissenes und verblutetes Unter-
hemd der Geschädigten.

**Bild 42**

dto., jedoch nur der be-schädigte
Vorderbereich.

EXT-STAPLETON-00250

C00172