UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| | ) | |
| THE EXTRADITION OF | ) | No. 3:22-MC-66-FKB |
| | ) | |
| FREDDIE LEE STAPLETON | ) | |
| | ) | |

MEMORANDUM OF EXTRADITION LAW
AND REQUEST FOR DETENTION PENDING EXTRADITION PROCEEDINGS

The United States, in fulfilling its treaty obligations to the Government of Germany ("Germany"), respectfully requests that the fugitive in this case, Freddie Lee Stapleton ("Stapleton" or the "fugitive") be held without bond pending the hearing on the certification of his extraditability pursuant to 18 U.S.C. §§ 3184 *et seq.*, and files this memorandum in support thereof. This memorandum summarizes the framework of extradition law in the United States, and sets forth the reasons why Stapleton should be detained. In short, Stapleton should be detained because he cannot overcome the strong presumption against bail in international extradition cases. Specifically, he cannot meet his burden of showing that he poses no risk of flight or danger to the community, and that special circumstances exist warranting his release.

## Background

Germany has requested Stapleton's extradition so that he can stand trial for attempted aggravated murder in violation of section 211 subsection 2 and section 22 of the German Criminal Code. On May 19, 2020, the Ulm Local Court in Germany issued an warrant for Stapleton's arrest, based on the following facts:

More than thirty-five years ago, a 29-year-old woman was brutally raped, beaten, and left for dead in Göppingen, Germany. The case sat cold despite authorities' diligent efforts to

identify the assailant.  Finally, advances in the field of DNA trace analysis together with international mutual legal assistance requests allowed Germany to identify STAPLETON as the individual that perpetrated this heinous crime.

The crime occurred on the evening of October 23, 1985 at approximately 10:20 p.m., as the victim, S.A.G., walked home from her sewing class.[1] (Citations are to pages of the Exhibit to the Complaint filed in this action.)  As S.A.G. passed through a public park, STAPLETON approached her from behind, threatening her with a knife and saying words to the effect of "come with me or I will kill you."[2]  STAPLETON grabbed S.A.G., dragging her off the walking path and onto the grass.[3]  S.A.G. cried out for help[4] and fought back against STAPLETON, biting his hand causing it to bleed.[5]  STAPLETON violently stripped S.A.G. down to her blouse and undershirt, while strangling her and punching her repeatedly in the face.[6]  STAPLETON then raped her vaginally and anally multiple times.[7]

After he raped her, STAPLETON left S.A.G., who laid motionless on the ground pretending to be dead.[8]  A short while later, STAPLETON returned carrying a wooden club that he used to strike S.A.G. forcefully and repeatedly in the head.[9]  STAPLETON again left S.A.G. lying motionless on the ground.  He returned a short while later driving his vehicle through the park towards her body.[10]  STAPLETON put the nearly unconscious S.A.G., who continued to

---

[1] EXT-STAPLETON-549; EXT-STAPLETON-556.
[2] EXT-STAPLETON-607.
[3] EXT-STAPLETON-607.
[4] EXT-STAPLETON-559.
[5] EXT-STAPLETON-558; EXT-STAPLETON-607.
[6] EXT-STAPLETON-608.
[7] EXT-STAPLETON-559.
[8] EXT-STAPLETON-608.
[9] EXT-STAPLETON-560.
[10] EXT-STAPLETON-609.

feign death, and her blood-stained clothing in his car and drove to the outskirts of town.[11]
STAPLETON dumped S.A.G. and her clothing in a roadside ditch.[12]  He covered her body with
tree branches and leaves, and drove away.[13]

S.A.G. laid motionless for some time before she was able to drag herself, half-naked and
bleeding profusely, to a nearby farmhouse.[14]  Mr. Hägenläuer answered the door and called the
police.[15]

S.A.G. was taken to the hospital where doctors determined that she sustained two broken
ribs, a ruptured ear drum, a laceration to the left side of her head, pressure marks on her larynx as
well as bruises and swelling throughout her body.[16]  A gynecological exam confirmed the
presence of spermatozoa in the victim's vagina.[17]

S.A.G. told police that her assailant was black and spoke German with an American
accent.[18]  At the time, a number of American military members were stationed in Göppingen.[19]
The police searched the barracks for anyone matching S.A.G.'s description and who had a
wound on their hand, but found none.[20]  Police showed S.A.G. several photographs of
individuals who matched the description she provided, but she was not able to make a positive
identification.[21]  Police also posted flyers, passed out leaflets, and offered a reward for

---

[11] EXT-STAPLETON-560.
[12] EXT-STAPLETON-609.
[13] EXT-STAPLETON-609.
[14] EXT-STAPLETON-634.
[15] EXT-STAPLETON-634.
[16] EXT-STAPLETON-551; EXT-STAPLETON-645.
[17] EXT-STAPLETON-651.
[18] EXT-STAPLETON-560; EXT-STAPLETON-612.
[19] EXT-STAPLETON-562.
[20] EXT-STAPLETON-562.
[21] EXT-STAPLETON-863.

information about the assailant.[22]

At the park, German authorities recovered a broken wooden club with traces of blood[23] and collected samples from 8 traces of blood found on the walking path.[24]  They also found S.A.G.'s glasses, purse, and buttons from her coat.[25]  In the roadside ditch, German authorities recovered S.A.G.'s coat, sweater, pants, and shoes.[26]  Her tights and blood-stained underwear were found in a meadow on the opposite side of the road.[27]

German authorities identified multiple suspects, but each was ruled out by comparing the suspects' blood to that found at the crime scene.[28]  In 2001, Germany utilized advances in the field of DNA trace analysis to develop a DNA profile of the perpetrator based on blood samples collected at the two crime scenes.  Through a mutual legal assistance request to the United States, Germany confirmed that the DNA profile created from evidence found at the scene matched the DNA profile of STAPLETON stored in the FBI database, CODIS.[29]  In 2019, Germany obtained a saliva swab from STAPLETON.[30]  The Forensic Institute of the State Office of Criminal Investigation at Baden-Württemberg analyzed the saliva swab and determined that it contained DNA found on paving stones at the park and in S.A.G.'s underwear and tights found near the roadside ditch.[31]  The statistical frequency of such a match was determined to be 1 in 536 septillion (536 x $10^{24}$).[32]

---

[22] EXT-STAPLETON-561.
[23] EXT-STAPLETON-560.
[24] EXT-STAPLETON-656.
[25] EXT-STAPLETON-656.
[26] EXT-STAPLETON-655.
[27] EXT-STAPLETON-655.
[28] EXT-STAPLETON-562-563.
[29] EXT-STAPLETON-907; EXT-STAPLETON-392-93.
[30] EXT-STAPLETON-516; EXT-STAPLETON-924.
[31] EXT-STAPLETON-925-26.
[32] EXT-STAPLETON-926.

Germany requested Stapleton's extradition pursuant to the extradition treaty in force between the United States and Germany,[33] and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint seeking a warrant for Stapleton's arrest.  U.S. Magistrate Judge F. Keith Ball issued an arrest warrant, and Stapleton was arrested on February 16, 2022.  Stapleton is currently in the custody of the United States Marshals Service.

## ARGUMENT

## I.   LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

### A.   The limited role of the Court in extradition proceedings

The extradition process is *sui generis*.  Extradition is primarily an executive function with a limited role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge."  18 U.S.C. § 3184; *see also, e.g.*, *In re Extradition of Hilton*, No. 13-7043, 2013 WL 1891327, at *3 (D. Mass. May 3, 2013) ("Extradition is an executive, not judicial, function.") (citing *Martin v. Warden*, 993 F.2d 824, 828 (11th Cir.1993)).  The Secretary of State, and not the court, makes the ultimate decision whether to surrender a fugitive to the requesting country.  18 U.S.C. §§ 3184, 3186; *Escobedo v. United States*, 623 F. 2d 1098, 1105 (5th Cir. 1980) ("The ultimate decision to extradite is a

---

[33] Treaty between the Government of the United States of America and the Federal Republic of Germany Concerning Extradition, U.S.-F.R.G., June 20,1978, T.I.A.S. No. 9785 (the "1978 Treaty"), *as supplemented by* the Supplementary Extradition Treaty with the Federal Republic of Germany, U.S.-F.R.G., Oct. 21, 1986, S. TREATY DOC. NO. 100-6 (1987) (the "1986 Supplementary Treaty"), *and* the Second Supplementary Treaty to the Treaty between The United States of America and the Federal Republic of Germany Concerning Extradition, U.S.-F.R.G., Apr. 18, 2006, S. TREATY DOC. NO. 109-14 (2006) (the "2006 Second Supplementary Treaty") (collectively, the "Treaty").

matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct its foreign affairs.").

At the extradition hearing, the court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established.  *See Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828 (11th Cir. 1993).  If the court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the court, and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender.  18 U.S.C. §§  3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made."); *see Martin*, 993 F.2d at 828.

**B.      The requirements for certification**

The Court should certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met:  (1) The judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge.  *See Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *In re Extradition of Hurtado*, 2013 WL 4515939, at *2 (Aug. 21, 2013 W.D. Tx.).  The following sections briefly discuss each of those requirements.

### 1.  Authority over the proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184.  As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," but is rather acting in a "non-institutional capacity by virtue of a special authority." *Howard*, 996 F.2d at 1325.  Both magistrate judges and district judges may render a certification under Section 3184.  *See*, *e.g.*, *id.*; *Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993).  Here, Rule 72(b) of the Uniform Local Criminal Rules expressly authorizes magistrate judges "In an action referred toa magistrate judge, … [to] perform the duties assigned by the court rule, plan, order or other document." U.L.C.R. 72(b).

### 2.  Jurisdiction over the fugitive

The court has jurisdiction over a fugitive, such as Stapleton, who is found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

### 3.  Treaty in full force and effect

Section 3184 provides for extradition in instances in which a treaty or convention is in force between the requesting state and the United States.  *See, e.g., Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000); *see also Hilton*, 754 F.3d at 84.  The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from Stacy Hauf,

an attorney in the Office of the Legal Adviser for the Department of State, attesting that the

Treaty is in force.  The court should defer to the Department of State's determination in that

regard.  *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for

themselves, the meaning given them by the departments of government particularly charged with

their negotiation and enforcement is given great weight").

> 4.  <u>Crimes covered by the treaty</u>

Extradition treaties create an obligation for the United States to surrender fugitives under

the circumstances the treaty defines.  Article I of the Treaty provides for the return of fugitives

charged with, or convicted of, an extraditable offense.  Article II of the Treaty defines offenses

as extraditable if the criminal conduct is punishable under the laws of both the United States and

Germany by deprivation of liberty for a maximum period of more than one year.  This

requirement is known as "dual criminality."  *See Knotek*, 925 F.3d 1118.

In assessing whether the conduct alleged by Germany is criminalized both in that country

and in the United States, the Court should examine the description of criminal conduct provided

by Germany in support of its charges and decide whether that conduct, if it had been committed

here, would be criminal under U.S. federal law, the law of the state in which the hearing is held,

or the law of a preponderance of the states.  *See, e.g.*, *id.* at 1129, n.10.  A requesting country need

not establish that its crimes are identical to ours.  *Id.* at 1131; *Clarey v. Gregg*, 138 F.3d 764, 765

(9th Cir. 1998).  Rather, "the court looks at whether 'the essential character of the transaction is

the same, and made criminal by both statutes.'"  *Knotek*, 925 F.3d at 1131 (quoting *Wright v.

Henkel*, 190 U.S. 40, 62 (1903); brackets omitted).  Indeed, "[t]he law does not require that the

name by which the crime is described in the two countries shall be the same; nor that the scope of

8

the liability shall be coextensive, or, in other respects, the same in the two countries.  It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).

In fulfilling its function under Section 3184, the Court should liberally construe the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country.  *Factor*, 290 U.S. at 298-300; *see also, e.g.*, *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"); *In re Extradition of Mathison*, 974 F. Supp. 2d 1296, 1305 (D. Or. 2013).  Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

## 5.  Probable cause that the fugitive has committed the offenses

To certify the evidence to the Secretary of State, the Court must conclude that probable cause exists to believe that the fugitive committed the offense for which Germany seeks extradition.  *See Escobedo*, 623 F. 2d at 1102 & 1105.  Probable cause exists if "there is evidence sufficient to show reasonable ground to believe the accused guilty."  *Sayne v. Shipley*, 418 F. 2d 679, 685 (5th Cir. 1969); *see also Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) ("The standard for arrest is probable cause, defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.") (internal quotation marks and citation omitted).  The extradition judge's probable cause determination is "not a finding of fact in the sense that the court has weighed the evidence and

resolved disputed factual issues," but instead "serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based." *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (internal quotation marks and citation omitted); *see Haxhiaj v. Hackman*, 528 F. 3d 282, 287 (4th Cir. 2008) ("The extradition hearing is not to serve as a full-blown trial and serves simply to permit a limited inquiry 'into the presence of probable cause to believe that there has been a violation of one or more of the criminal laws of the extraditing country.'"); *Hoxha*, 465 F. 3d at 561 ("The probable cause standard applicable to an extradition hearing is the same as the standard used in federal preliminary hearings.'").

### C.   An extradition hearing follows unique procedures

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination is reserved for the foreign court. *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901). "By design, 'the procedural framework of international extradition gives to the demanding country advantages most common to ordinary civil and criminal litigation.'" *Skaftouros*, 667 F.3d at 155 (quoting *First Nat'l City Bank v. Aristeguieta*, 287 F.2d 219, 226 (2d Cir. 1960)); *see also Hilton*, 2013 WL 1891327, at *3 ("Given the limited purpose of extradition hearings, the individual whose extradition is requested . . . does not benefit from most of the protections traditionally afforded to defendants in criminal proceedings."). A summary of these advantages appears below.

1.   <u>Extradition hearings rely on written submissions and do not require live witnesses</u>

An extradition hearing is not a criminal proceeding. *See, e.g.*, *Martin*, 993 F.2d at 828. Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply. *See*

Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) ("These rules – except for those on privilege – do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *Kin-Hong*, 110 F.3d at 120.

Hearsay evidence is admissible at an extradition hearing and, moreover, a certification of extradition may be—and usually is—based entirely on the authenticated documentary evidence and information the requesting government has provided.  *See, e.g.*, *Harshbarger v. Regan*, 599 F.3d 290, 294 (3d Cir. 2010) (affidavits of Canadian law enforcement officers are competent and "provided ample evidence of probable cause"); *Skaftouros*, 667 F.3d at 155 n.16 ("unsworn statements of absent witnesses may be considered"); *Kin-Hong*, 110 F.3d at 120 (finding statements from witnesses in Hong Kong admissible); *Bovio v. United States*, 989 F.2d 255, 259-60 (7th Cir. 1993) (relying on statement of Swedish investigator); *Emami v. U.S. Dist. Court for the N. Dist. of Cal.*, 834 F.2d 1444, 1450-52 (9th Cir. 1987) (relying on affidavit of German prosecutor).  Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing.  *See, e.g.*, *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *Yordi v. Nolte*, 215 U.S. 227, 231 (1909); *Shapiro v. Ferrandina*, 478 F.2d 894, 902 (2d Cir. 1973); *In re Extradition of Koskotas*, 88-MJ-73, 127 F.R.D. 13, 28 (D. Mass. July 13, 1989).  Requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty."  *Bingham*, 241 U.S. at 517.

2.   Limitations on fugitives' defenses in extradition proceedings

A fugitive's defenses in extradition proceedings are heavily circumscribed.  For example, a fugitive has (i) no Sixth Amendment right to a speedy extradition, *see, e.g.*, *Yapp v. Reno*, 26

F.3d 1562, 1565 (11th Cir. 1994); *Sabatier v. Dabrowski*, 586 F.2d 866, 869 (1st Cir. 1978); (ii) no Fifth Amendment guarantee against double jeopardy with respect to successive extradition proceedings, *see, e.g.*, *In re Extradition of McMullen*, 989 F.2d 603, 612-13 (2d Cir. 1993)  (iii) no ability to invoke the exclusionary rule, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); (iv) no right to cross-examine his or her accusers, *see, e.g.*, *Bingham*, 241 U.S. at 517; (v) no right to invoke defenses that "savor of technicality," *see id.*; and (vi) no right to introduce affirmative defenses, *see, e.g.*, *Charlton v. Kelly*, 229 U.S. 447, 462 (1913). Furthermore, a fugitive generally has no right to discovery.  *See, e.g.*, *Quinn*, 783 F.2d at 817, n.41; *Koskotas*, 931 F.2d at 175 ("[I]n an extradition proceeding, discovery is not only discretionary with the court, it is narrow in scope.").

Courts routinely reject technical and affirmative defenses in extradition proceedings. *See, e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"); *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir.) (noting that extradition court "properly may exclude evidence of alibi, or facts contradicting the government's proof, or of a defense such as insanity").  These issues, which require factual or credibility determinations, are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

Relatedly, a fugitive's right to present evidence is severely constrained.  "A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but may only introduce evidence explaining the submitted evidence. *See Charlton*, 229 U.S. at 457-58; *Koskotas*, 931 F.2d at 175 ("Although it is within the discretion of the district court to permit the relator to offer limited, explanatory evidence relating to the charges against him, contradictory evidence properly may be excluded.") (citations omitted).  A contrary rule

might compel the "demanding government to produce all its evidence … both directing and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)).

        3.  <u>Rule of non-inquiry:  all matters other than certification are reserved for the Secretary of State</u>

All matters a fugitive may raise as defenses to extradition, other than those concerning the requirements for certification, are to be considered by the Secretary of State to consider, not by the court.  *See* 18 U.S.C. §§ 3184, 3186; *see also, e.g.*, *Kin-Hong*, 110 F.3d at 109 ("The Secretary may . . . decline to surrender the relator on any number of discretionary grounds, including but not limited to, humanitarian and foreign policy considerations.").  For example, the Secretary of State should address a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds.  *Martin*, 993 F.2d at 830 n.10 ("We [have] explicitly held that judicial intervention in extradition proceedings based on humanitarian considerations is inappropriate. Rather, humanitarian considerations are matters properly reviewed by the Department of State.") (citation omitted).  The Secretary takes into account humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the requesting country.  *See Escobedo*, 623 F.2d at 1105.  This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State."  *See In re Kaine*, 55 U.S. 103, 110 (1852).

## II.    STAPLETON SHOULD BE DETAINED.

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*.  The federal statutes governing extradition in the

United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail.  Further, the Bail Reform Act,

18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding

is not a criminal case.[34]  *See United States v. Risner*, No. 3:18-MJ-765-BN, 2018 WL 6809796,

at *5 (N.D. Tex. Dec. 27, 2018).  Rather, case law provides that bail should be granted in an

extradition proceeding "only in the most pressing circumstances, and when the requirements of

justice are absolutely peremptory."  *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986)

(quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

### A.    Applicable Law

1.    <u>A strong presumption against bail governs in an international extradition proceeding</u>

Unlike in domestic criminal cases, "there is no presumption favoring bail" in

extradition cases.  *In re Extradition of Russell*, 805 F.2d 1215, 1216 (5th Cir. 1986).  "[B]ail should

be granted only in the most pressing circumstances, and when the requirements of justice are

absolutely peremptory."  *Leitner*, 784 F.2d at 160 (quoting *In re Mitchell*, 171 F. 289, 289

(S.D.N.Y. 1909) (Hand, J.)).

This presumption against bail is rooted in *Wright v. Henkel*, 190 U.S. 40 (1903), where the

Supreme Court explained that when a foreign government makes a proper request under a valid

extradition treaty, the United States is obligated to deliver the person sought after he or she is

apprehended:

> The demanding government, when it has done all that the treaty and
> the law require it to do, is entitled to the delivery of the accused on

---

[34] The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2). Here, Stapleton is not charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather with offense committed in violation of the law of the requesting state, Germany.

> the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

*Id.* at 62.

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling. When, as here, the Government of Germany meets the conditions of the Treaty, the United States is obliged to deliver the fugitive. It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond. *See id.*; *see also Leitner*, 784 F.2d at 160–61 (the Government has an overriding foreign relations interest in complying with treaty obligations and producing extradited persons).

Further, while forfeiture of bail in domestic criminal cases is designed to compensate, at least in part, the court that is seeking the accused's presence for trial, forfeiture of bail in international extradition cases due to the failure of the fugitive to appear would leave Germany without either remedy or compensation.

> 2.   Fugitives must be detained unless they are neither a flight risk nor a danger to the community and establish "special circumstances"

Given the strong presumption against bail established in *Wright*, a fugitive may not be released on bail unless he demonstrates that (1) he is neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant his release. *See, e.g.*, *Russell*, 805 F.2d at

15

1216.[35]  "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In the Matter of the Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

       In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to flee based on the severity of the offense.  *See, e.g.*, *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that a "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk); *In re Extradition of Patel*, 08-430–MJ–HUBEL, 2008 WL 941628, at *2 (D. Or. Apr. 4, 2008) (considering that fugitive, a physician, had "more than sufficient assets available with which to flee").  Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight.  *See, e.g.*, *Perez-Cueva*, 2016 WL 884877, at *2 (special circumstances must exist in addition to absence of risk of flight).  "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance.  *Leitner*, 784 F.2d at 161; *see also Salerno*, 878 F.2d at 317-18 (lack of flight risk "is not a criteria for release in an extradition case").  Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances.  *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1384 (D. Nev. 1995).

---

[35] "[T]here is disagreement among the federal district courts regarding the burden of persuasion that a potential extraditee must satisfy . . . . [Some] courts require the person subject to international extradition to overcome the presumption against bail by presenting clear and convincing evidence that bail is warranted. . . . [and t]here is a negligible minority of courts that have adopted a preponderance of the evidence standard."  *In re Extradition of Garcia*, 761 F. Supp. 2d 468, 481 (S.D. Tex. 2010).

Where a fugitive claims special circumstances, "courts consistently agree that special circumstances are supposed to be limited to the most extraordinary circumstances and cannot involve factors applicable to all potential extraditees." *Garcia*, 761 F. Supp. 2d at 472. Courts have considered and rejected a lengthy list of would-be special circumstances – among them:

- The complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996); *United States v. Tang Yee-Chun*, 657 F. Supp. 1270, 1271-72 (S.D.N.Y. 1987);

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see, e.g.*, *In re Extradition of Smyth*, 976 F.2d 1535, 1535–36 (9th Cir. 1992);

- The fugitive's character, background, and/or ties to the community, *see, e.g.*, *Risner*, 2018 WL 6809796, at *22; *Beresford-Redman*, 753 F. Supp. 2d at 1089; *Matter of Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994);

- That the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160– 61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *1, 3–4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *In re Extradition of Huerta*, No. H–08–342M, 2008 WL 2557514, at *2 (S. D. Tex. June 23, 2008); *In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1301–02 (S.D. Fla. July 7, 2017); *In re the Extradition of Kyung Joon Kim*, 04-cv-3886, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004); *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 173–74 (S.D.N.Y. 2009); *Nezirovic v. Holt*, 990 F. Supp. 2d 594, 602 (W.D. Va. 2013); *In re Extradition of Rouvier*, 839 F. Supp. 537, 541–42 (N.D. Ill. 1993);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *In re Extradition of Antonowicz*, 244 F. Supp. 3d 1066, 1072 (C.D. Cal. 2017); *In re Extradition of Knotek*, No. 13-9204 BRO, 2016 WL 4726537, at *7 (C.D. Cal. Sept. 8, 2016); *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 84 (S.D.N.Y. July 3, 2003); *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at *3–4 (allegedly well-respected businessman); *Borodin v. Ashcroft*, 136 F. Supp. 2d 125,

17

131 (E.D.N.Y. Mar. 21, 2001); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581–82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g.*, *Rovelli*, 977 F. Supp. at 569;

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Salerno*, 878 F.2d at 318; *Martinelli Berrocal*, 263 F. Supp. 3d at 1297–98; *Antonowicz*, 2017 WL 1197855, at *3;

- The availability of bail for the same offense in the requesting country, *see, e.g.*, *Antonowicz*, 2017 WL 1197855, at *3; *Garcia*, 615 F. Supp. 2d at 172; *Kyung Joon Kim*, 2004 WL 5782517, at *2; *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1386–87 (D. Nev. May 24, 1995).

While in certain exceptional cases, some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

B.    Analysis

The Court should detain Stapleton without bond because he is a significant flight risk with a history of evading justice. Stapleton fled Germany immediately after authorities investigating the brutal rape and attempted murder came into contact with him. Now that Stapleton knows Germany has connected him to the crime through D.N.A. and other evidence, he has a strong incentive to flee yet again. *See, e.g.*, *In re Extradition of Garcia*, 761 F. Supp. 2d 468, 483 (S.D. Tex. 2010) (finding that fugitive "has virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof, there are significant risks that he will be formally extradited"); *see also, e.g.*, *In re Extradition of Shaw*, No. 14–MC–81475, 2015 WL 521183, at *9 (S.D. Fla. Feb. 6, 2015) ("[T]he Defendant is facing serious criminal sanctions in

Thailand, which fact provides him with a strong incentive to flee.").  Allowing bail in any amount, under any set of conditions, would not guarantee Stapleton's presence in court and would invite the possibility of embarrassing the United States in the conduct of its foreign affairs.

Stapleton also poses a danger to the community.  Stapleton is accused of attacking a woman as she walked home alone at night, raping her repeatedly in a dark and deserted public park, beating her over the head with a club, and dragging then dumping her body in a roadside ditch where he either thought or hoped she would succumb to the injuries he inflicted on her.  This is not the only criminal episode in Stapleton's past.  He has previously been convicted on charges of abduction, rape, attacking a police officer, and unlawful possession of a firearm.  The danger Stapleton poses to the community is plain.

Stapleton's risk of flight and danger to the community are each, alone, sufficient reason for the Court to deny any forthcoming application for bail.  However, even if the Court were somehow satisfied that Stapleton posed no flight risk and no danger, the government is unaware of any "special circumstances" that would justify bail in this case.  Should, however, the Court be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to

Germany, the government also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.

**Conclusion**

For the foregoing reasons, the United States requests that Stapleton be detained pending resolution of the extradition proceedings.

Dated: February 16, 2022           Respectfully submitted,

                              DARREN J. LAMARCA
                              UNITED STATES ATTORNEY

                      By: *s/ Theodore M. Cooperstein*
                              Theodore M. Cooperstein (MSB#106208)
                              Assistant U.S. Attorney
                              Ted.cooperstein@usdoj.gov
                              United States Attorney's Office
                              501 E. Court Street, Suite 4.430
                              Jackson, MS  39210
                              Tel: (601) 965-4480
                              Attorney for the Federal Republic of Germany

**<u>CERTIFICATE OF SERVICE</u>**

I, Theodore M. Cooperstein, Assistant United States Attorney, hereby certify that on February 16, 2022, I electronically filed the foregoing document with the Clerk of the Court, which provides notice to all counsel of record.

                              */s/ Theodore M. Cooperstein*
                              THEODORE M. COOPERSTEIN
                              Assistant United States Attorney